ORIGINAL

1  Richard B. Specter, SBN 114090
   Laura E. Mascheroni, SBN 196909
2  CORBETT, STEELMAN & SPECTER
   A Professional Law Corporation
3  18200 Von Karman Avenue, Suite 900
   Irvine, California 92612-1023
4  Telephone: (949) 553-9266
   Facsimile: (949) 553-8454
5  e-mail: rspecter@corbsteel.com

6  Attorneys for Plaintiff
   ACACIA RESEARCH CORPORATION

7

8              UNITED STATES DISTRICT COURT

9      CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

10

11  ACACIA RESEARCH                  )  Case No.  SACV 05-501 CJC (MLGx)
    CORPORATION, a California        )
12  corporation,                     )  Honorable Cormac J. Carney
                                     )
13              Plaintiff,            )
                                     )  FIRST AMENDED COMPLAINT FOR:
14         vs.                        )
                                     )  1)  BREACH OF CONTRACT;
15  NATIONAL UNION FIRE              )
    INSURANCE COMPANY OF             )  2)  BREACH OF COVENANT OF GOOD
16  PITTSBURGH, PA, a Pennsylvania   )      FAITH AND FAIR DEALING; and
    insurance company; and DOES 1    )
17  through 10, inclusive,           )  3)  VIOLATION OF CALIFORNIA
                                     )      BUSINESS & PROFESSIONS CODE
            Defendants.              )      §12700

19

22         Plaintiff ACACIA RESEARCH CORPORATION, a Delaware

    corporation, alleges in support of its First Amended Complaint as follows:

23                     **GENERAL ALLEGATIONS**

24  A.    The Parties.

25         1.    Plaintiff ACACIA RESEARCH CORPORATION (hereinafter

26  "Plaintiff") is a corporation organized and existing under the laws of the State of

27  Delaware, with its principal place of business located in the County of Orange,

28  State of California.

5760-001\18Jul05

                              -1-

1        2.     Plaintiff is informed and believes, and thereupon alleges, that

2  Defendant NATIONAL UNION FIRE INSURANCE COMPANY OF

3  PITTSBURGH, PA (hereinafter "National Union") is a member of American

4  International Group, is a Pennsylvania insurance company, organized and existing

5  under the laws of the State of Pennsylvania, and has its principal place of business

6  at 70 Pine Street, New York, New York 10270. Plaintiff is further informed and

7  believes that National Union is currently authorized to transact business in all

8  states and the District of Columbia, and maintains offices in and conducts business

9  in the County of Orange, State of California.

10       3.     DOES 1 through 10, inclusive, are sued herein under their fictitious

11  names and capacities for the reason that their true names and capacities are

12  presently unknown to Plaintiff and its counsel. Plaintiff is informed and believes,

13  and thereupon alleges, that such fictitiously named Defendants were and are also

14  responsible for the wrongs described herein based upon the fact that they were

15  either agents, joint venturers, co-conspirators, servants, partners and/or employees

16  of the named Defendants, or were somehow independently and/or jointly involved

17  and thereby responsible for the wrongdoing complained of herein. As soon as is

18  practicable after learning of the identities and the factual basis of the claims

19  against these fictitiously named Defendants, counsel for Plaintiff will take the

20  necessary steps to name said parties as Defendants herein.

21       4.     At all times herein, Defendants, and each of them, were the agents,

22  trustees, partners, joint venturers, servants, contractors and/or employees of their

23  co-Defendants, and the acts and omissions herein alleged were done by them,

24  acting through such capacity and within the scope of their authority, with the

25  permission and consent of their co-Defendants, or that said conduct was thereafter

26  ratified by each of the co-Defendants, and each of them is jointly and severally

27  liable to Plaintiff. The named Defendant, and the Doe Defendants are hereinafter

28  jointly referred to as "Defendants."

-2-

5.    The written contracts of insurance, the claims and the payments made by Plaintiff, and the acts complained of which are the subject matter of this Complaint, were entered into, made, and performed in the State of California.

B.    The Insurance Policy.

6.    Effective January 22, 1999, National Union issued its Directors, Officers and Corporate Liability Insurance Policy ("D&O Gold") to Plaintiff, being policy number 857-85-90, for the term from January 22, 1999, until January 22, 2001, which insurance policy was signed by National Union's President, Secretary and Authorized Representative.   By the terms of that policy, the named insureds included Plaintiff and, among others, Plaintiff's wholly-owned subsidiary known as CombiMatrix Corporation (hereinafter "CombiMatrix"). Plaintiff has fully paid the premiums for policy number 857-85-90 (hereinafter the "Policy"), and has otherwise fully complied with all of its duties and obligations under The Policy.  Plaintiff chose the Policy for the maximum protection that it purportedly offered.  A true and correct copy of The Policy is attached hereto as Exhibit "1" and incorporated herein by reference.

7.    On or about January 22, 2000, Plaintiff paid for, and National Union accepted, an increase in the coverage from a $5,000,000.00 to a $10,000,000.00 limitation on liability. A true and correct copy of Endorsement #10 to The Policy is attached hereto as Exhibit "2" and incorporated herein by reference.

8.    On or about March 9, 2000, Plaintiff paid for, and National Union accepted, an extension of The Policy to January 22, 2002.  A true and correct copy of Endorsement #12 to The Policy is attached hereto as Exhibit "3" and incorporated herein by reference.

9.    By the terms of The Policy, Defendants were required, *inter alia,* to advance and reimburse defense costs to Plaintiff, prior to the final disposition of the claim, for any claim arising, or potentially arising, under The Policy.

///

C.     Facts.

10.     On or about November 28, 2000, a civil litigation matter was commenced in the United States District Court for the Southern District of California against CombiMatrix and Dr. Donald D. Montgomery, an officer and director of CombiMatrix. This action, *Nanogen, Inc. v. Donald D. Montgomery and CombiMatrix Corp.*, case number 00CV2369JM (RBB) (hereinafter the "*Action*"), sought damages for which coverage was provided by The Policy. A true and correct copy of the Complaint in the *Action* is attached hereto as Exhibit "4" and incorporated herein by reference.

11.     CombiMatrix, as a wholly owned subsidiary of Plaintiff, is covered under the Policy as "a corporation of which the Named Corporation owns on or before the inception of the Policy Period more than 50% of the issued and outstanding voting stock either directly, or indirectly. . . ." (Section 2 (p)(1)(A) of The Policy). Dr. Donald Montgomery is covered under The Policy as a "Natural Person Insured" by his position as a director and officer of Combimatrix:

> This policy shall pay the Loss of each and every Natural Person Insured(s) arising from a Claim (including a Securities Claim and a year 2000 Claim) first made against the Natural Person Insured(s) during the Policy Period or the Discovery Period (if applicable) and reported to the Insurer pursuant to the terms of this policy for any actual or alleged Wrongful Action in their respective capacities as Natural Person Insured(s), except when and to the extent that the Company has indemnified the Natural Person Insureds. The Insurer shall, in accordance with and subject to Clause 8, advance Defense Costs of such Claim prior to its final disposition. (Section 1 of The Policy).

12.     Pursuant to the terms of The Policy, Plaintiff timely reported the *Action* to Defendants, and tendered it for defense, indemnification, and reimbursement of defense costs under the terms of The Policy.

13.     Plaintiff likewise timely reported and tendered the *Action* to its excess insurers, Royal Insurance Company of America ("Royal") and Federal

1   Insurance Company ("Federal"), pursuant to their respective policies.

2      14. Despite repeated requests by Plaintiff, National Union failed and

3   refused to meaningfully respond to Plaintiff's tender, other than to eventually

4   acknowledge receipt.  Pursuant to the excess policies, coverage would attach only

5   after the exhaustion of the National Union primary policy.  Royal and Federal both

6   declined to take any coverage position until such time as the National Union

7   policy was exhausted.  True and correct copies of those letters from Royal and

8   Federal are attached hereto as Exhibits "5" and "6" and incorporated herein by

9   reference.

10      15. National Union never asserted any coverage position, while never

11   providing coverage, either in the form of defense or indemnity.  It repeatedly

12   changed or eliminated personnel on Plaintiff's account and ultimately completely

13   ignored Plaintiff's claims.  As a result of National Union's abandonment, Plaintiff

14   was required to provide its own defense of the *Action* without reimbursement by

15   Defendants.

16      16. The *Action* was prosecuted by the then substantial law firm of

17   Brobeck, Phleger & Harrison, LLP.  At the time of the litigation, the Brobeck firm

18   had no less than three offices in the San Diego area alone, and a multitude of law

19   offices nationwide.  Indeed, the very first firm identified in the appendix to the

20   Policy as approved panel counsel for National Union was the Brobeck firm.  That

21   firm aggressively prosecuted the *Action* using no less than five (5) attorneys, of

22   which, Plaintiff is informed and believes, two of those attorneys handled the case

23   on a full-time basis.

24      17. Plaintiff was forced to use multiple law firms to defend the *Action*.

25      18. Plaintiff was required to provide its own defense to the *Action* for

26   both CombiMatrix and Dr. Montgomery.  Plaintiff provided this defense at its own

27   expense, for which Defendants, and each of them, were responsible, incurring in

28   excess of $1,848,733.00, in defense expenses, for which no payment has ever been

-5-

1   made by Defendants, or any of them, pursuant to the policy.

2       19.   In or around September of 2002, following abandonment by

3   Defendants, mounting legal fees, and the possibility that Plaintiff would face a

4   lengthy trial without any coverage, Plaintiff was forced to settle the *Action*.

5   Plaintiff settled the *Action* at its own expense, paying consideration of almost $20

6   million including future payments, for which no payment has been made by

7   Defendants, or any of them.

8       20.   Throughout the duration of the *Action*, Plaintiff repeatedly

9   contacted National Union and sought to obtain a response from it regarding its

10   coverage position.  Plaintiff also provided National Union with status reports

11   concerning the action and made available to National Union all pleadings and

12   discovery generated in the *Action*.

13       21.   After the conclusion of the *Action*, Plaintiff persisted in contacting

14   National Union on an ongoing basis.  Finally, on or about November 3, 2003,

15   almost three years after tender, and despite its clear duty to provide coverage to

16   Plaintiff, National Union for the first time responded to Plaintiff's requests with a

17   denial of coverage letter.  A true and correct copy of this letter is attached hereto

18   as Exhibit "7" and incorporated herein by reference.

19       22.   Pursuant to following provision in The Policy, Plaintiff demanded

20   and participated in non-binding mediation:

21       It is hereby understood and agreed that all disputes or differences
        which may arise under or in connection with this policy, whether
22       arising before or after termination of this policy, including any
        determination of the amount of Loss, shall be submitted to the
23       alternate dispute resolution process ("ADR") as set forth in this
        clause.

24

        . . . .
25

26       In the event of mediation, either party shall have the right to
        commence a judicial proceeding; provided, however, that no such
        judicial proceeding shall be commenced until the mediation shall
27       have been terminated and at least 120 days shall have elapsed from
        the date of the termination of the mediation. . .

28

-6-

| | |
|---|---|
| 1 | Either choice of ADR may be commenced in either New York, New York; Atlanta, Georgia; Chicago, Illinois; Denver, Colorado; |
| 2 | on in the state indicated in Item 1 of the Declarations page as the mailing address for the Named Corporation.  The Named |
| 3 | Corporation shall act on behalf of all Insured in deciding to proceed with ADR under this clause. |
| 4 | Section 17 of The Policy). |

23.     On or around August 11, 2004, Plaintiff and National Union

participated in mediation before the American Arbitration Association ("AAA"),

Mediator Gerald Phillips.  The mediation was thereafter concluded as

unsuccessful.  The 120-day post-mediation waiting period has elapsed, and

Plaintiff may now file this lawsuit.

## **FIRST CAUSE OF ACTION**

### **(Breach of Contract Against All Defendants)**

24.     Plaintiff incorporates by reference herein, as though fully set forth

hereat, each of the allegations contained in ¶¶1 through 23, above, inclusive.

25.     National Union entered into a standard form of its D&O Gold policy

with Plaintiff in which it promised and agreed to pay for the defense, judgment,

and/or settlement of Plaintiff's covered claims.

26.     National Union's policies are standardized contracts that were

drafted by National Union (and/or AIG) and imposed on its policyholders.

Policyholders were given the choice only of adhering to National Union's standard

policy language or rejecting the policy.  As such, the policies are contracts of

adhesion.

27.     Each policy was valid and enforceable at the time of the *Action*.

All conditions precedent to National Union's liability under its standardized D&O

Gold insurance policy have been performed by Plaintiff, including the payment of

all premiums necessary to keep the Policy in effect.

28.     The *Action*, and the claims and allegations contained and embodied

therein, constituted a claim for damages covered or potentially covered under The

Policy issued by Defendants, and each of them, and/or was within the reasonable

SACV 05-501 CJC(MLGx)
First Amended Complaint

1  expectations of coverage of Plaintiff.

2      29.    National Union breached the terms and provisions of The Policy by,

3  including but not limited to the following: (a); Failing to pay for a defense and/or

4  to indemnify Plaintiff; (b) Refusing to provide a defense and/or to indemnify

5  Plaintiff; (c) Failing to respond to Plaintiff's requests for indemnity and/or

6  defense; (d) Failing to pay legal fees and defense costs as set forth above; and (e)

7  Refusing to pay legal fees and defense costs as set forth above.

8      30.    As a direct and proximate result of Defendants' breaching of The

9  Policy in failing to provide coverage, indemnify and/or reimburse defense costs to

10  Plaintiff, Plaintiff has suffered damages in a sum in excess of $20 million, which

11  encompasses the defense expenses and the settlement payment.

12                    **SECOND CAUSE OF ACTION**

13          **(Breach of the Implied Covenant of Good Faith and Fair**

14                    **Dealing Against All Defendants)**

15      31.    Plaintiff incorporates by reference herein, as though fully set forth

16  hereat, each of the allegations contained in ¶¶ 1 through 23, and ¶¶ 25 through 30,

17  above, inclusive.

18      32.    National Union, in its standardized D&O Gold insurance contract

19  with Plaintiff, promised and agreed to pay for a defense and/or indemnify Plaintiff

20  for any claims covered or potentially covered under The Policy.

21      33.    Implied in the Policy is a covenant of good faith and fair dealing

22  that neither party will do anything to impair, frustrate or injure the right of the

23  other to receive the benefits of their agreement.

24      34.    Plaintiff complied with its contractual obligations to pay policy

25  premiums to National Union, as well as fulfilled its obligations of good faith and

26  fair dealing by, *inter alia*, repeatedly sending correspondence to National Union

27  regarding the *Action*, and reasonably defending and settling the *Action* to the best

28  of its ability given the circumstances.

35. Defendants, and each of them, have breached their duty of good faith and fair dealing owed to Plaintiff by, including but not limited to:

a. Unreasonably and in bad faith failing to engage in proper claims handling practices by ignoring Plaintiff's repeated requests for assistance and/or tender throughout the duration of the *Action*;

b. Unreasonably and in bad faith failing to respond promptly and accurately to communications from Plaintiff and its representatives;

c. Unreasonably and in bad faith failing to fairly and promptly conduct an independent investigation and analysis of the claims tendered to them by Plaintiff in compliance with the Policy;

d. Unreasonably and in bad faith delaying to state a coverage position;

e. Unreasonably and in bad faith failing to provide a timely and ongoing defense to Plaintiff based upon the potential for coverage on all or parts of the claims tendered to them;

f. Unreasonably and in bad faith failing to compensate Plaintiff in the amount promised for losses covered or potentially covered under the Policy and/or was within the reasonable expectations of coverage of Plaintiff;

g. Unreasonably and in bad faith failing to acknowledge their duty to indemnify Plaintiff in the claim tendered to them;

h. Unreasonably and in bad faith failing to pay the costs of defense and indemnity of the action tendered to them;

i. Unreasonably and in bad faith applying the policy terms in a manner to attempt to defeat with coverage, with regard to the proper meaning of the express terms thereof;

j. Unreasonably and in bad faith requiring Plaintiff to pay the entire settlement of the *Action*;

k. Unreasonably and in bad faith purporting that National Union

SACV 05-501 CJC(MLGx)
First Amended Complaint

1   does not have to contribute to the settlement of the *Action* because it did not
2   consent to the settlement, after refusing to respond to any of Plaintiff's tender
3   letters regarding the *Action*;

4          l.      Unreasonably and in bad faith compelling Plaintiff to institute
5   this action to obtain the benefits due them; and

6          m.      Unreasonably and in bad faith abandoning Plaintiff and
7   thereby forcing Plaintiff to settle the *Action.*

8          36.     National Union, and all Defendants, engaged in these claims
9   practices knowing that Plaintiff would suffer financial harm. In so doing,
10  Defendants, and each of them, deprived Plaintiff of the very protection that it was
11  promised, which it trusted National Union and all Defendants to provide, and for
12  which Plaintiff paid substantial premiums. All Defendants placed their interests
13  in maximizing gains and limiting disbursements above the interests of their
14  insureds.

15         37.     Defendants, and each of them, were fully aware of their obligations
16  to Plaintiff, and that Defendants' refusal to honor their respective contracts of
17  insurance was motivated solely by their own economic concerns in conscious
18  disregard of Plaintiff's rights.

19         38.     Defendants' conduct described herein was intended by Defendants
20  to cause injury to Plaintiff, and was despicable conduct carried on by Defendants
21  in willful and conscious disregard of the rights of Plaintiff, subjecting Plaintiff to
22  cruel and unjust hardship in conscious disregard of Plaintiff's rights or was an
23  intentional misrepresentation, deceit or concealment of a material fact known to
24  National Union and all Defendants with the intention to deprive Plaintiff of
25  property, legal rights or to otherwise cause injury, such as to constitute malice,
26  oppression or fraud under California *Civil Code* §3294, thereby entitling Plaintiff
27  to punitive damages against each and all of the Defendants in an amount
28  appropriate to punish or set an example of Defendants.

39.     Defendants' conduct described herein was undertaken by the corporate officers or managing agents of Defendants, identified herein as DOES 1 through 5, who were responsible for claim supervision, and operations, underwriting, communications and/or decisions.  The aforementioned conduct of said managing agents and individuals was therefore undertaken on behalf of the corporate Defendants.  Said corporate Defendants further had advance knowledge of the actions and conduct of said individuals whose actions and conduct were ratified, authorized, and approved by managing agents who precise identities are unknown to Plaintiff at this time and are therefore identified and designated herein as DOES 1 through 5, inclusive.

40.     As a consequence of Defendants' breach of the implied covenant of good faith and fair dealing, National Union has wrongfully profited and benefitted and continues to wrongfully profit and benefit from the monies saved by its wrongful claims handling practices and by failing to compensate and/or reimburse Plaintiff in the amount promised for losses covered under the Policy.

41.     As a proximate result of the unreasonable and bad faith conduct of Defendants, Plaintiff was forced to retain and pay counsel to represent it in the *Action*, and forced to pay money for legal fees and defense costs in the *Action*.

42.     As a further proximate result of the unreasonable and bad faith conduct of Defendants, Plaintiff was forced to pay money and other consideration to settle the *Action* in an effort to protect its own interests, and by virtue of Defendants' wrongful refusal to pay fees and costs as agreed, and on a timely basis, and to pay any judgment rendered, or settlement reached, in the *Action* tendered to Defendants.

43.     As a further direct and proximate result of the foregoing conduct, Plaintiff has been required to retain counsel to institute this litigation in order to obtain the full benefits of the policies which have been wrongfully withheld by Defendants, and each of them; Plaintiff will be required to expend further costs

1  and attorney fees in the prosecution of this litigation to obtain said benefits and

2  Plaintiff is therefore entitled to recovery of all such costs and attorney fees

3  incurred in an amount presently unascertainable, but according to proof at the time

4  of trial herein, pursuant to *Brandt v. Superior Court* (1985) 37 Cal.3d. 813.

5      44.   As a further proximate result of the unreasonable and bad faith

6  conduct of Defendants, Plaintiff has suffered general damages and other

7  consequential economic damages in a sum to be determined at trial, in excess of

8  the minimum jurisdiction of this Court.

9              **THIRD CAUSE OF ACTION**

10     **(California *Business & Professions Code* 17200, et seq. Against All**

11  **Defendants)**

12      45.   Plaintiff incorporates by reference herein, as though fully set forth

13  hereat, each of the allegations contained in ¶¶1 through 23, ¶¶ 25 through 30, and

14  ¶¶ 32 through 44, above, inclusive.

15      46.   California *Business & Professions Code* §17200 prohibits any

16  "unlawful ... business act or practice."  National Union and DOES 1 through 10

17  conspired and acted in concert to violate *Business. & Professions Code* §17200's

18  prohibition against engaging in an unlawful act or practice by, *inter alia*, the

19  following:

20      a.   Defendants acted unreasonably and in bad faith toward

21  Plaintiff as set forth more fully elsewhere in this Complaint.

22      b.   In violation of California *Insurance Code* §790.03(h),

23  Defendants knowingly:

24          i.   Misrepresented to claimant pertinent facts or insurance

25          policy provisions relating to coverage at issue by, *inter alia*,

26          promising to reimburse Plaintiff for defense costs prior to the final

27          disposition of the claim;

28          ii.   Failed to acknowledge and act reasonably promptly upon

communications with respect to claims arising under The Policy, as set forth elsewhere in this Complaint;

       iii.   Failed to adopt and implement reasonable standards for the prompt investigation and processing of claims arising under insurance policies, as demonstrated, *inter alia*, by Defendants' repeated failures to respond to Plaintiff's tender and other defense-related requests;

       iv.   Failed to affirm or deny coverage of claims within a reasonable time after proof of loss requirements were completed and submitted by Plaintiff;

       v.   Failed to attempt, in good faith, to effectuate prompt, fair, and equitable settlement of the *Action*; and

       vi.   Compelled Plaintiff to institute litigation to recover amounts due under the Policy;

47.   The above-described acts of unfair competition conducted by Defendants still continue to this day and present a threat to Plaintiff in that, *inter alia,* Defendants continue to refuse to restore Plaintiff to its pre-*Action* position by failing to reimburse defense costs and/or insurance premiums, in which Plaintiff has an ownership interest, thereby causing generalized economic hardship on Plaintiff and its continued operation in the market.

48.   As a result of the foregoing conduct Defendants have been, and will be, unjustly enriched and continue to benefit therefrom by their failure to reimburse defense costs to Plaintiff or to restore Plaintiff to the *status quo ante*. Specifically, as a result of Defendants' acts of unfair competition, Defendants have been unjustly enriched and have benefitted in the amount of ten million dollars and insurance premium payments in which Plaintiff has an ownership interest.

49.   Plaintiff reserves the right to allege other violations of law which constitute other unlawful business acts or practices. Such conduct is ongoing and

5760-001\18Jul05

-13-

1   continues to this date.  Plaintiff is therefore entitled to the relief described below.

2   **PRAYER**

3   WHEREFORE, Plaintiff prays for judgment against Defendants, and each

4   of them, as follows:

5   1.   Damages for failure to pay for defense and/or indemnification, plus

6   interest, including pre-judgment interest, and other economic and consequential

7   damages, in a sum to be determined at the time of trial;

8   2.   For all economic damages proximately caused by Defendants'

9   conduct;

10   3.   For attorneys' fees, and cost of litigation, incurred by Plaintiff to

11   obtain the benefits of the Policy, in an amount to be determined at the time of trial;

12   4.   For general and compensatory damages in an amount to be

13   determined at the time of trial;

14   5.   For punitive and exemplary damages in an amount appropriate to

15   punish and set an example of Defendants, and each of them;

16   6.   For declaratory and injunctive relief as permitted by law or equity,

17   including restitution for defense costs, settlement costs, and insurance premium

18   payments incurred in the *Action*;

19   7.   For costs of suit incurred herein; and

20   8.   For such other and further relief as the Court deems just and proper

21   under the circumstances.

22   DATED:   July 18, 2005                    CORBETT, STEELMAN & SPECTER

23                                             A Professional Law Corporation

24

25                                             By:

26                                             Richard B. Specter
                                               Laura E. Mascheroni
27                                             Attorneys for Plaintiff
                                               ACACIA RESEARCH
28                                             CORPORATION

SACV 05-501 CJC(MLGx)
First Amended Complaint

**EXHIBIT 1**

POLICY NUMBER:
857-85-90
R/N:
861-06-22

 **American International Companies**

☐AIU Insurance Company                    ☐Granite State Insurance Company
☐American Home Assurance Company          ☐Illinois National Insurance Co.
☐American International Pacific Insurance Company   ☒National Union Fire Insurance Company of Pittsburgh, Pa.
☐American International South Insurance Company     ☐National Union Fire Insurance Company of Louisiana
☐Birmingham Fire Insurance Company of Pennsylvania ☐New Hampshire Insurance Company

(each of the above being a capital stock company)

---

### DIRECTORS, OFFICERS AND CORPORATE LIABILITY INSURANCE POLICY
### D&O GOLD

**NOTICE: THIS IS A CLAIMS MADE POLICY. EXCEPT TO SUCH EXTENT AS MAY OTHERWISE BE PROVIDED HEREIN, THE COVERAGE OF THIS POLICY IS GENERALLY LIMITED TO LIABILITY FOR ONLY THOSE CLAIMS THAT ARE FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD AND REPORTED IN WRITING TO THE INSURER PURSUANT TO THE TERMS HEREIN. PLEASE READ THE POLICY CAREFULLY AND DISCUSS THE COVERAGE THEREUNDER WITH YOUR INSURANCE AGENT OR BROKER.**

**NOTICE: THE LIMIT OF LIABILITY AVAILABLE TO PAY JUDGMENTS OR SETTLEMENTS SHALL BE REDUCED BY AMOUNTS INCURRED FOR LEGAL DEFENSE. AMOUNTS INCURRED FOR LEGAL DEFENSE SHALL BE APPLIED AGAINST THE RETENTION AMOUNT.**

**NOTICE: THE INSURER DOES NOT ASSUME ANY DUTY TO DEFEND; HOWEVER, THE INSURER MUST ADVANCE DEFENSE COSTS PAYMENTS PURSUANT TO THE TERMS HEREIN PRIOR TO THE FINAL DISPOSITION OF A CLAIM.**

## DECLARATIONS

ITEM 1.   NAMED CORPORATION:   ACACIA RESEARCH CORPORATION

          MAILING ADDRESS:   12 SOUTH RAYMOND
                             PASADENA, CA 91105

          STATE OF INCORPORATION OF THE NAMED CORPORATION:   California

ITEM 2.   SUBSIDIARY COVERAGE:  any past, present or future Subsidiary of the Named Corporation

ITEM 3.   POLICY PERIOD:   From:   January 22, 1999   To:   January 22, 2001
          (12:01 A.M. standard time at the address stated in Item 1.)

ITEM 4.   LIMIT OF LIABILITY:  $5,000,000        aggregate for Coverages
                                                 A, B and C combined
                                                 (including Defense Costs)

70321 (4/98)

Exhibit _1_ page _1_
Page _15_

**Exhibit "1"**

Case 8:05-cv-00187-DOC-MLG Document 10 Filed 07/13/05 Page 17 of 161 Page ID #:3488

**ITEM 5.**     RETENTION:

#### SECURITIES CLAIMS (INCLUDING YEAR 2000 SECURITIES CLAIMS):

| | |
|---|---|
| Judgments & Settlements (all coverages) | None |
| Defense Costs (non-Indemnifiable Loss) | None |
| Defense Costs (Coverage B(i) and Indemnifiable Loss ) | **$150,000** for Loss arising from Claims alleging the same Wrongful Act or related Wrongful Acts (waivable under Clause 6 in certain circumstances) |

#### YEAR 2000 CLAIMS (OTHER THAN YEAR 2000 SECURITIES CLAIMS:

| | |
|---|---|
| Judgments, Settlements and Defense Costs (non-Indemnifiable Loss) | None |
| Judgments, Settlements and Defense Costs (Coverage B(ii) and Indemnifiable Loss) | **$150,000** for Loss arising from Claims alleging the same Wrongful Act or related Wrongful Acts (waivable under Clause 6 in certain circumstances) |

#### OTHER CLAIMS:

| | |
|---|---|
| Judgements, Settlements and Defense Costs (non-Indemnifiable Loss) | None |
| Judgements, Settlements and Defense Costs Indemnifiable Loss | **$150,000** for Loss arising from Claims alleging the same Wrongful Act or related Wrongful Acts |

**ITEM 6.**     YEAR 2000 THIRD PARTY CLAIMS ALLOCATION

| | |
|---|---|
| Judgements, Settlements and Defense Costs (non-Indemnifiable Loss) | 100% |

Coverage B(ii) and Indemnifiable Loss:

#### DEFENSE COSTS

| | |
|---|---|
| (A) Pre-trial | 25% |
| (B) Trial and appeal | 100% |

#### SETTLEMENTS AND JUDGEMENTS

| | |
|---|---|
| (C) Joint Settlements and Judgements (except in (D) below) | 10% |
| (D) Joint Judgements (Company insolvency) | 100% |

**ITEM 7.**     CONTINUITY DATES:

A.     All Coverages (other than Outside Entity Coverage)   1/22/98

B.     Outside Entity Coverage: Per Outside Entity: See Endorsement #2

70321 (4/98)

Exhibit 1 page 2

Page 16

ITEM 8.　　　PREMIUM:　　　$173,250

ITEM 9.　　　NAME AND ADDRESS OF INSURER ("Insurer"):
　　　　　　　(This policy is issued only by the insurance company indicated below.)

　　　　　　　National Union Fire Insurance Company of Pittsburgh, Pa.
　　　　　　　175 Water Street
　　　　　　　New York, NY 10038

IN WITNESS WHEREOF, the Insurer has caused this policy to be signed by on the Declaration Page its President, Secretary and a duly authorized representative of the Insurer.

**PRESIDENT**　　　　　　　　　　　　　　　**SECRETARY**

**AUTHORIZED REPRESENTATIVE**

**COUNTERSIGNATURE DATE**　　　　　　　　　**COUNTERSIGNED AT**

**COSTELLO, THOMAS FRANCIS**
**40 WEST COCHRAN STREET**
**SIMI VALLEY, CA 93065**

70321 (4/98)

Exhibit _1_ page _3_
Page _17_

# DIRECTORS, OFFICERS AND CORPORATE LIABILITY INSURANCE POLICY

## D&O GOLD℠

In consideration of the payment of the premium, and in reliance upon the statements made to the Insurer by application forming a part hereof and its attachments and the material incorporated therein, the insurance company designated in Item 9 of the Declarations, herein called the "Insurer", agrees as follows:

## 1. INSURING AGREEMENTS

### COVERAGE A: NATURAL PERSON INSUREDS INSURANCE

This policy shall pay the Loss of each and every Natural Person Insured(s) arising from a Claim (including a Securities Claim and a Year 2000 Claim) first made against the Natural Person Insured(s) during the Policy Period or the Discovery Period (if applicable) and reported to the Insurer pursuant to the terms of this policy for any actual or alleged Wrongful Act in their respective capacities as Natural Person Insured(s), except when and to the extent that the Company has indemnified the Natural Person Insureds. The Insurer shall, in accordance with and subject to Clause 8, advance Defense Costs of such Claim prior to its final disposition.

### COVERAGE B: CORPORATE LIABILITY INSURANCE

This policy shall pay the Loss of the Company arising from a:

      (i)   Securities Claim (including a Year 2000 Securities Claim) first made against the Company, or

      (ii)   Year 2000 Third Party Claim first made against the Company, or

      (iii) Claim (including a Securities Claim or Year 2000 Claim) first made against a Natural Person Insured(s),

during the Policy Period or the Discovery Period (if applicable) and reported to the Insurer pursuant to the terms of this policy for any actual or alleged Wrongful Act, but, in the case of (ii) above, only during the time that the Claim was also made against a Director or Officer, and, in the case of (iii) above, only to the extent that the Company has indemnified the Natural Person Insureds for such Loss pursuant to law, common or statutory, or contract, or the Charter or By-laws of the Company duly effective under such law which determines and defines such rights of indemnity. The Insurer shall, in accordance with and subject to Clause 8, advance Defense Costs of such Claim prior to its final disposition.

### COVERAGE C: YEAR 2000 CRISISFUND℠ INSURANCE

This policy shall pay the Year 2000 Crisis Loss of the Company arising from a Year 2000 Crisis first occurring during the Policy Period and reported to the Insurer pursuant to Clause 7(a) of this policy up to the maximum of the Year 2000 CrisisFund℠. Clause 4, Exclusions, shall not be applicable to Year 2000 Crisis Loss. There shall be no Retention amount applicable to Year 2000 Crisis Loss, and the Insurer shall pay such Loss from first dollar subject to the other terms and conditions of this policy. Clause 8 of this policy shall have no applicability to any Year 2000 Crisis.



Exhibit 1 page 4

Page 18

## 2.  DEFINITIONS

(a)  "Claim" means:

   (1)  a written demand for monetary or non-monetary relief;
   (2)  a civil, criminal, administrative, regulatory or arbitration proceeding for monetary or non-monetary relief which is commenced by:
   (i) service of a complaint or similar pleading; or
   (ii) return of an indictment, information or similar document (in the case of a criminal proceeding); or
   (iii) receipt or filing of a notice of charges; or
   (3)  a civil, criminal, administrative or regulatory investigation (including a Securities and Exchange Commission, Equal Employment Opportunity Commission or grand jury investigation) of a Natural Person Insured but only after such Natural Person Insured is identified in writing by the investigating authority as a person against whom a proceeding described in clause (2) above may be commenced, or in the case of a securities investigation, after the service of a subpoena on such Natural Person Insured.

The term "Claim" shall include a Securities Claim and a Year 2000 Claim; provided, however, that with respect to Coverage B(i) only,  Claim or Securities Claim shall not mean an administrative or regulatory proceeding against the Company.

(b)  "Company" means the entity designated in Item 1 of the Declarations and any Subsidiary thereof and any limited liability company specifically listed in an endorsement to this policy ("LLC"); and, in the event any bankruptcy proceeding shall be instituted by or against the Named Corporation or any Subsidiary thereof or any LLC, the Debtor in Possession (or equivalent status outside the United States), if any.

(c)  "Continuity Date" means the date set forth in:

   (1)  Item 7A of the Declarations with respect to all coverages (other than Outside Entity Coverage); or

   (2)  Item 7B of the Declarations with respect to a Claim against a Director or Officer arising out of such Director or Officer serving as a director, officer, trustee or governor of an Outside Entity.

(d)  "Defense Costs" means reasonable and necessary fees, costs and expenses consented to by the Insurer (including premiums for any appeal bond, attachment bond or similar bond arising out of a covered judgment, but without any obligation to apply for or furnish any such bond) resulting solely from the investigation, adjustment, defense and appeal of a Claim against the Insureds, but excluding salaries of Officers or Employees of the Company.

Further, with respect to the limit of liability set forth in Clause 5(c)(1), Defense Costs shall also include the reasonable and necessary fees, costs and expenses consented to by the Insurer resulting solely from the prosecution or appeal of a Year 2000 Claim brought by the Insured in the same proceeding as a counterclaim, cross-claim or third-party claim which results directly from a Year 2000 Claim brought against such Insured ("Prosecution Costs").

Exhibit  1  page  5
Page  19

(e) "Director(s) or Officer(s)" means any past, present or future duly elected or appointed directors or officers of the Company or any past, present or future duly elected, appointed or designated member of the Board of Managers or officers of an LLC. In the event the Named Corporation, a Subsidiary or a LLC thereof operates outside the United States, then the term "Director(s) or Officer(s)" shall also mean those titles, positions or capacities in such foreign Named Corporation, Subsidiary or LLC which is equivalent to the position of Director or Officer in a corporation incorporated or LLC formed within the United States. Coverage will automatically apply to all new Directors and Officers after the inception date of this policy.

(f) "Employment Practices Violation(s)" means any actual or alleged:

(1) wrongful dismissal, discharge or termination (either actual or constructive) of employment, including breach of an implied contract;

(2) harassment (including sexual harassment whether "quid pro quo", hostile work environment or otherwise);

(3) discrimination, (including but not limited to discrimination based upon age, gender, race, color, national origin, religion, sexual orientation or preference, pregnancy, or disability);

(4) retaliation (including lockouts);

(5) employment-related misrepresentation(s) to an Employee or applicant for employment with the Company or an Outside Entity;

(6) employment-related libel, slander, humiliation, defamation or invasion of privacy;

(7) wrongful failure to employ or promote;

(8) wrongful deprivation of career opportunity, wrongful demotion or negligent employee evaluation, including the giving of negative or defamatory statements in connection with an employee reference;

(9) wrongful discipline;

(10) failure to grant tenure;

(11) failure to provide or enforce adequate or consistent corporate policies and procedures relating to any other Employment Practices Violation;

(12) violation of any natural person's civil rights relating to any of the above,

but only if the Employment Practices Violation relates to an Employee(s), Officer or applicant(s) for employment, with the Company or an Outside Entity, whether direct, indirect, intentional or unintentional.

Exhibit __1__ page __6__
Page __20__

With respect to any customer(s), client(s) or other natural person(s), other than an Employee, Officer or applicant for employment with the Company or an Outside Entity, Employment Practices Violation shall mean only any actual or alleged discrimination, sexual harassment or violation of any natural person's civil rights relating to such discrimination or sexual harassment, whether direct, indirect, intentional or unintentional.

(g)   "Employee" means any past, present or future employee of the Company (other than an employee who is a Director or Officer) whether such employee is full-time, part-time, seasonal, permanent or temporary and shall include employees in a supervisory, managerial, co-worker or subordinate position or otherwise.

(h)   "Indemnifiable Loss" means Loss for which the Company has indemnified or is permitted or required to indemnify a Natural Person Insured.

(i)   "Insured(s)" means:

   (1)   with respect to Coverages A and B(iii), any Natural Person Insured;

   (2)   with respect to Coverage B(i) only, the Company; and

   (3)   with respect to Coverage B(ii) only, the Company, but only during the time that the Claim was also made against a Director or Officer.

(j)   "Loss" means damages, judgments (including any award of pre-judgment and post-judgment interest), settlements, Defense Costs and Year 2000 Crisis Loss; however, Loss shall not include civil or criminal fines or penalties imposed by law, punitive or exemplary damages, the multiplied portion of multiplied damages, taxes, any amount for which the Insureds are not financially liable or which are without legal recourse to the Insureds, any judgment solely against, or settlement solely by, the Company and/or any Employee in a Year 2000 Third Party Claim, any cost or expense incurred by the Company in connection with the assessing, auditing, testing, correcting, converting, renovating, rewriting, designing, evaluating, inspecting, installing, maintaining, repairing or replacing any Computer System of the Company with respect to a potential Year 2000 Problem (as such terms are defined below in definition (r)).

In the event of a Claim alleging that the price or consideration paid or proposed to be paid for the acquisition or completion of the acquisition of all or substantially all of the stock issued by or assets owned by any entity is inadequate or excessive, Loss with respect to such Claim shall not include any amount of any judgment or settlement by which such price or consideration is increased or decreased, directly or indirectly; provided, however, that the foregoing shall not apply to any non-Indemnifiable Loss resulting from any judgment (other than a stipulated judgment) against a Natural Person Insured.

Notwithstanding the foregoing, with respect to Securities Claims only and subject to the other terms, conditions and exclusions of the policy, Loss shall include punitive or exemplary damages imposed upon any Insured. It is further understood and agreed that the enforceability of the foregoing coverage shall be governed by such applicable law which most favors coverage for punitive or exemplary damages.

Exhibit 1   page 7
Page 21

(k) "Natural Person Insured(s)" means:

    (1) with respect to all Claims any Director or Officer;

    (2) with respect to Securities Claims, any Employee; and

    (3) with respect to Year 2000 Third Party Claims, any Employee, but only during the time that the Claim was also made against a Director or Officer.

(l) "No Liability" means with respect to a Securities Claim or a Year 2000 Third Party Claim made against the Insured(s): (1) a final judgment of no liability obtained prior to trial, in favor of all Insureds, or with respect to a Year 2000 Third Party Claim, in favor of all Directors and Officers, by reason of a motion to dismiss or a motion for summary judgment, after the exhaustion of all appeals; or (2) a final judgment of no liability obtained after trial, in favor of all Insureds, or with respect to a Year 2000 Third Party Claim, in favor of all Directors and Officers, after the exhaustion of all appeals.  In no event shall the term "No Liability" apply to a Claim made against an Insured for which a settlement has occurred.

(m) "Outside Entity" means:

    (1) any not-for-profit organization; or

    (2) any other corporation, partnership, joint venture or other organization listed by endorsement to this policy.

(n) "Policy Period" means the period of time from the inception date shown in Item 3 of the Declarations to the earlier of the expiration date shown in Item 3 of the Declarations or the effective date of cancellation of this policy.

(o) "Securities Claim" means a Claim (including a civil lawsuit or criminal proceeding brought by any governmental body) made against an Insured and brought anywhere in the world alleging a violation of any law, regulation or rule, whether statutory or common law, which is

    (1) brought by any person or entity alleging, arising out of, based upon or attributable to, in part or in whole, the purchase or sale or offer or solicitation of an offer to purchase or sell, any securities of the Company, or

    (2) in the form of a securities holder derivative claim brought on the behalf of the Company, or

    (3) brought by a securities holder of the Company, with respect to such securities holder's interest in such securities of the Company, whether directly or by class action.

(p) "Subsidiary" means:

    (1) (A) a corporation of which the Named Corporation owns on or before the inception of the Policy Period more than 50% of the issued and outstanding voting stock either directly, or indirectly through one or more of its Subsidiaries or (B) a corporation of which the Named Corporation owns on or before the inception of the Policy Period exactly 50% of the issued and outstanding voting stock and which, pursuant to or in connection with a written agreement with the owner(s) of the remaining 50% of the issued and outstanding voting stock of such corporation, solely controls such corporation (a "Controlled Joint Venture"), in each case either directly, or indirectly through one or more of its Subsidiaries;

Exhibit __1__ page __8__

Page __22__

(2) automatically a corporation whose assets total less than 15% of the total consolidated assets of the Company as of the inception date of this policy, which corporation becomes a Subsidiary during the Policy Period. The Named Corporation shall provide the Insurer with full particulars of the new Subsidiary before the end of the Policy Period;

(3) a corporation which becomes a Subsidiary during the Policy Period (other than a corporation described in paragraph (2) above) but only upon the condition that within 90 days of its becoming a Subsidiary, the Named Corporation shall have provided the Insurer with full particulars of the new Subsidiary and agreed to any additional premium and/or amendment of the provisions of this policy required by the Insurer relating to such new Subsidiary. Further, coverage as shall be afforded to the new Subsidiary is conditioned upon the Named Corporation paying when due any additional premium required by the Insurer relating to such new Subsidiary;

(4) a not-for-profit organization under section 501(c)(3) of the Internal Revenue Code of 1986 (as amended) sponsored exclusively by the Company.

A corporation becomes a Subsidiary when the Named Corporation (1) owns more than 50% of the issued and outstanding voting stock or (2) in the case of a Controlled Joint Venture, owns exactly 50% of the issued and outstanding voting stock and, pursuant to or in connection with a written agreement with the owner(s) of the remaining 50% of the issued and outstanding voting stock of such corporation, solely controls such corporation, in each case either directly, or indirectly through one or more of its Subsidiaries. A corporation ceases to be a Subsidiary when the Named Corporation (1) ceases to own more than 50% of the issued and outstanding voting stock, either directly, or indirectly through one or more of its Subsidiaries or (2) in the case of a Controlled Joint Venture, ceases to own exactly 50% of the issued and outstanding voting stock or solely to control, pursuant to or in connection with a written agreement with the owner(s) of the remaining 50% of the issued and outstanding voting stock of such corporation, such corporation, in each case either directly, or indirectly through one or more of its Subsidiaries.

In all events, coverage as is afforded with respect to a Claim made against a Subsidiary or any Natural Person Insured thereof shall only apply for Wrongful Acts committed or allegedly committed after the effective time that such Subsidiary became a Subsidiary and prior to the time that such Subsidiary ceased to be a Subsidiary.

(q) "Wrongful Act" means:

(1) with respect to a Director or Officer, any actual or alleged Employment Practice Violation or other actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or act by the Directors or Officers in their respective capacities as such, or any matter claimed against them solely by reason of their status as Directors or Officers of the Company, or any matter claimed against a Director or Officer arising out of their serving as a director, officer, trustee or governor of an Outside Entity in such capacities, but only if such service is at the specific written request or direction of the Company, and

(2) with respect to an Employee, any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or act by the Employees in their respective capacities as such or any matter claimed against them solely by reason of their status as Employees of the Company but solely as respects a Securities Claim or a Year 2000 Claim, and

(3) with respect to the Company, any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or act by the Company, but solely as respects a Securities Claim or Year 2000 Claim.

(r) "Year 2000 Claim" means: (i) any Claim (including a Securities Claim) against a Director(s) or Officer(s), or (ii) any Year 2000 Securities Claim against the Company and/or any Employee, or (iii) any Year 2000 Third Party Claim against the Company and/or any Employee (but only during the time the Claim is also made against a Director or Officer) alleging, arising out of, based upon, attributable to or involving, directly or indirectly, in whole or in part:

    (1) any computer, computer system or code (including but not limited to firmware, hardware, microprocessors, software, operating systems, networks, peripherals attached to or used in conjunction with any of the foregoing, or any other computerized or electronic equipment or components) ("Computer System"); of any organization (whether or not an Insured):

        (A) failing to accurately and properly read, process, perform mathematical calculations, store, sort, distinguish, recognize, accept or interpret prior to, during or after, the year 2000 any data containing date information;

        (B) failing to accurately and properly read and process the fact that the year 2000 is a leap year;

        (C) reading and processing so-called "magic dates" such as the date "9/9/99" or any other date field data used by an organization to signify information other than the date;

        (D) failing to be compatible with any other organization's Computer System with respect to (A), (B) and (C) above.

    (the foregoing individually or collectively being sometimes referred to as the "Year 2000 Problem");

    (2) any assessing, auditing, correcting, converting, renovating, rewriting, designing, evaluating, inspecting, installing, maintaining, repairing or replacing any Computer System with respect to a potential or actual Year 2000 Problem, or any failure to do any of the foregoing activities, or any disclosure, advice, consultation or supervision of any of the foregoing activities or any failure relating thereto.

(s) "Year 2000 Crisis" means a Negative Earnings or Sales Announcement resulting from a Year 2000 Problem which, in the good faith opinion of the chief financial officer of the Named Corporation reported in writing to the Insurer pursuant to Clause 7(a) of the policy, reasonably may have been associated with, or reasonably has the potential to be associated with, a Material Effect on the Company's Common Stock Price within a period of 48 hours after the time of the public announcement.

"Negative Earnings or Sales Announcement" means a public announcement of the Company's past or future earnings or sales which is substantially below: (1) the Company's last prior public statement or projection of earnings or sales for such period, (2) the last consensus outside securities analysts' estimate as published by First Call (or if First Call does not publish financial estimates regarding the Company then any other similar consensus outside analysis estimate), or (3) the Company's prior year's earnings or sales for the same period.

Exhibit 1 page 10
Page 24

"Material Effect on the Company's Common Stock Price" means that the price per share of the Company's common stock shall experience a decrease net of the change in the Standard & Poor's Composite Stock Index of the greater of: $5 per share ($2.50 per share if the Company is solely traded on The Nasdaq Stock Market) or 10%.

(t) "Year 2000 Crisis Fund" means Ten Thousand Dollars ($10,000).

(u) "Year 2000 Crisis Loss" means the following amounts incurred during the Pendency of a Year 2000 Crisis, regardless of whether a Claim is ever made against an Insured arising from the Year 2000 Crisis and, in the case where a Claim is made, regardless of whether the amount is incurred prior to or subsequent to the making of the Claim:

  (1) amounts for which the Company is legally liable for the reasonable and necessary fees and expenses incurred by a Year 2000 Crisis Management Firm in the performance of Year 2000 Crisis Management Services for the Company arising from a Year 2000 Crisis; and

  (2) amounts for which the Company is legally liable for the reasonable and necessary printing, mailing of materials, or travel by Directors, Officers, Employees or agents of the Company or the Year 2000 Crisis Management Firm in connection with the Year 2000 Crisis.

The "Pendency of a Year 2000 Crisis" means the period of time beginning when the Year 2000 Crisis or anticipated Year 2000 Crisis is first reported to the Insurer or the Year 2000 Crisis Management Firm and ending with the earliest of the following events: (A) the Year 2000 Crisis Management Firm advises the Company that the Year 2000 Crisis no longer exists or (B) the Year 2000 Crisis Fund has been exhausted.

(v) "Year 2000 Crisis Management Firm" means any public relations firm, crisis management firm or law firm hired by the Company with the Insurer's consent (which consent shall not be unreasonably withheld) to perform Year 2000 Crisis Management Services. Attached to this policy is a list of firms which have been pre-approved by the Insurer and may be hired by the Company without further approval by the Insurer.

(w) "Year 2000 Crisis Management Services" means those services performed by a Year 2000 Crisis Management Firm in advising the Company or any of its Directors, Officers or Employees on minimizing potential harm to the Company arising from the Year 2000 Crisis, including but not limited to maintaining and restoring investor confidence in the Company.

(x) "Year 2000 Securities Claim" means any Year 2000 Claim in the form of a Securities Claim.

(y) "Year 2000 Third Party Claim" means any Year 2000 Claim other than a Year 2000 Securities Claim.

## 3. EXTENSIONS

Subject otherwise to the terms hereof, this policy shall cover Loss arising from a Claim made against the estates, heirs, or legal representatives of deceased Natural Person Insureds, and the legal representatives of Natural Person Insureds in the event of incompetency, insolvency or bankruptcy, who were Natural Person Insureds at the time the Wrongful Acts upon which such Claims are based were committed.

Subject otherwise to the terms hereof, this policy shall cover Loss arising from a Claim made against the lawful spouse (whether such status is derived by reason of statutory law, common law or otherwise of any applicable jurisdiction in the world) of a Natural Person Insured for a Claim arising solely out of his or her status as the spouse of a Natural Person Insured, including a Claim that seeks damages recoverable from marital community property, property jointly held by the Natural Person Insured and the spouse, or property transferred from the Natural Person Insured to the spouse; provided, however, that this extension shall not afford coverage for any Claim for any actual or alleged Wrongful Act of the spouse, but shall apply only to Claims arising out of any actual or alleged Wrongful Acts of a Natural Person Insured, subject to the policy's terms, conditions and exclusions.

## 4.   EXCLUSIONS

The Insurer shall not be liable to make any payment for Loss in connection with a Claim made against an Insured:

(a)   arising out of, based upon or attributable to the gaining in fact of any profit or advantage to which the Insured was not legally entitled;

(b)   arising out of, based upon or attributable to payments to an Insured of any remuneration without the previous approval of the stockholders or members of the Company, which payment without such previous approval shall be held to have been illegal;

(c)   arising out of, based upon or attributable to the committing in fact of any deliberate criminal or deliberate fraudulent act by the Insured;

[For the purpose of determining the applicability of the foregoing exclusions 4(a) through 4(c), the facts pertaining to and knowledge possessed by any Insured shall not be imputed to any Natural Person Insured; only facts pertaining to and knowledge possessed by any past, present or future chairman of the board, president, chief executive officer, chief operating officer or chief financial officer of the Company shall be imputed to the Company.]

(d)   alleging, arising out of, based upon or attributable to the facts alleged, or to the same or related Wrongful Acts alleged or contained, in any Claim which has been reported, or in any circumstances of which notice has been given, under any policy of which this policy is a renewal or replacement or which it may succeed in time;

(e)   alleging, arising out of, based upon or attributable to any pending or prior litigation as of the Continuity Date, or alleging or derived from the same or essentially the same facts as alleged in such pending or prior litigation;

(f)   for emotional distress or for injury from libel, slander, defamation, disparagement, or a violation of a person's right of privacy; provided, however, this exclusion shall not apply to any Claim alleging an Employment Practices Violation;

(g)   with respect to serving as a director, officer, trustee or governor of an Outside Entity, for any Wrongful Act occurring prior to the Continuity Date if the Insured knew or could have reasonably foreseen that such Wrongful Act could lead to a Claim under this policy;

Exhibit  1  page  12

Page  26

(h)    alleging, arising out of, based upon or attributable to any actual or alleged act or omission of the Natural Person Insureds serving in their capacities as directors, officers, trustees, employees or governors of any other entity other than the Company or an Outside Entity, or by reason of their status as directors, officers, trustees, employees or governors of such other entity;

(i)    which is brought by or on behalf of any Insured or the Company; or which is brought by any security holder or member of the Company, whether directly or derivatively, unless such securities holder's or member's Claim is instigated and continued totally independent of, and totally without the solicitation of, or assistance of, or active participation of, or intervention of, any Director or Officer or the Company; provided, however, this exclusion shall not apply to:

    (1)    any Claim brought by a Natural Person Insured in the form of a cross-claim or third-party claim for contribution or indemnity which is part of and results directly from a Claim which is not otherwise excluded by the terms of this policy; or

    (2)    any Claim alleging an Employment Practices Violation brought by any past or present Natural Person Insured other than a past or present Natural Person Insured who is or was a member of the Company's Board of Directors or, in the case of an LLC, the Board of Managers; or

    (3)    any Claim brought by or against an Employee; or

    (4)    in any bankruptcy proceeding by or against the Named Corporation or any Subsidiary thereof, any Claim brought by the Examiner or Trustee of the Company, if any, or any assignee of such Examiner or Trustee;

(j)    for any Wrongful Act arising out of the Insured serving as a director, officer, trustee or governor of an Outside Entity if such Claim is brought by the Outside Entity or by any director or officer thereof; or which is brought by any security holder of the Outside Entity, whether directly or derivatively, unless such security holder's Claim is instigated and continued totally independent of, and totally without the solicitation of, or assistance of, or active participation of, or intervention of, the Outside Entity, any director or officer thereof, the Company or any Director or Officer;

(k)    for bodily injury, sickness, disease, or death of any person, or damage to or destruction of any tangible property, including the loss of use thereof;

(l)    alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly:

    (1)    the actual, alleged or threatened discharge, dispersal, release or escape of pollutants; or

    (2)    any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants,

including but not limited to a Claim alleging damage to the Company or its securities holders; provided, however, that this exclusion shall not apply to non-Indemnifiable Loss arising from a Claim alleging damage to the Company or its securities holders.

Pollutants include (but is not limited to) any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes (but is not limited to) materials to be recycled, reconditioned or reclaimed;



Exhibit __ page _13_

Page _27_

(m) for violation(s) of any of the responsibilities, obligations or duties imposed upon fiduciaries by the Employee Retirement Income Security Act of 1974, or amendments thereto or any similar provisions of state statutory law or common law.

### EXCLUSIONS NOT APPLICABLE TO YEAR 2000 CLAIMS

Notwithstanding the foregoing, with respect to Year 2000 Claims:

(1) exclusion 4(b) shall not apply;

(2) exclusion 4(c) shall not apply to any Year 2000 Securities Claim which arises out of, is based upon or is attributable to any statement or other disclosure (including any statement filed with the Securities and Exchange Commission) if all such statements and other disclosure had been written or approved by a Panel Counsel Firm (as defined in Clause 9);

(3) exclusion 4(e) shall not apply.

## 5.  LIMIT OF LIABILITY (FOR ALL LOSS - INCLUDING DEFENSE COSTS)

The Limit of Liability stated in Item 4 of the Declarations is the limit of the Insurer's liability for all Loss, under Coverages A, B and C combined, arising out of all Claims first made against the Insureds or all Year 2000 Crises occurring during the Policy Period and the Discovery Period (if applicable); however, the Limit of Liability for the Discovery Period shall be part of, and not in addition to, the Limit of Liability for the Policy Period. Further, a Claim which is made subsequent to the Policy Period or Discovery Period (if applicable) which pursuant to Clause 7(b) or 7(c) is considered made during the Policy Period or Discovery Period shall also be subject to the one aggregate Limit of Liability stated in Item 4 of the Declarations.

In the event of a Year 2000 Securities Claim, this policy shall provide coverage for 100% of Loss incurred by the Directors, Officers, Employees, the Company, individually or collectively, up to the Limit of Liability of the policy, subject to the policy's terms, conditions and exclusions.

In the event of a Year 2000 Third Party Claim, the following provisions shall apply:

(a) During the time in which the Claim is solely made against a Director or Officer, this policy shall provide coverage for 100% of Loss incurred by the Insureds up to the Limit of Liability of the policy, subject to the policy's terms, conditions and exclusions;

(b) During the time in which the Claim is solely made against the Company and/or any Employee(s), this policy shall not provide any coverage for Loss incurred by the Company and/or any Employee(s);

(c) Except as provided in (d) below, during the time in which the Claim is jointly made against both the Company and/or any Employee(s) on the one hand, and one or more Directors and Officers on the other hand, this policy shall pay Loss as follows (subject to the policy's other terms, conditions and exclusions):

(1) the total combined amount of Defense Costs (including Prosecution Costs) incurred by the Directors and Officers, the Company and/or any Employee(s), prior to the commencement of trial multiplied by the percent set forth in Item 6A of the Declarations;

Exhibit __1__ page __14__
Page __28__

(2) the total combined amount of Defense Costs incurred by the Directors and Officers, the Company and/or any Employee(s), after the commencement of trial (including appeal) multiplied by the percent set forth in Item 6B of the Declarations;

(3) the total combined net monetary amount of any: (1) joint judgment (other than one described in (4) below) against, or (2) joint settlement (including any stipulated judgment) entered into by, the Directors or Officers, the Company and/or any Employee(s) multiplied by the percent set forth in Item 6C of the Declarations;

(4) the total combined net monetary amount of any joint judgment (other than a stipulated judgment) against the Directors or Officers, the Company and/or any Employee(s) multiplied by the percent set forth in Item 6D of the Declarations, but only to the extent the Company has insufficient assets to pay the judgment.

(d) Notwithstanding (c) above, in the event of a Year 2000 Third Party Claim jointly made against both the Company and/or any Employee on the one hand, and one or more Directors and Officers on the other hand, for which non-Indemnifiable Loss is incurred by the Directors and Officers, this policy shall provide coverage for 100% of such non-Indemnifiable Loss and shall pay, in addition, the combined Indemnifiable Loss and Coverage B(ii) Loss for the Claim multiplied by the applicable percent set forth in (c) above, subject to the other terms, conditions and exclusions of the policy.

The limit of the Insurer's liability for Year 2000 Crisis Loss arising from all Year 2000 Crises occurring during the Policy Period, in the aggregate, shall be the amount set forth as the Year 2000 Crisis Fund. This limit shall be the maximum liability of the Insurer under this policy regardless of the number of Year 2000 Crises occurring during the Policy Period.

The amounts referred to in all of the foregoing shall be part of and not in addition to the Limit of Liability stated in Item 4 of the Declarations and shall in no way be construed to increase such limit.

**Defense Costs are not payable by the Insurer in addition to the limit of liability. Defense Costs are part of Loss and as such are subject to the Limit of Liability for Loss.**

## 6. RETENTION CLAUSE

The Insurer shall only be liable for the amount of Loss arising from a Claim which is in excess of the applicable Retention amount stated in Item 5 of the Declarations, such Retention amount to be borne by the Company and/or the Insureds and shall remain uninsured, with regard to: (i) all Indemnifiable Loss; and (ii) Loss under Coverages B(i) and B(ii). A single Retention amount shall apply to Loss arising from all Claims alleging the same Wrongful Act or related Wrongful Acts.

Notwithstanding the foregoing, solely with respect to a Securities Claim, the Retention shall only apply to Defense Costs. Further, solely with respect to a Securities Claim or a Year 2000 Claim, no Retention shall apply to Loss arising from such Claims and the Insurer shall reimburse Defense Costs otherwise covered hereunder paid by the Insured, in the event of:

(1) a determination of No Liability of all Insureds in a Securities Claim; or

(2) a determination of No Liability of all Directors and Officers in a Year 2000 Third Party Claim; or

Exhibit __1__ page __15__
Page __29__

(3)    a dismissal or a stipulation to dismiss all Insureds in a Securities Claim without prejudice and without the payment of any consideration by any Insured; or

(4)    a dismissal or a stipulation to dismiss all Directors and Officers in a Year 2000 Third Party Claim without prejudice and without the payment of any consideration by such Insureds;

provided, however, that in the case of (3) and (4) above, such reimbursement shall occur 90 days after the date of dismissal or stipulation as long as such Claim is not brought (or any other Claim which is subject to the same single retention by virtue of Clause 6 is not brought) again within that time, and further subject to an undertaking by the Company in a form acceptable to the Insurer that such reimbursement shall be paid back by the Company to the Insurer in the event the Claim (or any other Claim which is subject to the same single retention by virtue of Clause 6) is brought after such 90-day period and before the expiration of the statute of limitations for such Claim.

## 7.  NOTICE/CLAIM REPORTING PROVISIONS

**Notice hereunder shall be given in writing to the Insurer named in Item 9 of the Declarations at the address indicated in Item 9 of the Declarations. If mailed, the date of mailing shall constitute the date that such notice was given and proof of mailing shall be sufficient proof of notice .**

(a)    The Company or the Insureds shall, as a condition precedent to the obligations of the Insurer under this policy, give written notice to the Insurer of a Claim made against an Insured as soon as practicable after the Named Corporation's risk manager or general counsel first becomes aware of the Claim but in all events no later than either:

    (1)    anytime during the Policy Period or during the Discovery Period (if applicable); or

    (2)    within 30 days after the end of the Policy Period or the Discovery Period (if applicable), as long as such Claim is reported no later than 30 days after the date such Claim was first made against an Insured.

(b)    If written notice of a Claim has been given to the Insurer pursuant to Clause 7(a) above, then a Claim which is subsequently made against the Insureds and reported to the Insurer alleging, arising out of, based upon or attributable to the facts alleged in the Claim for which such notice has been given, or alleging any Wrongful Act which is the same as or related to any Wrongful Act alleged in the Claim of which such notice has been given, shall be considered made at the time such notice was given.

(c)    If during the Policy Period or during the Discovery Period (if applicable) the Company or the Insureds shall become aware of any circumstances which may reasonably be expected to give rise to a Claim being made against the Insureds and shall give written notice to the Insurer of the circumstances and the reasons for anticipating such a Claim, with full particulars as to dates, persons and entities involved, then a Claim which is subsequently made against the Insureds and reported to the Insurer alleging, arising out of, based upon or attributable to such circumstances or alleging any Wrongful Act which is the same as or related to any Wrongful Act alleged or contained in such circumstances, shall be considered made at the time such notice of such circumstances was given.

Exhibit _1_ page _16_

Page _30_

8.  **DEFENSE COSTS, SETTLEMENTS, JUDGMENTS (INCLUDING THE ADVANCEMENT OF DEFENSE COSTS)**

Under both Coverage A and Coverage B of this policy, except as hereinafter stated, the Insurer shall advance excess of the applicable retention amount, at the written request of the Insured, covered Defense Costs every ninety (90) days. Such advance payments by the Insurer shall be repaid to the Insurer by the Insureds or the Company, severally according to their respective interests, in the event and to the extent that the Insureds or the Company shall not be entitled under the terms and conditions of this policy to payment of such Loss.

**The Insurer does not, however, under this policy, assume any duty to defend. The Insureds shall defend and contest any Claim made against them. The Insureds shall not admit or assume any liability, enter into any settlement agreement, stipulate to any judgment, or incur any Defense Costs without the prior written consent of the Insurer. Only those settlements, stipulated judgments and Defense Costs which have been consented to by the Insurer shall be recoverable as Loss under the terms of this policy. The Insurer's consent shall not be unreasonably withheld, provided that the Insurer shall be entitled to effectively associate in the defense, the prosecution and the negotiation of any settlement of any Claim that involves or appears reasonably likely to involve the Insurer.**

The Insurer shall have the right to effectively associate with the Company and the Insureds in the defense and prosecution of any Claim that involves or appears reasonably likely to involve the Insurer, including but not limited to negotiating a settlement. The Company and the Insureds shall give the Insurer full cooperation and such information as it may reasonably require.

Notwithstanding any of the foregoing, if all Insured defendants are able to dispose of all Claims which are subject to one retention amount for an amount not exceeding such retention amount (inclusive of Defense Costs), then the Insurer's consent shall not be required for such disposition.

The Company is not covered in any respect under Coverage A; the Company is covered, subject to the policy's terms and conditions, only with respect to its indemnification of its Natural Person Insureds under Coverage B(iii) as respects a Claim against such Natural Person Insureds, and subject to the policy's terms and conditions, under Coverage B(i) for a Securities Claim and B(ii) for a Year 2000 Third Party Claim made against the Company. Accordingly, the Insurer has no obligation under this policy for covered Defense Costs incurred by, judgments against or settlements by the Company arising out of a Claim made against the Company other than a covered Securities Claim or Year 2000 Claim, or any obligation to pay Loss arising out of any legal liability that the Company has to a claimant except as respects a covered Securities Claims or Year 2000 Third Party Claim against the Company.

With respect to (i) Defense Costs jointly incurred by, (ii) any joint settlement entered into by and/or (iii) any judgment of joint and several liability against the Company and any Natural Person Insured in connection with any Claim other than a Securities Claim and a Year 2000 Claim (other than claims described in clause 5(d)), the Company and the Natural Person Insureds and the Insurer agree to use their best efforts to determine a fair and proper allocation of the amounts as between the Company and the Natural Person Insureds and the Insurer taking into account the relative legal and financial exposures, and the relative benefits obtained by, the Natural Person Insureds and the Company.

In the event that a determination as to the amount of Defense Costs to be advanced under the policy cannot be agreed to, then the Insurer shall advance such Defense Costs which the Insurer states to be fair and proper until a different amount shall be agreed upon or determined pursuant to the provisions of this policy and applicable law.

Exhibit 1 page 17

Page 31

In the event of Loss arising from a Claim or Claims for which payment is due under the provisions of this policy, then the Insurer shall:

(a)  first, pay such non-Indemnifiable Loss for which coverage is provided under Coverage A of this policy; and

(b)  then, with respect to whatever remaining amount of the Limit of Liability is available after payment of such non-Indemnifiable Loss, at the written request of the chief executive officer of the Named Corporation, either pay or withhold payment of such other Loss for which coverage is provided under this policy.

In the event the Insurer withholds payment pursuant to subparagraph (b) above, then the Insurer shall at such time and in such manner as shall be set forth in written instructions of the chief executive officer of the Named Corporation, remit such payment to the Company or directly to or on behalf of a Natural Person Insured.

## 9.  PRE-AUTHORIZED SECURITIES DEFENSE ATTORNEYS

Only with respect to a Securities Claim:

Affixed as Appendix A hereto and made a part of this policy is a list of Panel Counsel law firms ("Panel Counsel Firms"). The list provides the Insured a choice of law firms from which a selection of legal counsel shall be made to conduct the defense of the Claim made against them.

The Insureds shall select a Panel Counsel Firm to defend the Claim made against the Insureds in the jurisdiction in which the Claim is brought. In the event the Claim is brought in a jurisdiction not included on the list, the Insureds shall select a Panel Counsel Firm in the listed jurisdiction which is the nearest geographic jurisdiction to either where the Claim is brought or where the corporate headquarters of the Named Corporation is located. In such instance the Insureds also may, with the express prior written consent of the Insurer, which consent shall not be unreasonably withheld, select a non-Panel Counsel Firm in the jurisdiction in which the Claim is brought to function as "local counsel" on the Claim to assist the Panel Counsel Firm which will function as "lead counsel" in conducting the defense of the Securities Claim.

With the express prior written consent of the Insurer, an Insured may select a Panel Counsel Firm different from that selected by other Insured defendants if such selection is required due to an actual conflict of interest or is otherwise reasonably justifiable.

The list of Panel Counsel Firms may be amended from time to time by the Insurer. However, no change shall be made to the specific list attached to this policy during the Policy Period without the consent of the Named Corporation. The Insurer may in its discretion add to the attached list of Panel Counsel Firms for the purposes of defending the Claim made against the Insured in any specified jurisdiction (including a jurisdiction not originally included in the Panel Counsel list) a Panel Counsel Firm not originally listed for such jurisdiction. The Insurer may in its discretion waive, in part or in whole, the provisions of this clause as respects a particular Claim.

Exhibit  1  page  18

Page  32

## 10. DISCOVERY CLAUSE

Except as indicated below, if the Insurer or the Named Corporation shall cancel or refuse to renew this policy, the Named Corporation shall have the right to a period of either one, two or three years following the effective date of such cancellation or nonrenewal upon payment of the respective "Additional Premium Amount" described below (herein referred to as the "Discovery Period") in which to give to the Insurer written notice pursuant to Clause 7(a) of Claims first made against the Insureds during said Discovery Period or pursuant to Clause 7(c) of circumstances of which the Company or the Insureds shall become aware during said Discovery Period, in each case with respect to any Wrongful Act occurring prior to the end of the Policy Period and otherwise covered by this policy.

The Additional Premium Amount for: (1) one year shall be 75% of the "full annual premium"; (2) two years shall be 150% of the "full annual premium"; (3) three years shall be a reasonable premium amount to be mutually agreed upon by the Insured and the Insurer. As used herein, "full annual premium" means the premium level in effect immediately prior to the end of the Policy Period. The rights contained in this paragraph shall terminate, however, unless written notice of such election together with the additional premium due is received by the Insurer within 60 days of the effective date of cancellation or nonrenewal. The Additional Premium for the Discovery Period shall be fully earned at the inception of the Discovery Period. The Discovery Period is not cancelable. This clause and the rights contained herein shall not apply to any cancellation resulting from non-payment of premium.

Notwithstanding the first paragraph of Clause 5, if the Insurer or the Named Corporation gives notice of its intention to cancel or non-renew this policy, then the Named Corporation shall also have the right, within 60 days before the end of the Policy Period, to request an offer from the Insurer of a Discovery Period (with respect to Wrongful Acts occurring prior to the end of the Policy Period) for a period of one, two or three years with an aggregate limit of liability applicable to Claims made against the Insured during such Discovery Period which is in addition to, and not part of, the applicable Limit of Liability set forth in Item 4 of the Declarations. The Insurer shall quote such a Discovery Period pursuant to such terms, conditions, exclusions and additional premium as it deems appropriate in its sole and absolute discretion.

In the event of a Transaction, as defined in Clause 12, or the confirmation of a Bankruptcy Plan of Reorganization of the Named Corporation, the Named Corporation shall have the right, within 30 days before the end of the Policy Period, to request an offer from the Insurer of a Discovery Period (with respect to Wrongful Acts occurring prior to the effective time of the Transaction or such confirmation) for a period of no less than three years or for such longer or shorter period as the Named Corporation may request. The Insurer shall offer such Discovery Period pursuant to such terms, conditions, exclusions and additional premium as the Insurer may reasonably decide. In the event of a Transaction or such a confirmation, the right to a Discovery Period shall not otherwise exist except as indicated in this paragraph.

The additional premium for the Discovery Period shall be fully earned at the inception of the Discovery Period. The Discovery Period is not cancelable. This clause and the rights contained herein shall not apply to any cancellation resulting from non-payment of premium.

## 11. CANCELLATION CLAUSE

This policy may be canceled by the Named Corporation at any time only by mailing written prior notice to the Insurer or by surrender of this policy to the Insurer or its authorized agent. This policy may also be canceled by or on behalf of the Insurer by delivering to the Named Corporation or by mailing to the Named

Exhibit 1  page 19
Page 33

Corporation, by registered, certified, or other first class mail, at the Named Corporation's address as shown in Item 1 of the Declarations, written notice stating when, not less than 60 days thereafter (15 days in the case of cancellation for non-payment of premium), the cancellation shall be effective. The mailing of such notice as aforesaid shall be sufficient proof of notice. The Policy Period terminates at the date and hour specified in such notice, or at the date and time of surrender.

If this policy shall be canceled by the Named Corporation, the Insurer shall retain the customary short rate proportion of the premium herein.

If this policy shall be canceled by the Insurer, the Insurer shall retain the pro rata proportion of the premium herein.

Payment or tender of any unearned premium by the Insurer shall not be a condition precedent to the effectiveness of cancellation, but such payment shall be made as soon as practicable.

If the period of limitation relating to the giving of notice as set forth above is also set forth in any law controlling the construction thereof, the period set forth above shall be deemed to be amended so as to be equal to the minimum period of limitation set forth in the controlling law.

## 12. TERMINATION OF COVERAGE FOR WRONGFUL ACTS AFTER CERTAIN TRANSACTIONS

If during the Policy Period:

    a.    the Named Corporation shall consolidate with or merge into, or sell all or substantially all of its assets to any other person or entity or group of persons and/or entities acting in concert; or

    b.    any person or entity or group of persons and/or entities acting in concert shall acquire an amount of the outstanding ownership interests representing more than 50% of the voting or designation power for the election of Directors of the Named Corporation, or acquires the voting or designation rights of such an amount of such ownership interests;

          (either of the above events herein referred to as the "Transaction")

then, this policy shall continue in full force and effect as to Wrongful Acts occurring prior to the effective time of the Transaction, but there shall be no coverage afforded by any provision of this policy for any actual or alleged Wrongful Act occurring after the effective time of the Transaction. This policy may not be canceled after the effective time of the Transaction and the entire premium for this policy shall be deemed earned as of such time. The Named Corporation shall also have the right to an offer by the Insurer of a Discovery Period described in Clause 10 of the policy.

The Named Corporation shall give the Insurer written notice of the Transaction as soon as practicable, but not later than 30 days after the effective date of the Transaction.

## 13. SUBROGATION

In the event of any payment under this policy, the Insurer shall be subrogated to the extent of such payment to all the Company's and the Insureds' rights of recovery thereof, and the Company and the Insureds shall execute all papers required and shall do everything that may be necessary to secure such rights including the execution of such documents necessary to enable the Insurer effectively to bring suit in the name of the

Exhibit 1 page 20
Page 34

Company and/or the Insureds. Any amounts recovered in connection with a Year 2000 Claim by the Insured shall be applied first to reimburse the Insurer for any Prosecution Costs paid by the Insurer in connection with such Year 2000 Claim and then to reimburse the Insurer and the Insureds in proportion to their respective payments of Loss. In no event, however, shall the Insurer exercise its rights of subrogation against an Insured under this policy unless such Insured has been convicted of a deliberate criminal act, or been determined to have in fact committed a deliberate fraudulent act, or obtained any profit or advantage to which such Insured was not legally entitled.

## 14. OTHER INSURANCE AND INDEMNIFICATION

Such insurance as is provided by this policy shall apply only as excess over any other valid and collectible insurance.

In the event of a Claim against a Director or Officer arising out of his or her serving as a director, officer, trustee or governor of an Outside Entity, coverage as is afforded by this policy shall be specifically excess of indemnification provided by such Outside Entity and any insurance provided to such Outside Entity with respect to its directors or officers. In the event of a Year 2000 Third Party Claim or Year 2000 Crisis, coverage as is afforded by this policy shall be specifically excess of any other insurance provided for such Claim or Crisis for any Insured. Further, in the event such other Outside Entity insurance or Year 2000 Crisis insurance is provided by the Insurer or any other member company of American International Group, Inc. (AIG) (or would be provided but for the application of the retention amount, exhaustion of the limit of liability or failure to submit a notice of a Claim) then the maximum aggregate Limit of Liability for all Losses combined covered by virtue of this policy as respects any such Claim shall be reduced by the limit of liability (as set forth on the Declarations Page) of the other AIG insurance provided to such Outside Entity.

## 15. NOTICE AND AUTHORITY

It is agreed that the Named Corporation shall act on behalf of its Subsidiaries and all Insureds with respect to the giving of notice of Claim or giving and receiving notice of cancellation, the payment of premiums and the receiving of any return premiums that may become due under this policy, the receipt and acceptance of any endorsements issued to form a part of this policy and the exercising or declining to exercise any right to a Discovery Period.

## 16. ASSIGNMENT

This policy and any and all rights hereunder are not assignable without the written consent of the Insurer.

## 17. DISPUTE RESOLUTION PROCESS

It is hereby understood and agreed that all disputes or differences which may arise under or in connection with this policy, whether arising before or after termination of this policy, including any determination of the amount of Loss, shall be submitted to the alternate dispute resolution process ("ADR") set forth in this clause.

Either the Insurer or the Insureds may elect the type of ADR discussed below; provided, however, that the Insureds shall have the right to reject the Insurer's choice of the type of ADR at any time prior to its commencement, in which case the Insureds' choice of ADR shall control.

Exhibit _1_ page _21_

Page _35_

The Insurer and the Insureds agree that there shall be two choices of ADR: (1) non-binding mediation administered by the American Arbitration Association, in which the Insurer and the Insureds shall try in good faith to settle the dispute by mediation under or in accordance with its then-prevailing Commercial Mediation Rules; or (2) arbitration submitted to the American Arbitration Association under or in accordance with its then-prevailing Commercial Arbitration Rules, in which the arbitration panel shall consist of three disinterested individuals. In either mediation or arbitration, the mediator(s) or arbitrators shall have knowledge of the legal, corporate management, or insurance issues relevant to the matters in dispute. The mediator(s) or arbitrators shall also give due consideration to the general principles of the law of the state where the Named Corporation is incorporated in the construction or interpretation of the provisions of this policy; provided, however, that the terms, conditions, provisions and exclusions of this policy are to be construed in an even-handed fashion in the manner most consistent with the relevant terms, conditions, provisions and exclusions of the policy. In the event of arbitration, the decision of the arbitrators shall be final and binding and provided to both parties, and the arbitrators' award shall not include attorneys fees or other costs. In the event of mediation, either party shall have the right to commence a judicial proceeding; provided, however, that no such judicial proceeding shall be commenced until the mediation shall have been terminated and at least 120 days shall have elapsed from the date of the termination of the mediation. In all events, each party shall share equally the expenses of the ADR.

Either choice of ADR may be commenced in either New York, New York; Atlanta, Georgia; Chicago, Illinois; Denver, Colorado; or in the state indicated in Item 1 of the Declarations page as the mailing address for the Named Corporation. The Named Corporation shall act on behalf of all Insureds in deciding to proceed with ADR under this clause.

## 18. ACTION AGAINST INSURER

Except as provided in Clause 17 of the policy, no action shall lie against the Insurer unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this policy, nor until the amount of the Insureds' obligation to pay shall have been finally determined either by judgment against the Insureds after actual trial or by written agreement of the Insureds, the claimant and the Insurer.

Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this policy to the extent of the insurance afforded by this policy. No person or organization shall have any right under this policy to join the Insurer as a party to any action against the Insureds or the Company to determine the Insureds' liability, nor shall the Insurer be impleaded by the Insureds or the Company or their legal representatives. Bankruptcy or insolvency of the Company or the Insureds or of their estates shall not relieve the Insurer of any of its obligations hereunder.

## 19. WORLDWIDE TERRITORY

This policy shall apply to Claims made against an Insured anywhere in the world.

## 20. HEADINGS

The descriptions in the headings of this policy are solely for convenience, and form no part of the terms and conditions of coverage.

Exhibit  1  page  22

Page  36

# APPENDIX A

## PANEL COUNSEL

### California

Brobeck, Phleger & Harrison
Spear Street Tower
One Market
San Francisco, CA 94105
Contact:
Tower C. Snow Jr.          415-442-0900

Gibson, Dunn & Crutcher
333 South Grand Avenue
Los Angeles, CA 90071-3197
Contact:
Robert S. Warren          213-229-7326
John H. Sharer            213-229-7476
Wayne W. Smith            213-229-7464

Heller, Ellman, White & McAuliffe
333 Bush Street San Francisco,
CA 94104 Main Tel:
Contact:                  415-772-6000
Douglas   N.   Schwab
M. Laurence Popofsky

Heller, Ellman, White & McAuliffe
525 University Avenue
Palo Alto, CA 94301
Contact:
Norman J. Blears          415-324-7000

Irell & Manella
1800 Avenue of the Stars
Suite 900
Los Angeles, CA 90067
Contact:
Richard Borow             310-277-1010

Latham & Watkins
633 West Fifth Avenue
Suite 4000
Los Angeles CA, 90071-2007
Contact:
Hugh Stevens Wilson       213-485-1234

Latham & Watkins
505 Montgomary Street
Suite 1900
San Francisco, CA 94111
Contact:
Paul H. Dawes             415-391-0600

McCutchen Doyle, Brown & Emerson
355 South Grand Avenue
Suite 4400
Los Angeles, CA 90071-1560
Contact:
John C. Morrissey          213-680-6400

McCutchen, Doyle, Brown & Emerson
Three Embarcadero Center
San Francisco, CA 94111
Contact:
David M. Balabanian        415-393-2000
Mary Huser                 415-393-2000

Morrison & Foerster
425 Market Street
San Francisco, CA  94104-2482
Contact:
Paul T. Friedman           415-268-7444

Morrison & Foerster
555 West 5th Street - Suite 3500
Los Angles, CA 90013-1024
Contact:
Rober S. Stern·            213-892-5464

Munger, Tolles & Olson
355 South Grand Avenue-35th Floor
Los Angeles, CA 90071-1560
Contact:
Dennis L Kinnaird          213-683-9264
John W. Spiegel            213-683-9152

O'Melveny & Myers
400 South Hope Street
Los Angeles, CA 90071-2899
Main Tel:                  213-669-6000
Contact:
Seth Aronson
Robert Vandaret

O'Melveny & Myers
610 Newport Center
Newport Beach, CA 92660
Contact:
Phillip Kaplan            714-760-9600

Exhibit 1  page 23
Page 37

# APPENDIX A (contin

## PANEL COUNSEL

O'Melveny & Myers
275 Battery Street
San Francisco, CA 94111
Contact:
Richard Warner     415-984-8700

Orrick Herrington & Sutcliffe
Old Federal Reserve Bank Building
400 Sansome Street
San Francisco, CA 94111
Main Tel:     415-392-1122
Contact:
James A. Hughes
W. Reece Bader
Richard J. Lucas

Pillsbury Madison & Sutro
225 Bush Street
P.O. Box 7880
San Francisco, CA 94104
Contact:
Gary H. Anderson     415-983-1000

Pillsbury Madison & Sutro
725 South Figueroa Street
Suite 1200
Los Angeles CA 90017
Contact:
Steve O. Kramer     213-488-7100

Pilsbury Madison & Sutro
101 West Broadway
Suite 1800
San Diego, CA 92101
Contact:
David E. Kleinfeld     619-234-5000

Sherman & Sterling
555 California Street
San Fncisco, CA 94104
Contact:
Susan Samuels Muck     415-616-1198

Skadden, Arps, Slate, Meagher & Flom
300 South Grand Avenue
Los Angeles, CA 90071
Main Tel:     213-687-5000
Contact:
Frank Rothman
James E. Lyons

Wilson, Sonsini, Goodrich & Rosati
650 Page Mill Road
Palo, Alto, CA 94304-1050
Main Tel:     415-493-9300
Contact:
Bruce G. Vanyo
Steven M. Sethatz

### District of Columbia

Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1202
Contact:
Scott Schreiber     202-942-5672

Davis, Polk & Wardwell
1300 I Street, N.W.
Washington, DC 20005
Main Tel:     202-962-7000
Contact:
Scott W. Muller

Gibson, Dunn & Crutcher
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306
Contact:
F. Joseph Warin     202-887-3609

Patton Boggs, L.L.P.
2550 M Street N.W.
Washington, D.C. 20037
Contact:
C. Allen Foster     202-457-6320
Charles H. Camp     202-457-5265

Sherman & Sterling
801 Pennsylvania Avenue, N.W.
Washington, DC 20004-2604
Main Tel:     202-508-8000
Contact:
Thomas S. Martin
Jonathan L. Greenblat

Willkie Farr & Gallagher
Three Lafayette Centre
1155 21st Street N.W.
Washington, D.C. 20036-3384
Contact:
Kevin B. Clark     202-328-8000

Exhibit 1 page 24
Page 38

# APPENDIX A (continued)

## PANEL COUNSEL

### Florida

Fowler White, Gillen, Boggs, Villareal
and Banker, P.A.
501 East Kennedy Boulevard
Suite 1700
Tampa, Fl 33602
Contact:
W. Donald Cox                    813-228-7411

Fowler, White, Gillen, Boggs, Villareal
and Banker, P.A.
601 Cleveland Street
Suite 800
Clearwater Florida 34615
Contact:
Burton W. Wiand                  813-446-8525

Katz, Barron, Squtiero, Faust & Berman, P.A.
2699 South Bayshore Drive
Seventh Floor
Miami, Florida 33133-5408
Contact:
Richard E. Berman                305-856-2444

Zuckerman Spaeder Taylor & Evans LLP
900 Miami Center
201 South Biscayne Boulevard
Miami, Fl 33131
Main Tel:                        305-358-5000
Ronald B. Ravikoff
Thomas J. Meeks
Guy A. Rasco

Steel, Hector & Davis LLP
200 South Biscayne Boulevard
Miami, FL 33131-2398
Contact:
Lewis F. Murphy, P.A.            305-577-2957

Holland & Knight
400 North Ashley Drive
Suite 2300
Tampa, FL 33602
Main Tel:                        813-227-8500
Contact:
Frederick S. Schrils
Calvin Hayes
Gregory P. Hansel

Holland & Knight
50 North Laura Street
Suite 3900
Jacksonville, Fl 32202
Main Tel:                        904-353-2000
Contact:
George E. Schultz, Jr.

Holland & Knight
701 Brickell Avenue
Suite 3000
Miami, FL 33131
Main Tel:                        305-374-8500
Contact:
Marty Steinberg
William F. Hamilton

Holland & Knight
315 South Calhoun Street
Suite 600
Tallahassee, FL 32301
Main Tel:                        904-224-7000
Contact:
Robert R. Feagin, III

### Georgia

Alston & Bird
One Atlantic Center
1201 W. Peachtree Street
Atlanta, GA 30309
Contact:
Peter Q. Bassatt                 404-881-7343
Mary C. Gill                     404-881-7276

King & Spalding
191 Peachtree Street
Atlanta, GA 30303-1763
Main Tel:                        404-572-4600
Contact:
Grippin B. Bell
Michael R. Smith

Long, Aldridge & Norman
One Peachtree Center-Suite 5300
303 Peachtree Street
Atlanta, GA 30308
Contact:                         404-527-8340
J. Allen Maines
Sharon Glenn                     404-527-8391

Exhibit  1  page 25

Page  31

## APPENDIX A (continued)

## PANEL COUNSEL

- 4 -

Smith Gambrell & Russel
3343 Peachtree Road, N.E.-Suite 1800
Atlanta, GA 30326-1010
Contact:
David A. Handley                    404-264-2671
Robert C. Schwartz                  404-264-2658

### Illinois

Jenner & Block
One IBM Plaza
Chicago, IL 60611
Contact:
Jerold Solovy                       312-222-9350

Freeborn & Peters
311 South Wacker Drive
Suite 3000
Chicago, IL 60606-6677
Contact:
David H. Kistenbroker               312-360-6567

Kirkland & Ellis
2000 East Randolph Drive
Chicago, IL 60601
Main Tel:                           312-861-2000
Contact:
Garrett B. Johnson
Robert J. Kopecky

Sidley & Austin
One First National Plaza
Chicago, IL 60603
Contact:
Walter C. Carlson                   312-853-7734
Robert A. Downing                   312-853-7434
Eugene A. Schoon                    312-853-7279

Skadden, Arps, Slate, Meagher & Flom
333 West Wacker Drive
Chicago, IL 60606
Main Tel:                           312-407-0700
Contact:
Susan Getzendanner
Timothy A. Nelsen

Sonnenschein Nath & Rosenthal
8000 Sears Tower
Chicago, IL 60606
Contact:
Harold D. Shapiro                   312-876-8035

### Massachusetts

Goodwin, Procter & Hoar
Exchange Place
Boston, MA 02109
Contact:
Don M. Kennedy                      617-570-1000

Hale & Dorr
60 State Street
Boston, MA 02109
Main Tel:                           617-526-6000
Contact:
Jeffrey Rudman
John Batter

Mintz, Levin, Cohn, Feris, Glovsky & Popeo
One Financial Center
Boston, MA 02111
Contact:
Peter M. Saparoff                   617-542-6000

Palmer & Dodge
One Beacon Street
Boston, MA 02108
Contact:
Peter S. Terris                     617-573-0100

Ropes & Gray
One International Plaza
Boston, MA 02110-2624
Contact:
John D. Donovan, Jr.                617-951-7566

Skadden, Arps, Slate, Meager & Flom
One Beacon Street
Boston, Ma 02108
Main Tel:                           617-573-4800
Contact:
Thomas A. Dougherty
George J. Skelly

Exhibit 1 page 26
Page 40

# APPENDIX A (continued)
## PANEL COUNSEL

Testa, Hurwitz & Thibeault
High Street Tower
125 High Street
Boston, MA 02110
Contact:
Brian E. Pastuszenski      617-248-7000
Edmund G. Case

### New York

Arnold & Porter
399 Park Avenue
New York, NY 10022-4690
Contact:
Scott Schreiber            212-715-1000

Cahill Gordon & Reindel
80 Pine Street
New York, NY 10005
Main Tel:                  212-701-3000
Contact:
Charles A. Gilman
Immanuel Kohn
Thomas J. Kavaler

Davis Polk & Wardwell
450 Lexington Avenue
New York, NY 10017
Main Tel:                  212-450-4000
Contact:
Henry L. King
Daniel F. Kolb

Fried, Frank, Harris, Shriver & Jacobson
One New York Plaza
New York, NY 10004
Contact:
Sheldon Raab               212-859-8090

Kaye, Scholer, Fierman, Hays & Handler
425 Park Avenue
New York, NY 10022
Contact:
Frederic W. Yerman         212-836-8663

Kirkland & Ellis
Citicorp Center
153 East 53rd Street
New York, NY 10022-4675
Main Tel:                  212-446-4800
Contact:
Yosef J. Riemer
Frank M. Holozubiec

Milbank, Tweed Hadley & McCloy
One Chase Manhattan Plaza
New York, NY 10005
Contact:
Russell Brooks             212-530-5554

Shearman & Sterling
Citicorp Center
153 East 53rd Strteet
New York, NY 10022-4576
Contact
Jeremy G. Epstein          212-848-8000

Simpson Thacher & Bartlett
425 Lexington Avenue
New York, NY 10017
Main Tel:                  212-455-2000
Contact:
Roy L. Reardon
James J. Hagan
Michael J. Chepiga

Skadden, Arps, Slate, Meagher & Folm
919 Third Avenue
New York, NY 10022
Mein Tel:                  212-735-3000
Contact:
Barry H. Garfinkel
Jonathan J. Lerner

Stroock & Stroock & Lavan
Seven Hanover Square
New York, NY 10004-2696
Main Tel:                  212-806-5400
Contact
Melvin A Brosterman
Lawrence Greenwald
Alvin K Hellerstein

Exhibit 1 page 27
Page 41

## APPENDIX A (continued)

# PANEL COUNSEL

Sullivan & Cromwell
125 Broad Street
New York, NY 10004-2498
Main Tel:                        212-558-4000
Contact:
John L. Warden
Philip L. Grahman, Jr.

Robinson, Silverman, Pearce, Aronachn
& Berman
1290 Avenue of the Americas
New York, N Y 10104
Contact:
Herbert Teitelbaum         212-541-2000
Mark Bunin

Wachtell, Lipton, Rosen & Katz
51 West 57th Street
New York, NY 10019
Contact:
Norman Redlich              216-371-9200

Weil, Gotshal & Manges
767 Fifth Avenue
New York, NY 10153
Contact:
Dennis J. Block               213-310-8000

Wilkie, Farr & Gallagher
One Citicorp Center
153 East 53rd Street
New York, NY 10022-4677
Main Tel:                        212-821-8000
Contact:
David L. Foster
Richard L. Posen
Michael R. Young

### Ohio

Jones Day, Reavis & Pogue
North Point
Lakeside Avenue
Cleveland, OH 44114
Contact:
John Newman Jr.            216-586-3939

### Philadelphia

Blank, Rome, Comisky & McCauley
1200 Four Penn Center
Philadelphia, PA 19103
Main Tel:                        215-569-5500
Contact:
Alexander D. Bono
Richard P. McElroy
Jerome R. Richter

Cozen and O'Connor
The Atrium
1900 Market Street
Philadelphia, PA 19103
Main Tel:                        215-665-2000
Contact:
Patrick J. O'Connor
Thomas C. Zielinski
H. Robert Fiebach

Dechert Price & Rhoads
4000 Bell Atlantic Tower
1717 Arch Street
Philadelphia, PA 19103-2793
Main Tel:                        215-994-4000
Contact:
Seymour Kurland
Jeffrey G. Weil

Morgan, Lewis & Bockius
2000 One Logan Square
Philadelphia, PA 19103-6993
Main Tel:                        215-963-5000
Contact:
Gregory M. Harvey
Marc J. Sonnenfeld
Elizabeth Hoop Fay

Pepper, Hamilton & Scheetz
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA 19103-2799
Main Tel:                        215-981-4000
Contact:
Jon A. Baughman
Laurence Z. Shiekman

Exhibit 1 page 28
Page 42

# APPENDIX A (cont'd)
# PANEL COUNSEL

Wolf, Block, Schorr and Solis–Cohen
12th Floor – Packard Building S.E.
Corner 15th & Chestnut Streets
Philadelphia, PA 19102-2678
Contact:
Jay A. Dubow                    215-977-2058

## Washington

Foster Pepper & Shefelman
1111 Third Avenue, Suite 3400
Seattle, Washington 98101-2399
Main Tel:                       206-447-4400
Main Fax:                       206-447-9700
Contact:                        206-447-8998
Peter S. Ehrlichman             206-447-8935
Stellman Keehnel

Davis Wright Tremain
2600 Century Square
1501 Fourth Avenue
Seattle, Washington 98101-1688
Main Tel:                       206-622-3150
Contact:
Stephen M. Rummage              206-628-7755

Bogle & Gates
Two Union Square
601 Union Street Seattle,
Washington 98101-2346
Main Tel:                       206-682-5151
Contact:                        206-621-1478
Evan Schweb                     206-621-1448
Arthur C. Claflin

Heller, Ehrman, White & McAuliffe
701 Fifth Avenue
Seattle, WA 98104-7098
Main Tel:                       206-447-0900
Main Fax:                       206-447-0849
Contact:
George E. Greer

Lane Powell Spearslubersky
1420 Fifth Avenue Suite 4100
Seattle, Washington 98101-2338
Main Tel:                       206-223-7000
Main Fax:                       206-223-7107
Contact:
James L. Robart
Rudy A. Englund
James B. Stoetzer

Perkins Coie
1201 Third Avenue, 40th Floor
Seattle, Washington 98101-3099
Main Tel:                       206-583-8888
Main Fax:                       206-583-8500
Contact:
Ronald L. Berenstain
Harry H. Schneider

## Texas

Akin, Gump, Statauss, Haurer & Feld, LLP.
1700 Pacific Avenue
Suite 4100
Dallas, TX 75201-4618
Main Tel:                       214-969-2800
Contact:
Lou Bickel
Mike Lowenberg

Akin, Gump, Strauss, Hauer & Feld, LLP.
Pennzoil Place –South Tower
711 Louisiana Street
Suite 1900
Houston, TX 77002
Main Tel:                       713-220-5800
Contact:
Charlie Moore
Paula Hinton

Baker & Botts, LLP.
910 Louisianna
Houston, TX 77002-4995
Main Tel:                       713-229-1234
Contact:
William C. Slusser
Harold L. Metts

Exhibit I  page 29
Page 43

# APPENDIX A (continued)

## PANEL COUNSEL

Baker & Botts, LLP.
2001 Ross Avenue
Dallas, TX 75201-2916
Contact:
Ronald L. Palmer                    214-953-6500

Fulbright & Jaworski, L.L.P.
1301 McKinney
Suite 5100
Houston, TX 77010
Main Tel:                           713-651-5151
Contact:
Frank G. Jones
Richard N. Carrell

Fullbright & Jaworski, L.L.P.
2200 Ross Avenue
Suite 2800
Dallas, Tx 75201
Contact:
Karl G. Dial                        214-855-8000

Haynes & Boone, LLP.
3100 Nationsbank Plaza
901 Main Street
Dallas, TX 75202-3789
Main Tel:                           214-651-5000
Contact:
Michael Boone
George Bramblett
Noel Hensley

Locke Purnell Rain Harrell
2200 Ross Avenue
Suite 2200
Dallas, TX 75201-6776
Contact:
John McElhaney                      214-740-8458
Peter Flynn                         214-740-8654
Morris Harrell                      214-740-8404

Thompson & Knight, P.C.
1700 Pacific
Suite 3300
Dallas, TX 75201-4693
Contact:
Timothy R. McCormick                214-969-1103

Vinson & Elkins
2500 First City Tower
1001 Fannin
Houston, TX 77002-6760
Contact:
David T. Hedges, Jr.                713-758-2676

Vinson & Elkins
3700 Trammell Crow Center
2001 Ross Avenue
Dallas, TX 75201-2975
Contact:
Orrin L. Harrison

Exhibit 1 page 80
Page 44

EXHIBIT 2

## ENDORSEMENT #10

This endorsement, effective *12:01 AM*  ***January 22, 2000***  forms a part of
policy number: *857-85-90*
issued to: **ACACIA RESEARCH CORPORATION**

*by*   *National Union Fire Insurance Company of Pittsburgh, PA*

### Amend Policy Period Endorsement

In consideration of the premium charged of **$57,750.00**, it is hereby understood and agreed Item 4
of the Declarations, Policy Period is deleted in its entirety and replaced by the following:

ITEM 4. LIMIT OF LIABILITY: **$10,000,000**   **aggregate for all Coverages
A, B and C combined
(including Defense Costs)**

ALL OTHER TERMS, CONDITIONS, AND EXCLUSIONS REMAIN UNCHANGED.

*Paul [signature]*

**AUTHORIZED REPRESENTATIVE**

Exhibit **2** page **1**
Page **45**

**Exhibit "2"**

**EXHIBIT 3**

## ENDORSEMENT #12

This endorsement, effective *12:01 AM*          **March 9, 2000**          forms a part of
policy number: *857-85-90*
issued to: **ACACIA RESEARCH CORPORATION**

*by*          *National Union Fire Insurance Company of Pittsburgh, PA*

### Amend Policy Period Endorsement

In consideration of the premium charged of **$185,000.00** , it is hereby understood and agreed Item 3 of the Declarations,  Policy Period is deleted in its entirety and replaced by the following:

ITEM 3.  POLICY PERIOD:          From:  January 22, 1999  To:  January 22, 2002
                                  (12:01 A.M. standard time at the address stated in Item 1.)

ALL OTHER TERMS, CONDITIONS, AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

Exhibit 3 page 1
Page 46

**Exhibit "3"**

**EXHIBIT 4**

FILED

00 NOV 28 PH 4: 39

CLERK. U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY:_____
                              DEPUTY

DOUGLAS E. OLSON, State Bar No. 38649
JEFFREY W. GUISE, State Bar No. 164203
PETER R. MUNSON, State Bar No. 193216
BROBECK, PHLEGER & HARRISON LLP
12390 El Camino Real
San Diego, CA 92130-2081
Telephone:    (858) 720-2500
Facsimile:    (858) 720-2555

Attorneys for Plaintiff
NANOGEN, INC.

# UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NANOGEN, INC., a Delaware Corporation,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>DONALD D. MONTGOMERY, an Individual, and COMBIMATRIX CORP., a Delaware Corporation, and a California Corporation,<br><br>　　　　　Defendants. | Case No.<br><br>**COMPLAINT FOR:**<br><br>1)   **Correction of Inventorship of U.S. Patent No. 6,093,302 (35 U.S.C. § 256);**<br><br>2)   **Declaratory Ruling of Applicants, Assignee and Inventors**<br><br>3) and 4)   **Misappropriation Of Trade Secrets (Cal. Civil Code § 3426.1);**<br><br>5) and 6)   **Breach of Written Contract;**<br><br>7)   **Inducing Breach Of Written Contract;**<br><br>8)   **Breach Of Implied Covenant Of Good Faith And Fair Dealing;**<br><br>9)   **Intentional Interference With Prospective Economic Advantage;**<br><br>10) **Unfair Competition (Common Law and Cal. Bus. & Prof. Code §17200);**<br><br>11) **Unjust Enrichment;**<br><br>12) **Constructive Trust;**<br><br>13) **Injunctive Relief; and**<br><br>14) **Conversion.**<br><br>**DEMAND FOR JURY TRIAL**<br><br>Judge:        [not yet assigned] |

Exhibit  4  Page  1

Page  47

Exhibit "4"

Plaintiff NANOGEN, INC., by and through its designated attorneys, complains and alleges as follows:

## I.   PARTIES

1.   Plaintiff NANOGEN, INC. ("Nanogen") is a corporation organized under the laws of the State of Delaware and has its principal place of business at 10398 Pacific Center Court, San Diego, CA 92121.

2.   Upon information and belief, Defendant DONALD D. MONTGOMERY ("Dr. Montgomery") is an individual who is a citizen of the State of Washington and resides in the State of Washington in or near Snoqualmie, WA. Dr. Montgomery was employed by Nanogen from about May of 1994 to about August of 1995.

3.   Upon information and belief, Defendant COMBIMATRIX CORP. ("CombiMatrix") is a corporation that was incorporated under the laws of the State of California in October of 1995 with the help of Dr. Montgomery. CombiMatrix Corporation was reincorporated in Delaware in September of 2000. The California Corporation was merged into the Delaware Corporation on September 14, 2000. On information and belief, the California Corporation remains listed as active. The Delaware Corporation is currently existing under the laws of the State of Delaware and has a place of business at 34935 SE Douglas St., Suite 110, Snoqualmie, WA 98065.

## II.   JURISDICTION AND VENUE

4.   This Court has jurisdiction over the first claim alleged herein for "Correction of Inventorship of U.S. Patent No. 6,093,302" and the second claim alleged herein under 35 U.S.C. § 256, 28 U.S.C. § 1331, 28 U.S.C. §§ 1338(a) and (b), and 28 U.S.C. §§ 2201 and 2202. Pursuant to 28 U.S.C. § 1367(a), this Court has supplemental jurisdiction in this matter over each of the following claims:

a.   Misappropriation Of Trade Secrets (Cal. Civil Code § 3426 *et seq.*) (two claims);

b.   Breach of Written Contract (two claims);

c.   Inducing Breach Of Written Contract;

DILIB1-JM04-41701 0 3



Exhibit   4   Page   2

Page   48

1       d.     Breach Of Implied Covenant Of Good Faith And Fair Dealing;

2       e.     Intentional Interference With Prospective Economic Advantage;

3       f.     Unfair Competition (Common Law and Cal. Bus. & Prof. Code §17200 *et*

4     *seq.*);

5       g.     Unjust Enrichment;

6       h.     Injunctive Relief;

7       i.     Constructive Trust; and

8       j.     Conversion.

9       5.     Venue is proper in this district under 28 U.S.C. § 1391 for at least the reasons that a

10  substantial part of the events giving rise to the claims of this action occurred in this district, and

11  Nanogen is located in this district and CombiMatrix's contacts with California are in this district.

12  **III.    FACTUAL BACKGROUND**

13     <u>Dr. Montgomery's Employment at Nanogen</u>

14       6.     Plaintiff Nanogen is a San Diego biotechnology company that researches, develops,

15  manufactures, markets and intends to market technology that utilizes various aspects of

16  microelectronics, microfabrication, chemistry, and molecular biology. Nanogen is currently

17  developing and has developed instruments and consumables for genomics applications, biomedical

18  research, medical diagnostics, drug discovery and forensics.

19       7.     Maintaining the secrecy of information, including Nanogen's Proprietary

20  Information as defined herein in Paragraph 10, related to the research conducted at, and the

21  technology developed by, Nanogen is important to Nanogen's economic survival. Nanogen

22  derives independent economic value from its Proprietary Information not being generally known to

23  the public or others who could obtain economic value therefrom. Nanogen takes reasonable

24  precautions to protect the secrecy of its Proprietary Information, including its research, data,

25  technology and business plans. Among other precautions, Nanogen obtains its employees' written

26  agreement regarding the disclosure and unauthorized use of Nanogen's confidential and proprietary

27  information.

28

8. In about May 1994, Nanogen hired Dr. Montgomery to work as a Senior Research Scientist. By agreement with Nanogen, Dr. Montgomery began work on about May 23, 1994. Dr. Montgomery's responsibilities at Nanogen included, among other subjects, research in electrochemistry related to the transport of DNA to spatially multiplexed assay locations for research and diagnostic applications, formulation of permeation layer polymers, solutions for DNA transport and other aspects of using electrodes and electric fields to synthesize polymers and move analytes. Dr. Montgomery terminated his employment at Nanogen on or about August 18, 1995.

9. As part of Dr. Montgomery's employment agreement with Nanogen, he entered into a written Proprietary Information and Inventions Agreement ("Proprietary Information Agreement") with Nanogen. The Proprietary Information Agreement was executed by Dr. Montgomery and approved and agreed to by Nanogen on May 5, 1994. Dr. Montgomery's execution of the Proprietary Information Agreement was a material part of Nanogen's consideration for hiring Montgomery. A true and correct copy of the Agreement is attached to this Complaint as Exhibit "A"[1] and incorporated herein by reference.

10. During the course of his employment, Dr. Montgomery had access to and was exposed to confidential and proprietary information such as the Proprietary Information defined in the Proprietary Information Agreement, including but not limited to, trade secrets, scientific data, invention disclosures, patent applications and drafts thereof, know-how, inventions, strategies, marketing studies, financial information and lists of present and potential financial backers and business partners (collectively, "Proprietary Information").

11. Nanogen's Proprietary Information Agreement, and Nanogen company policy well known to Dr. Montgomery, required that he and all Nanogen scientists maintain daily laboratory notebooks detailing all research, experiments and conclusions, and to submit regular progress reports regarding such during their employment at Nanogen. Nanogen's Proprietary Information Agreement, including the Agreement executed by Dr. Montgomery, as well as Nanogen company policy well known to Dr. Montgomery, also obligated Dr. Montgomery and all Nanogen scientists

---

[1] Because of the confidential and proprietary information disclosed in the Settlement Agreement, it has been separately under seal with the Court.

CASE NO.

Exhibit 4 Page 4

Page 50

1   to disclose to Nanogen all inventions resulting from work performed during their employment, and

2   to assign ownership of all such inventions to Nanogen. Nanogen's Proprietary Information

3   Agreement, including the Agreement executed by Dr. Montgomery, and company policy well

4   known to Dr. Montgomery, further required Dr. Montgomery and all Nanogen employees to

5   maintain the confidentiality of all research performed at Nanogen, and to keep in confidence any

6   and all of Nanogen's trade secrets and other Proprietary Information of which any and all Nanogen

7   employees, including Dr. Montgomery, became aware during their employment. As with any

8   Nanogen employee, the obligations of assignment and confidentiality, among others, continued in

9   force after Dr. Montgomery terminated his employment with Nanogen.

10       12.     Nanogen is informed and believes, and thereon alleges, that Dr. Montgomery has

11   and continues to retain, use and disclose Nanogen's Proprietary Information in violation of his

12   employment agreement, the Proprietary Information Agreement, and company policy well known

13   to Dr. Montgomery.

14       13.     While affiliated with Nanogen, Dr. Montgomery performed experiments, and was

15   aware of experiments performed by other Nanogen employees, relating to structures and solid

16   phase synthesis methods for the preparation of sequences of biological polymers, including nucleic

17   acid sequences and amino acid sequences using electrochemical placement of monomers on a

18   substrate containing an electrode. Moreover, on information and belief, during his employment at

19   Nanogen Dr. Montgomery performed experiments relating to structures and the placing of a

20   synthesis electrode in contact with a buffering or scavenging solution to prevent chemical crosstalk

21   between electrodes due to diffusion of electrochemically generated reagents, and/or in close

22   proximity to a "getter" structure that could both monitor and obviate ion contamination. Before

23   and/or during Dr. Montgomery's affiliation with Nanogen, experiments conducted by other

24   Nanogen employees, alone or together with Dr. Montgomery's experiments, led to certain

25   inventions which constitute the subject matter of some or all of the technology described and

26   claimed in United States Patent Number 6,093,302 (the "'302 Patent"), PCT Application Number

27   WO 98/01221 (the "'221 PCT"), and PCT Application Number WO 99/35688 (the "'688 PCT"),

28

1    all of which are incorporated herein by reference.  A true and correct copy of the '302 Patent is

2    attached hereto as Exhibit "B".

3           14.    During his employment at Nanogen, Dr. Montgomery was aware of experiments

4    relating to structures and syntheses of biological polymers at an electrode including, but not limited

5    to, experiments performed by or under the direction of Dr. David Wu and Dr. Theo Nikiforov.

6           15.    Nanogen was aware of research performed and inventions conceived by Nanogen

7    employees, including but not limited to Dr. Wu and Dr. Nikiforov (collectively, the "Nanogen

8    Inventors") and/or Dr. Montgomery constituting or leading to the technology disclosed and

9    claimed in the '302 Patent, the '221 PCT and the '688 PCT.  Nanogen had elected to protect any

10   such inventions as trade secrets.  At all times, Nanogen was the owner of these trade secrets.

11   Nanogen did not become aware that Dr. Montgomery, for himself or on behalf of CombiMatrix,

12   and CombiMatrix had misappropriated, by disclosure, use or acquisition, of any Nanogen

13   technology, trade secrets or other Proprietary Information until after the publication of the '221

14   PCT and the '688 PCT; and the issuance of the '302 Patent in July, 2000.

15          16.    On information and belief, the technology disclosed and claimed in the '302 Patent,

16   the '221 PCT and the '688 PCT was conceived and developed by the Nanogen Inventors alone or

17   together with Dr. Montgomery before and/or during Dr. Montgomery's employment at Nanogen.

18          17.    Dr. Montgomery was well aware of his duty to disclose and assign any inventions or

19   technology developed during his employment to Nanogen, as evidenced by his signing of the

20   Proprietary Information Agreement and his disclosure of certain inventions to Nanogen while

21   employed at Nanogen.

22          18.    On information and belief, the laboratory notebooks turned over by

23   Dr. Montgomery upon terminating his employment at Nanogen did not contain all of the scientific

24   research performed by Dr. Montgomery during his employment, as required by the Proprietary

25   Information Agreement and by company policy.  Nanogen has been denied access to the records of

26   some of the scientific work performed by Dr. Montgomery during his employment at Nanogen,

27   despite Nanogen's rights to disclosure and ownership of all Dr. Montgomery's research and any

28   technology or inventions derived therefrom during such employment.

SDILIB1\JX04
41743
TBON at t INNC

Exhibit  4  page  6
Page  52

CASE NO.

19.     On information and belief, during Dr. Montgomery's employment at Nanogen and continuing to the present date, Dr. Montgomery concealed from Nanogen his contribution to the research performed at Nanogen by Nanogen employees to develop the technology disclosed and claimed in the '302 Patent, the '221 PCT and the '688 PCT.

20.     On information and belief, in about 1995 Dr. Montgomery disclosed to Nanogen employees that he was starting a new venture using a form of combinatorial synthesis technology which is proprietary to Nanogen and owned by Nanogen, and that he had already prepared and presented a business plan to potential investors and had obtained $800,000 in funding from an undisclosed venture capitalist.

21.     On information and belief, Dr. Montgomery claimed that he had developed scientific data while employed at Nanogen demonstrating that the above-mentioned synthesis technology would work.  Nanogen is informed and believes, and thereon alleges, that Dr. Montgomery obtained and/or developed this data while employed by Nanogen and at Nanogen's expense.

22.     Because Dr. Montgomery knew and accepted Nanogen's company policies and the terms of the written Proprietary Information Agreement and again promised and was aware of his obligations in the Settlement Agreement (as detailed in the following paragraph), and because it is customary for biotechnology companies and Nanogen to rely on the representations made by scientists at Dr. Montgomery's level relating to the progress of their scientific research, and because Dr. Montgomery maintained possession of and control over at least some of his laboratory notebooks and other documents containing his scientific research, the facts as set forth herein relating to Dr. Montgomery's research were particularly within Dr. Montgomery's knowledge.

<u>Dr. Montgomery's Activities After Leaving Nanogen</u>

23.     Following Dr. Montgomery's voluntary resignation from Nanogen on about August 18, 1995, Dr. Montgomery filed suit in November 1995 against Nanogen for 1) Violation of California Labor Code Section 970; 2) Fraudulent Inducement to Accept Employment; and 3) Constructive Termination in Violation of Public Policy.  <u>Montgomery v. Nanogen, Inc.</u>, No. 69421 (Cal. Sup. Ct., San Diego 1995).  On about February 26, 1996, Dr. Montgomery voluntarily

Exhibit 4 Page 7

Page 53

1   entered into a Settlement and General Release Agreement ("Settlement Agreement") with Nanogen

2   to settle Dr. Montgomery's lawsuit. In the Settlement Agreement, Dr. Montgomery again

3   covenanted that he would not compete unfairly with Nanogen and would not misappropriate any

4   Nanogen trade secrets. A true and correct copy of the Settlement Agreement is attached hereto as

5   Exhibit "C"[2] and is incorporated herein by reference.

6       24.    On information and belief, Dr. Montgomery actively explored the possibility of

7   commercializing certain inventions made at Nanogen by Nanogen employees, alone or together

8   with Dr. Montgomery for his own benefit. Sometime in about October of 1995, Dr. Montgomery

9   founded and incorporated CombiMatrix in the State of California to directly compete with

10  Nanogen using Nanogen's Proprietary Information, including but not limited to inventions made,

11  conceived, reduced to practice or developed by Nanogen employees and/or by Dr. Montgomery

12  while working at Nanogen.

13      25.    Dr. Montgomery filed a PCT application on July 3, 1997, published on January 15,

14  1998 as the '221 PCT, claiming priority to a United States Patent Application Serial No. 021,002

15  filed July 5, 1996, which disclosed and claimed technology developed at Nanogen relating to

16  structures and synthesis methods, using electrochemical placement of monomers or nucleic acids at

17  specific locations on a substrate containing at least one electrode. Dr. Montgomery filed Patent

18  Application No. 09/003,075 with the United States Patent and Trademark Office ("PTO") on

19  January 5, 1998 which ultimately issued on July 25, 2000 as the '302 Patent. Dr. Montgomery

20  filed another PCT application on January 5, 1999, published on July 15, 1999 as the '688 PCT,

21  claiming a priority date of January 5, 1998. Both the '302 Patent and the '688 PCT disclosed and

22  claimed technology developed at Nanogen relating to structures and synthesis methods using

23  electrochemical placement of monomers or nucleic acids at specific locations on a substrate

24  containing at least one electrode in contact with a scavenging solution or proximate to a getter

25

26

27      [2] Because of the confidential and proprietary information disclosed in the Settlement
Agreement, it has been filed separately under seal with the Court. Nanogen has concurrently filed
28  *Ex Parte* request for the Court to accept for filing Exhibits A and C under seal.

1   electrode. Because of the above uses and disclosures, Dr. Montgomery breached his Settlement

2   Agreement with Nanogen.

3       26.    According to the information on the faces of the '302 Patent, the '221 PCT and the

4   '688 PCT, all alleged rights in Dr. Montgomery's patents and applications were assigned to

5   CombiMatrix Corporation. On the '302 Patent, CombiMatrix is listed as the Assignee. On each of

6   the '221 PCT and '688 PCT, CombiMatrix is listed as the Applicant. On information and belief,

7   Dr. Montgomery was a founding stockholder and the Vice President of Research and Development

8   of CombiMatrix at the time the alleged rights in the '302 Patent, the '221 PCT and '688 PCT were

9   granted to CombiMatrix by Dr. Montgomery.

10      27.    On information and belief, all of the claims of the '302 Patent, the '221 PCT and the

11  '688 PCT were conceived at Nanogen by Nanogen employees, all of whom were obligated to

12  assign any and all inventions to Nanogen. Consequently, Nanogen is the rightful owner of the '302

13  Patent, the '221 PCT and the '688 PCT, and any and all related domestic and foreign patents and

14  patent applications.

15  IV.    **CAUSES OF ACTION**

16                  **FIRST CAUSE OF ACTION**

17            (Correction of Inventorship of U.S. Patent No. 6,093,302
                         under 35 U.S.C. § 256)
18

19      28.    Nanogen hereby refers to and incorporates by reference paragraphs 1 through 27,

20  inclusive, of this Complaint.

21      29.    The inventorship on each of the '302 Patent, the '221 PCT and the '688 PCT is

22  currently incorrect because the names of the Nanogen Inventors were omitted.

23      30.    The Nanogen Inventors never signed nor were asked to sign by anyone any

24  Inventors Oath or Declarations or Assignment documents for the '302 Patent, the '221 PCT or the

25  '688 PCT or any other domestic or foreign applications or issued patents claiming priority

26  therefrom or relating to the technology disclosed therein.

27

28

31.     The Nanogen Inventors each had a duty to assign their rights in the inventions of the '302 Patent, the '221 PCT and the '688 PCT to Nanogen under individual employment agreements and company policy.

32.     At all times relevant herein, the Nanogen Inventors acted without deceptive intent with respect to their omissions as inventors or co-inventors of the '302 Patent, the '221 PCT and the '688 PCT and related domestic and foreign patents and patent applications.  Only after issuance of the '302 Patent and publication of the '221 PCT and '688 PCT did Nanogen and the Nanogen Inventors became aware that the Nanogen Inventors should have been named as inventors on the '302 Patent, the '221 PCT and the '688 PCT.

33.     On information and belief, the Nanogen Inventors, alone or with Dr. Montgomery, employees conceived the subject matter claimed in the '302 Patent, the '221 PCT and the '688 PCT before or during the period of Dr. Montgomery's employment at Nanogen.

34.     Experiments, research and invention disclosures of at least several Nanogen employees including Dr. Wu and Dr. Nikiforov indicate that the Nanogen Inventors are inventors of the subject matter claimed in the '302 Patent, the '221 PCT and the '688 PCT.

35.     Pursuant to the provisions of 35 U.S.C. § 256, Nanogen requests the Court to order the correction of the inventorship of '302 Patent and any related United States patents and applications by the Commissioner of Patents by the addition of the Nanogen Inventors as inventors or co-inventors.

## SECOND CAUSE OF ACTION

### (Declaratory Ruling of Proper Applicants, Assignees and Inventors)

36.     Nanogen hereby refers to and incorporates by reference Paragraphs 1 through 35, inclusive, of this Complaint.

37.     Nanogen requests that this Court, under 28 U.S.C. § 2201 and 2202, declare that the Nanogen Inventors are the inventors or co-inventors, and that Nanogen is the proper assignee and/or Applicant of each of the '302 Patent, the '221 PCT and the '688 PCT, and any domestic or foreign applications, and any issued domestic or foreign patents claiming priority therefrom or related thereto.

## THIRD CAUSE OF ACTION

**(Misappropriation Of Trade Secrets and Injunction under the California Uniform Trade Secrets Act, Cal. Civil Code §§ 3426 et seq. (by Defendant Dr. Montgomery))**

38.    Nanogen hereby refers to and incorporates by reference paragraphs 1 through 37, inclusive, of this Complaint.

39.    A confidential relationship existed between Nanogen and Dr. Montgomery based on his employment with Nanogen and his Acknowledgement of Nanogen's company policies as set forth in the Employee Handbook, the Proprietary Information Agreement and the Settlement Agreement, each of which Dr. Montgomery signed and agreed to be bound thereto.  True and correct copies of Nanogen's Employee Handbook and Dr. Montgomery's signed acknowledgement thereof are attached hereto as Exhibit "D" and incorporated herein by reference.

40.    Dr. Montgomery knew, had reason to know, and continues to know that he acquired Proprietary Information, including trade secrets, from Nanogen, that he had a confidential relationship with Nanogen and that he had and continues to have an obligation to maintain the secrecy of and not to use or disclose Nanogen's Proprietary Information without Nanogen's consent.

41.    As a senior level scientist at Nanogen, Dr. Montgomery promised Nanogen that he would disclose to Nanogen his research and any technology developed as a result of research performed by him, alone or together with other Nanogen employees, and that he would assign to Nanogen all rights in any technology or inventions developed or based upon proprietary information he acquired during his employment at Nanogen.  Based upon Dr. Montgomery's promises and the confidential relationship existing between Nanogen and Dr. Montgomery, Nanogen depended on Dr. Montgomery to keep his promises so that Nanogen could retain rightful ownership of any such technology or inventions.

42.    On information and belief, Dr. Montgomery breached the confidential relationship by using and disclosing Nanogen's Proprietary Information in the '302 Patent, the '221 PCT and '688 PCT for his own benefit and the benefit of CombiMatrix.

Exhibit 4 Page 71

Page 57

43. As a result of Dr. Montgomery's breach of the confidential relationship, Dr. Montgomery wrongfully gained ownership of the technology disclosed and claimed in the '302 Patent, the '221 PCT and the '688 PCT, and potentially in other foreign and domestic patents and/or applications, and commercially exploited the technology for his own personal gain and for the gain of CombiMatrix.

44. As a result of Dr. Montgomery's breach of the confidential relationship, Nanogen has been damaged by the loss of, including but not limited to, rights to the inventions disclosed and claimed in the '302 Patent, the '221 PCT and the '688 PCT, and potentially other domestic and foreign patents and applications, and all revenue derived therefrom, and the '302 patent, the '221 PCT and the '688 PCT themselves, and all revenue derived therefrom.

45. Dr. Montgomery was required to maintain Nanogen's Proprietary Information as secret and had agreed to refrain from misappropriating any of Nanogen's trade secrets by each of his agreement with Nanogen company policy, his Proprietary Information Agreement and the Settlement Agreement.

46. Dr. Montgomery knew, had reason to know, and continues to know that he acquired Proprietary Information, including trade secrets, from Nanogen either through or related to his employment at Nanogen, and that he had and continues to have a duty to maintain the secrecy and limit the use and disclosure of those trade secrets.

47. Nanogen actively sought to protect its trade secrets, and other Proprietary Information including the technology disclosed and claimed in the '302 Patent, the '221 PCT and '688 PCT, from unauthorized use and disclosure, including by Dr. Montgomery after the termination of Dr. Montgomery's employment with Nanogen. Nanogen was not aware of the misappropriation of Nanogen's trade secrets and other Proprietary Information by Dr. Montgomery and CombiMatrix until after the issuance of the '302 Patent, and publication of the '221 PCT and '688 PCT.

48. The technology disclosed and claimed in the '302 Patent, the '221 PCT and the '688 PCT was valuable as trade secrets, as possession of the trade secret information allowed Dr. Montgomery, personally and on behalf of CombiMatrix, to further develop the technology

Exhibit 4 Page 12

Page 58

described therein, obtain financing for development of a business designed to exploit the technology, seek patent protection, potentially license the invention to other business entities for use, and potentially market products derived from the technology to customers. The '302 Patent, the '221 PCT and the '688 PCT are disclosed as valuable intellectual property in CombiMatrix's November 22, 2000 S-1 filing.

49.    Nanogen has made substantial expenditures in investigating and developing the technology disclosed and claimed in the '302 Patent, the '221 PCT and the '688 PCT.

50.    Dr. Montgomery breached Nanogen's trust and confidence, Nanogen's company policies, the Proprietary Information Agreement and the Settlement Agreement. Further, Dr. Montgomery violated Nanogen's proprietary rights in its trade secrets and Proprietary Information by using them for Dr. Montgomery's own purposes and/or those of CombiMatrix, without Nanogen's consent.

51.    Dr. Montgomery misappropriated Nanogen's trade secrets by disclosing and using Nanogen's trade secrets and Proprietary Information to CombiMatrix without Nanogen's permission or consent, including without limitation in the preparation and filing of the application for the '302 Patent, and the publication of the '302 Patent, the '221 PCT and the '688 PCT.

52.    On information and belief, Dr. Montgomery, for himself personally and on behalf of CombiMatrix, misappropriated Nanogen's trade secrets and Proprietary Information at little or no cost to himself or CombiMatrix, thereby significantly reducing the cost of determining the feasibility and the cost of initial development of the subject matter of the '302 Patent, the '221 PCT and the '688 PCT.

53.    Nanogen is informed and believes, and thereon alleges, that Dr. Montgomery for himself and on behalf of CombiMatrix, had the express intent of misappropriating Nanogen's Proprietary Information, including its trade secrets, and intended to use and currently is using Nanogen's Proprietary Information for his own and CombiMatrix's commercial advantage to compete directly with Nanogen and/or to destroy Nanogen's competitive advantage in the marketplace, without incurring the expense and time necessary to research and develop their own technology separate and apart from that taken from Nanogen.

Exhibit 4 Page 13   NO.

Page 59

SDIL8B16)M6A
·41·⁊#I·v⁊
·™O%⁊·!· ⁊V⁊C·

54.     Nanogen is informed and believes, and thereon alleges, that Dr. Montgomery, for himself personally and on behalf of CombiMatrix, knowingly, willfully and deliberately misappropriated Nanogen's trade secrets and other Proprietary Information with full knowledge of the secret and confidential nature and commercial value of such information.  Nanogen further is informed and believes, and thereon alleges, that Dr. Montgomery's conduct was and is willful, malicious, despicable and in conscious disregard of Nanogen's rights and, therefore, Nanogen is entitled to an award of punitive damages in an amount not exceeding twice any award made for actual loss and for unjust enrichment, and to reasonable attorneys' fees, all pursuant to the California Uniform Trade Secrets Act, California Civil Code §§ 3426 *et seq.*

55.     Nanogen is informed and believes, and thereon alleges, that Dr. Montgomery's wrongful use and exploitation of Nanogen's trade secrets and other Proprietary Information has already damaged Nanogen and threatens to and will continue to damage Nanogen and cause it irreparable harm unless restrained by this Court, and Nanogen is without an adequate remedy that could fully compensate it at law.

56.     Nanogen is entitled to all available damages under California Civil Code § 3426.3(a) and (b).

57.     The use and disclosures by Dr. Montgomery, for himself personally and on behalf of CombiMatrix, as described above were willful and malicious, justifying the award of exemplary damages under California Civil Code § 3426.3(c).

58.     Defendant Dr. Montgomery had a duty to assign rights in this technology to Nanogen as required by Nanogen company policy and his Proprietary Information Agreement. Instead, Dr. Montgomery assigned rights in the technology to CombiMatrix.

59.     As the correct assignee of the Nanogen Inventors and Dr. Montgomery while employed at Nanogen, Nanogen is entitled to an undivided interest in all rights, title and interest as co-owner and tenant-in-common in and to the '302 Patent, the '221 PCT and the '688 PCT and in and to any domestic or foreign applications or issued domestic or foreign patents claiming priority therefrom or relating thereto.

60.     Nanogen is entitled to have this Court order Dr. Montgomery to assign any and all rights he may have in the '302 Patent, '221 PCT and the '688 PCT to Nanogen.

61.     Nanogen is entitled to have this Court enjoin Dr. Montgomery from further disclosure and use of Nanogen's trade secret and other Proprietary Information, including from further domestic and foreign patent filings naming Dr. Montgomery as the inventor or applicant.

## FOURTH CAUSE OF ACTION

**(Misappropriation of Trade Secrets and Injunction Under the California Uniform Trade Secrets Act, Cal. Civil Code §§ 3426 et seq. (by Defendant CombiMatrix))**

62.     Nanogen hereby refers to and incorporates by reference Paragraphs 1 through 61, inclusive, of this Complaint.

63.     By virtue of Dr. Montgomery's use of Nanogen's Proprietary Information, including Nanogen trade secret information, such information was acquired from Nanogen by improper means.

64.     On information and belief, CombiMatrix acquired such Nanogen trade secret and other Proprietary Information when it knew or had reason to know that such information was acquired from Nanogen by improper means. Dr. Montgomery was an officer of CombiMatrix and knew that the Nanogen trade secret and Proprietary Information was acquired by improper means. Dr. Montgomery's knowledge is imputed to CombiMatrix.

65.     CombiMatrix is deriving substantial economic benefit from such Nanogen trade secret and other Proprietary Information.

66.     The technology disclosed and claimed in the '302 Patent, the '221 PCT and the '688 PCT was valuable as trade secrets, as possession of the trade secret information allowed CombiMatrix to further develop the technology described therein, obtain financing for development of a business designed to exploit the technology, seek patent protection, potentially license the invention to other business entities for use, and potentially market products derived from the technology to customers. The '302 Patent, the '221 PCT and the; '688 PCT are disclosed as valuable intellectual property in CombiMatrix's November 22, 2000 S-1 filing.

Exhibit __4__ Page __15__ NO.

Page __61__

67.     CombiMatrix violated Nanogen's proprietary rights in its trade secrets and Proprietary Information by using them for their own purposes without Nanogen's consent.

68.     CombiMatrix misappropriated Nanogen's trade secrets by acquiring Nanogen's trade secrets and proprietary information from or through Dr. Montgomery without Nanogen's permission or consent, including without limitation in the preparation and filing of the application for the '302 Patent, and the publication of the '302 Patent, the '221 PCT and the '688 PCT.

69.     On information and belief, CombiMatrix misappropriated Nanogen's trade secrets and Proprietary Information at little or no cost to itself, thereby significantly reducing the cost of determining the feasibility and the cost of initial development of the subject matter of the '302 Patent, the '221 PCT and the '688 PCT.

70.     Nanogen is informed and believes, and thereon alleges, that CombiMatrix had the express intent of misappropriating Nanogen's Proprietary Information, including its trade secrets, and intended to acquire such for its own commercial advantage to compete directly with Nanogen and/or to destroy Nanogen's competitive advantage in the marketplace, without incurring the expense and time necessary to research and develop their own technology separate and apart from that taken from Nanogen.

71.     Nanogen is informed and believes, and thereon alleges, that CombiMatrix knowingly, willfully and deliberately misappropriated Nanogen's trade secrets and other Proprietary Information with full knowledge of the secret and confidential nature and commercial value of such information. Nanogen further is informed and believes, and thereon alleges, that CombiMatrix's conduct was and is willful, malicious, despicable and in conscious disregard of Nanogen's rights and, therefore, Nanogen is entitled to an award of punitive damages in an amount not exceeding twice any award made for actual loss and for unjust enrichment, and to reasonable attorneys' fees, all pursuant to the California Uniform Trade Secrets Act, California Civil Code §§ 3426 et seq.

72.     Nanogen is informed and believes, and thereon alleges, that CombiMatrix's wrongful acquisition and exploitation of Nanogen's trade secrets and other Proprietary Information has already damaged Nanogen and threatens to and will continue to damage Nanogen and cause it

Exhibit  4  Page 16

Page 62

1    irreparable harm unless restrained by this Court, and Nanogen is without an adequate remedy that

2    could fully compensate it at law.

3         73.    Nanogen is entitled to all available damages under California Civil Code

4    § 3426.3(a) and (b).

5         74.    The trade secret acquisition and exploitation by CombiMatrix as described above

6    were willful and malicious, justifying the award of exemplary damages under California Civil

7    Code § 3426.3(c).

8         75.    Defendant Dr. Montgomery had a duty to assign rights in this technology to

9    Nanogen as required by Nanogen company policy and his Proprietary Information Agreement.

10   Instead, Dr. Montgomery assigned rights in the technology to CombiMatrix.

11        76.    Nanogen is entitled to have the Court order transfer of assignment of any and all

12   rights CombiMatrix may have in the '302 Patent, the '221 PCT and the '688 PCT, to Nanogen.

13        77.    Nanogen is entitled to have the Court enjoin CombiMatrix from further exploitation

14   of Nanogen's trade secret and other Proprietary Information, including from further domestic and

15   foreign patent filings naming CombiMatrix as the applicant or assignee.

16                               **FIFTH CAUSE OF ACTION**

17              **(Breach of Written Contract Re:  Proprietary Information Agreement**
                              **(Against Defendant Dr. Montgomery))**
18

19        78.    Nanogen hereby refers to and incorporates by reference paragraphs 1 through 77,

20   inclusive, of this Complaint.

21        79.    Under the Proprietary Information Agreement with Nanogen, and by his signed

22   acknowledgement of the company policies set forth in Nanogen's Employee Handbook,

23   Dr. Montgomery assumed contractual obligations to Nanogen in connection with his employment.

24   Dr. Montgomery's obligations to Nanogen include, without limitation:  1) his agreements to assign

25   technology and inventions to Nanogen; 2) his agreement to maintain in confidence and not disclose

26   Nanogen Proprietary Information; 3) his agreement to disclose inventions to Nanogen; 4) his

27   agreement to return Nanogen documents; 5) the duty to record his scientific research, results and

28   conclusions in laboratory notebooks issued by Nanogen; and 6) his duty to make regular reports

Exhibit  4  Page 17   NO.

Page  63

1   and presentations to his supervisors and colleagues at Nanogen summarizing his scientific research

2   results and conclusions. Dr. Montgomery's Proprietary Information Agreement is attached hereto

3   as Exhibit A and incorporated herein by reference.

4          80.    Dr. Montgomery breached his written Proprietary Information Agreement and

5   Nanogen's company policies by failing to perform each of his obligations as set forth in the above

6   paragraph, including failing disclose some amount of his research and his contributions to the

7   technology disclosed and claimed in the '302 Patent, the '221 PCT and the '688 PCT in his

8   laboratory notebooks, reports or presentations, and by using Nanogen's trade secrets and other

9   Proprietary Information for his own purposes and/or those of CombiMatrix during and after his

10  employment, including by the use and disclosure related to the '302 Patent, the '221 PCT and the

11  '688 PCT, and by failing to assign to Nanogen ownership rights in this technology and in any

12  patents or patent applications in which this technology or any other Nanogen trade secret or

13  Proprietary Information is disclosed.

14         81.    Nanogen has performed all conditions, covenants and promises required on its part

15  in accordance with the terms and conditions of the Proprietary Information Agreement and the

16  Employee Handbook.

17         82.    Nanogen is informed and believes, and thereon alleges that Dr. Montgomery's acts

18  and omissions as alleged in this Complaint constitute material breaches of his obligations under the

19  Proprietary Information Agreement and the Employee Handbook Acknowledgement, each of

20  which were voluntarily agreed to and signed by Dr. Montgomery.

21         83.    As a direct and proximate result of Dr. Montgomery's secretive and material

22  breaches of Nanogen's company policies and the Proprietary Information Agreement and the facts

23  here alleged, Nanogen has suffered and will continue to suffer substantial damages by the loss of,

24  including but not limited to, rights to the technology disclosed and claimed in the '302 Patent, the

25  '221 PCT and the '688 PCT, and all revenue derived therefrom, and the '302 Patent, the '221 PCT

26  and the '688 PCT themselves, and all revenue derived therefrom. Nanogen has suffered damages

27  in an amount to be proven at trial, but believed to be substantial.

28

Exhibit 4 Page 8 No.

Page 64

84.     Nanogen was not aware nor should it reasonably have been aware of its potential causes of action against Dr. Montgomery, including its breach of written contract claim regarding the Proprietary Information Agreement, due to the secretive nature of Dr. Montgomery's breach.

## SIXTH CAUSE OF ACTION

### (Breach of Written Contract Re: Settlement Agreement (Against Defendant Dr. Montgomery))

85.     Nanogen hereby refers to and incorporates by reference paragraphs 1 through 84, inclusive, of this Complaint.

86.     Under the Settlement Agreement Dr. Montgomery voluntarily signed to terminate his lawsuit against Nanogen, Dr. Montgomery again promised, and was aware of his obligation, to protect in confidence, and not to disclose or use in competition with Nanogen and/or in any way to Nanogen's detriment, any research conducted or technology developed at Nanogen by Dr. Montgomery himself and/or by other Nanogen employees and/or any Nanogen trade secrets or other Proprietary Information of which Dr. Montgomery became aware during his employment.

87.     On information and belief, Dr. Montgomery materially breached the written Settlement Agreement with Nanogen by, among other actions by breaching:  1) his covenant not to compete, as defined in the Settlement Agreement; and 2) his agreement not to misappropriate trade secrets; including by failing to protect in confidence, disclosing and/or using in competition with Nanogen, the subject matter in the '302 Patent, the '221 PCT and the '688 PCT to Nanogen's detriment, as well as research conducted or technology developed at Nanogen by Dr. Montgomery himself and/or by other Nanogen employees, and/or any Nanogen trade secrets or other Proprietary Information of which Dr. Montgomery became aware during his employment.

88.     Nanogen has performed all conditions, covenants and promises required on its part in accordance with the terms and conditions of the Settlement Agreement.

89.     Nanogen is informed and believes, and thereon alleges that Dr. Montgomery's acts and omissions as alleged in this Complaint constitute material breaches of his obligations under the Settlement Agreement, which was voluntarily agreed to and signed by Dr. Montgomery.

Exhibit  4   Page  19

Page  65

90.     As a direct and proximate result of Dr. Montgomery's secretive and material
breaches of Nanogen's company policies, the Settlement Agreement and the facts here alleged,
Nanogen has suffered and will continue to suffer substantial damages by the loss of, including but
not limited to, rights to the technology disclosed and claimed in the '302 Patent, the '221 PCT and
the '688 PCT, and all revenue derived therefrom, and the '302 Patent, the '221 PCT and the '688
PCT themselves, and all revenue derived therefrom.  Nanogen has suffered damages in an amount
to be proven at trial, but believed to be substantial.

91.     Nanogen was not aware nor should it reasonably have been aware of its potential
causes of action against Dr. Montgomery, including its breach of written contract claim regarding
the Settlement Agreement, due to the secretive nature of Dr. Montgomery's breach.

## SEVENTH CAUSE OF ACTION

### (Inducing Breach Of Written Contract
### (Against Defendant CombiMatrix))

92.     Nanogen hereby refers to and incorporates by reference paragraphs 1 through 91,
inclusive, of this Complaint.

93.     On information and belief, Defendant CombiMatrix knew of Dr. Montgomery's
former employment at Nanogen and of the existence of the Proprietary Information Agreement and
Settlement Agreement between Dr. Montgomery and Nanogen.

94.     On information and belief, CombiMatrix, with such knowledge of the Agreements
and of Nanogen's reliance on these Agreements, intentionally acted to induce Dr. Montgomery to
disclose and use Nanogen's trade secrets and other Proprietary Information and to disclose and use
the '302 Patent, the '221 PCT and the '688 PCT and the technology described therein, and to
assign the '302 Patent, the '221 PCT and '688 PCT to CombiMatrix and thereby breach
Dr. Montgomery's Proprietary Information Agreement and Settlement Agreement with Nanogen.

95.     As a direct and proximate result of CombiMatrix's inducement to cause
Dr. Montgomery's secretive and material breaches of the Proprietary Information Agreement and
Settlement Agreement and the facts here alleged, Nanogen has suffered and will continue to suffer
substantial damages by the loss of, including but not limited to, rights to the technology disclosed

Exhibit  4  Page 20  No.

Page 66

1    and claimed in the '302 Patent, the '221 PCT and the '688 PCT and all revenue derived therefrom,

2    and the '302 Patent, the '221 PCT and the '688 PCT themselves and all revenue derived therefrom.

3    Nanogen has suffered damages in an amount to be proven at trial, but believed to be substantial.

4        96.    Nanogen was not aware nor should it reasonably have been aware of its potential

5    causes of action against CombiMatrix, including its inducing breach of written contract claims, due

6    to the secretive nature of CombiMatrix's breach.

### EIGHTH CAUSE OF ACTION

**(Breach Of Implied Covenant Of Good Faith And Fair Dealing
(Against Defendant Dr. Montgomery))**

10       97.    Nanogen hereby refers to and incorporates by reference paragraphs 1 through 96,

11   inclusive, of this Complaint.

12       98.    By virtue of Dr. Montgomery's employment agreement with Nanogen, his

13   Acknowledgement of the Employee Handbook, the Proprietary Information Agreement and the

14   Settlement Agreement with Nanogen, Dr. Montgomery impliedly covenanted to act toward and

15   deal with Nanogen fairly and in good faith.

16       99.    Dr. Montgomery's acts and omissions as alleged above constituted a breach of the

17   covenant of good faith and fair dealing implied in Dr. Montgomery's employment, Proprietary

18   Information Agreement and Settlement Agreement with Nanogen.

19       100.   As a direct and proximate result of Dr. Montgomery's breach of the implied

20   covenant of good faith and fair dealing, Nanogen has suffered and will continue to suffer

21   substantial damages by the loss of, including but not limited to, rights to the inventions disclosed

22   and claimed in the '302 Patent, the '221 PCT and the '688 PCT, and all revenue derived therefrom,

23   and the '302 Patent, the '221 PCT and the '688 PCT themselves, and all revenue derived

24   therefrom.  Nanogen has suffered damages in an amount to be proven at trial, but believed to be

25   substantial.

26       101.   Nanogen was not aware nor should it reasonably have been aware of its potential

27   causes of action against Dr. Montgomery, including its breach of implied covenant of good faith

28   and fair dealing claim, due to the secretive nature of Dr. Montgomery's breach.



# NINTH CAUSE OF ACTION

**(Intentional Interference With Prospective Economic Advantage (Against Both Defendants))**

102.    Nanogen hereby refers to and incorporates by reference paragraphs 1 through 101, inclusive, of this Complaint.

103.    Upon information and belief, despite his obligations to do so, Dr. Montgomery has failed to disclose to Nanogen that he and/or the Nanogen Inventors made or derived inventions during his employment at Nanogen and failed to assign to Nanogen patents and applications for patents claiming such inventions filed after termination of his employment at Nanogen. Instead, Dr. Montgomery disclosed, CombiMatrix acquired, and both Defendants used and commercially exploited Nanogen's trade secrets and/or other Proprietary Information, including the technology disclosed and claimed in the '302 Patent, the '221 PCT and the '688 PCT, as if they were the rightful owners. These actions resulted in the denial of Nanogen's rights in the technology disclosed and claimed in the '302 Patent, the '221 PCT and the '688 PCT, and potentially other patent applications, and the loss of Nanogen's valuable trade secrets.

104.    As a result of Dr. Montgomery's secretive and material breach of his obligations to Nanogen and the facts alleged herein, Nanogen has suffered and will continue to suffer substantial economic damages by the loss of, including but not limited to, rights to the inventions disclosed in the '302 Patent, the '221 PCT and the '688 PCT, and all revenue derived therefrom, and the '302 Patent, the '221 PCT and the '688 PCT themselves, and all revenue derived therefrom. Nanogen has suffered damages in an amount to be proven at trial, but believed to be substantial.

105.    Defendant CombiMatrix intentionally and wrongfully acted to disrupt the established relationship between Nanogen and Dr. Montgomery by causing Dr. Montgomery to disclose and assign an alleged ownership interest in the technology disclosed and claimed in the '302 Patent, the '221 PCT and the '688 PCT to CombiMatrix, contrary to Nanogen's company policies, the Proprietary Information Agreement and the Settlement Agreement, which require Dr. Montgomery to maintain the confidentiality and assign ownership of this technology to Nanogen.

Exhibit 4 Page 222

Page 68

106.   Dr. Montgomery's commitments and promises to Nanogen were valuable to Nanogen, as they entitled Nanogen to ownership of '302 Patent, the '221 PCT and the '688 PCT, and potentially other patents or applications, as well as rights to the technology disclosed therein and to commercialize and sub-license the technology disclosed therein.

107.   As a direct and proximate result of the actions of Dr. Montgomery and CombiMatrix, Nanogen has suffered and will continue to suffer substantial damages by the loss of, including but not limited to, rights to the technology and inventions disclosed and claimed in '302 Patent, the '221 PCT and the '688 PCT and all revenue derived therefrom, and '302 Patent, the '221 PCT and the '688 PCT themselves and all revenue derived therefrom. Nanogen has suffered damages in an amount to be proven at trial, but believed to be substantial.

108.   On information and belief, Dr. Montgomery and CombiMatrix misappropriated Nanogen's trade secrets and Proprietary Information at little or no cost to themselves, thereby significantly reducing the cost of determining the feasibility and the cost of initial development of the subject matter of the '302 Patent, the '221 PCT and the '688 PCT.

109.   The technology disclosed and claimed in the '302 Patent, the '221 PCT and the '688 PCT was valuable to Nanogen as trade secrets, as possession of that information allowed Dr. Montgomery and CombiMatrix to further develop the technology, obtain financing for development of a business designed to exploit the technology, seek patent protection, potentially license the invention to other business entities for use, and potentially market products derived from the technology to customers. Each of these actions gave the Defendants an actual or prospective economic advantage that should have inured to Nanogen exclusively.

110.   Nanogen is informed and believes, and thereon alleges, that Dr. Montgomery and CombiMatrix had the express intent of misappropriating Nanogen's Proprietary Information, including its trade secrets, and acquired and intended to use and currently is using Nanogen's Proprietary Information for their own commercial advantage to compete directly with Nanogen and/or to destroy Nanogen's competitive advantage in the marketplace and prospective economic advantage, without incurring the expense and time necessary to research and develop their own technology separate and apart from that taken from Nanogen.

Exhibit 4 Page 23
Page 69

1      111.    Nanogen was not aware nor should it reasonably have been aware of its potential

2  causes of action against Dr. Montgomery and CombiMatrix, including the intentional interference

3  with potential economic advantage cause of action, due to the secretive and fraudulent nature of

4  Defendants' tortious conduct.

5                          **TENTH CAUSE OF ACTION**

6             **(Unfair Competition under the Common Law and California Business
                & Professions Code § 17200 (Against Both Defendants))**

7

8      112.    Nanogen hereby refers to and incorporates by reference paragraphs 1 through 111,

9  inclusive, of this Complaint.

10     113.    By unlawfully, unfairly and/or intentionally acting to interfere with Nanogen's

11  contractual relations and prospective economic advantage by using, disclosing, commercially

12  exploiting and claiming ownership of Nanogen's trade secrets and other Proprietary Information,

13  and other deliberate acts and omissions as described above, Dr. Montgomery, for himself and on

14  behalf of CombiMatrix, and CombiMatrix engaged in improper means to obtain a business benefit

15  to the detriment of Nanogen.

16     114.    Nanogen is informed and believes, and thereon alleges, that Dr. Montgomery's

17  actions, for himself and on behalf of CombiMatrix, and CombiMatrix's actions constitute unfair

18  competition against Nanogen under California common law which has resulted and threatens to

19  continue to result in damages and other further and substantial irreparable harm to Nanogen.

20  Nanogen further is informed and believes, and thereon alleges, that Dr. Montgomery, for himself

21  and on behalf of CombiMatrix, and CombiMatrix acted unlawfully, unfairly and/or willfully,

22  maliciously, despicably and in conscious disregard of Nanogen's rights entitling Nanogen to

23  punitive damages under California Civil Code § 3294.

24     115.    Nanogen is informed and believes, and thereon alleges, that Dr. Montgomery's

25  actions, for himself and on behalf of CombiMatrix, and CombiMatrix's actions constitute a pattern

26  of business unfair trade practices in violation of California Business and Professions Code § 17200

27  et seq. which has resulted in and continues to cause and threaten to cause Nanogen substantial and

28  irreparable harm.

Exhibit _4_ Page _24_  No.

Page _70_

116.   As a direct and proximate result of Dr. Montgomery's unfair competition, for himself and on behalf of CombiMatrix, and CombiMatrix's unfair competition, Nanogen has suffered and will continue to suffer substantial damages by the loss of, including but not limited to, rights to the inventions disclosed and claimed in the '302 Patent, the '221 PCT and the '688 PCT and all revenue derived therefrom, and the '302 Patent, the '221 PCT and the '688 PCT themselves and all revenue derived therefrom.  Nanogen has suffered damages in an amount to be proven at trial, but believed to be substantial.

117.   Nanogen is informed and believes that each of the acts and omissions by Defendants complained of in this cause of action constitutes an act done willfully and with malice, thereby supporting the award of exemplary damages.

## ELEVENTH CAUSE OF ACTION

### (Unjust Enrichment (Against Both Defendants))

118.   Nanogen hereby refers to and incorporates by reference paragraphs 1 through 117, inclusive, of this Complaint.

119.   Nanogen did not grant to Defendants, and Defendants did not bargain for or receive, any ownership rights to the technology disclosed and claimed in the '302 Patent, the '221 PCT, the '688 PCT or any and all other domestic or foreign issued patents or applications that encompass the Nanogen Inventors' contributions and/or Dr. Montgomery's contributions to this technology while employed at Nanogen.

120.   On information and belief, Defendants have and/or will unjustly receive money from venture capitalists, sale of stock to the public, sales, collaborative agreements, and/or sub-license fees as a result of the misappropriation of trade secrets and/or other Proprietary Information, the unauthorized uses of the technology disclosed and claimed in the '302 Patent, the '221 PCT, the '688 PCT to which Nanogen claims ownership, and other wrongful acts set forth above.

121.   Allowing Defendants to retain any funds received as a result of their wrongful acts would unjustly benefit Defendants to the damage, detriment and exclusion of Nanogen.

SDILIB-1 JMM/
541793 03

Exhibit 4 Page 25
Page 71
SE NO. _

122.   Defendants have wrongfully detained the property consisting of the technology disclosed and claimed in the '302 Patent, the '221 PCT, the '688 PCT, and all remedies derived therefrom, and potentially other patents and applications, within the meaning of California Civil Code § 2223 and thus are involuntary trustees thereof for the benefit of Nanogen.

123.   Defendants have gained control over the technology disclosed '302 Patent, the '221 PCT, the '688 PCT, and the patent and applications themselves, by accident, mistake, undue influence, the violation of a trust, or other wrongful acts within the meaning of California Civil Code § 2224, do not possess some other and better right to the technology and the Patent and applications, and are involuntary trustees of the Patent and applications, and potentially other domestic and foreign patents and applications, and the technology disclosed therein, for the benefit of Nanogen who would otherwise have gained ownership of each of them.

124.   Accordingly, Nanogen requests that this Court declare Dr. Montgomery and/or CombiMatrix involuntary trustees of the technology disclosed and claimed in the '302 Patent, the '221 PCT, the '688 PCT, and any and all domestic and foreign patents and applications related thereto, and the patent and applications themselves, in constructive trust for the benefit of Nanogen.

## TWELFTH CAUSE OF ACTION

### (Constructive Trust (Against Both Defendants))

125.   Nanogen hereby refers to and incorporates by this reference paragraphs 1 through 124, inclusive, of this Complaint.

126.   Nanogen is entitled to a constructive trust over the trust res which consists of (1) the technology and/or inventions disclosed and claimed in the '302 Patent, the '221 PCT and the '688 PCT and any and all domestic and foreign patents and applications related thereto, and all revenue derived therefrom and (2) the patents and/or applications themselves and all revenue derived therefrom.

127.   On information and belief, Dr. Montgomery and CombiMatrix are constructive trustees over the trust res described in Paragraph 126 above because Defendants' acquisition of the trust res resulted from Dr. Montgomery's wrongful failure to disclose and assign the technology

SULLIVAN & JMM·
:41793 625

Exhibit 4 Page 76
Page 72

1  and/or inventions constituting the trust res to Nanogen, and because Nanogen is entitled to

2  possession and ownership of the trust res due to its development by Nanogen employees at

3  Nanogen.

4       128.   Nanogen was not aware nor should it reasonably have been aware of its potential

5  causes of action against Dr. Montgomery and CombiMatrix, including its claim for constructive

6  trust, due to the secretive and fraudulent nature of Defendants' tortious conduct.

7       129.   Accordingly, Nanogen requests that the Court declare Dr. Montgomery and/or

8  CombiMatrix involuntary trustees of the technology disclosed and claimed in the '302 Patent, the

9  '221 PCT, the '688 PCT, and any and all domestic and foreign patents and applications related

10  thereto, and the patent and applications themselves, in constructive trust for the benefit of

11  Nanogen.

12  **THIRTEENTH CAUSE OF ACTION**

13  **(Injunctive Relief (Against Both Defendants))**

14       130.   Nanogen hereby refers to and incorporates by reference paragraphs 1 through 129,

15  inclusive, of this Complaint.

16       131.   Nanogen is entitled to an injunction preventing Dr. Montgomery and CombiMatrix,

17  their agents, representatives, employees and all those acting in concert with or under any of them,

18  from using or disclosing to third parties Nanogen's Proprietary Information, including Nanogen's

19  trade secrets, inventions, and technical know-how.

20       132.   Nanogen is entitled to an injunction compelling Dr. Montgomery and CombiMatrix

21  to disclose to Nanogen all technology or inventions Dr. Montgomery made/makes,

22  conceived/conceives, reduced/reduces to practice or developed/develops (in whole or in part, either

23  alone or jointly with others) during or as a result of his employment with Nanogen.

24       133.   Nanogen is entitled to an injunction compelling Dr. Montgomery and CombiMatrix

25  to assign to Nanogen all technology or inventions Dr. Montgomery made/makes,

26  conceived/conceives, reduced/reduces to practice or developed/develops (in whole or in part, either

27  alone or jointly with others) during or as a result of his employment with Nanogen, including but

28  not limited to the technology disclosed and claimed in the '302 Patent, the '221 PCT, the '688

Exhibit 4 Page 27

Page 73

1    PCT, and any and all domestic and foreign patents and applications related thereto, and the patent

2    and applications themselves.

3        134.   Nanogen is entitled to a preliminary injunction preventing Dr. Montgomery and

4    CombiMatrix from licensing or transferring any rights in the '302 Patent, the '221 PCT, the '688

5    PCT, and any and all domestic and foreign patents and applications related thereto.

6        135.   Defendants' wrongful conduct and threatened continued wrongful conduct, unless

7    and until enjoined and restrained by order of this Court, will cause grave and irreparable harm to

8    Nanogen in that Nanogen's competitive advantage will be diminished or destroyed.

9        136.   Nanogen has no adequate remedy at law for the injuries it will suffer if

10   Dr. Montgomery and CombiMatrix are not enjoined from their present course of conduct or it will

11   be extremely difficult to ascertain the amount of compensation that would afford Nanogen

12   adequate relief.

### FOURTEENTH CAUSE OF ACTION

**(Conversion of the '302 Patent, the '221 PCT and the '688 PCT
(Against Both Defendants))**

16       137.   Nanogen hereby refers to and incorporates by this reference paragraphs 1 through

17   136, inclusive, of this Complaint.

18       138.   In filing the patent application of the '302 Patent and allowing its issuance covering

19   subject matter that was conceived and developed by the Nanogen Inventors alone or jointly with

20   Dr. Montgomery, Dr. Montgomery omitted naming the Nanogen Inventors as inventors or co-

21   inventors of the subject matter claimed in the '302 Patent. Through the omission of the Nanogen

22   Inventors as inventors or co-inventors and upon the issuance of the '302 Patent and the publication

23   of the '221 PCT and the '688 PCT, Dr. Montgomery actually interfered with and effectively denied

24   Nanogen's ownership position, as the Nanogen Inventors' assignee, in the '302 Patent, the '221

25   PCT and the '688 PCT.

26       139.   Defendants have from at least July, 1996 to the present day, exercised complete and

27   absolute control over the '302 Patent, the '221 PCT, the '688 PCT, and the respected applications

28   related thereto, and possibly other related patents and applications to the exclusion of Nanogen.

Exhibit _4_ Page _28_

Page _74_

CASE NO._____

140.    Nanogen, as assignee of the Nanogen Inventors and of Dr. Montgomery during his employment at Nanogen, has a right to possession of the '302 patent, as well as any patents resulting from the '221 PCT, the '688 PCT, and other related domestic and foreign patents and applications.

141.    The denial of the legal recognition of the Nanogen Inventors as inventors or co-inventors has precluded Nanogen from further developing, marketing or licensing the technology disclosed and claimed in the '302 Patent, the '221 PCT and the '688 PCT in order to achieve commercialization and benefit therefrom.  As a result, Nanogen has been and continues to be severely damaged by Defendants' conversion of the technology, patents and applications.

142.    Defendant Dr. Montgomery has materially benefited by assigning his rights in the technology disclosed and claimed in the '302 Patent, the '221 PCT and the '688 PCT, the patents and applications themselves and potentially other patents and applications to CombiMatrix. Nanogen is informed and believes, and on that basis alleges, that CombiMatrix recompensed Dr. Montgomery as if Dr. Montgomery were the sole inventor and as such could grant exclusive rights to practice the invention.

143.    Nanogen is entitled to compensatory damages for the injuries suffered as a result of the aforementioned conversion and resultant complete deprivation of Nanogen's property rights in the '302 Patent, the '221 PCT and the '688 PCT, the patents and applications themselves and all revenue derived therefrom.

144.    Nanogen was not aware nor should it reasonably have been aware of its potential causes of action against Dr. Montgomery and CombiMatrix, including its conversion claim, due to the secretive and fraudulent nature of Defendants' tortious conduct.

### PRAYER FOR RELIEF

WHEREFORE, Nanogen prays for relief as follows:

A.    For correction of the inventorship to add the Nanogen Inventors to the '302 patent, the '221 PCT, and the '688 PCT, and related applications;

B.    For Assignment of any and all rights of CombiMatrix Corporation and/or Dr. Montgomery in the '302 Patent, the '221 PCT, the '688 PCT and any related

Exhibit  4  Page  29
Page  75
CASE NO.

1         patents or applications to Nanogen;

2     C.     For an injunction permanently enjoining Defendants from further disclosure and use

3         of any of Nanogen's trade secret information and Proprietary Information including

4         that misappropriated and incorporated into the '302 Patent and related applications;

5     D.     For an injunction preventing Dr. Montgomery, CombiMatrix, their agents,

6         representatives, employees and all those acting in concert with or under any of

7         them, from using or disclosing to third parties Nanogen's proprietary information,

8         including Nanogen's trade secrets, inventions, and technical know-how;

9     E.     For an injunction compelling Dr. Montgomery and CombiMatrix to disclose to

10        Nanogen all technology or inventions Dr. Montgomery made, conceived, reduced to

11        practice or developed (in whole or in part, either alone or jointly with others) during

12        or as a result of his employment with Nanogen;

13     F.     For an injunction compelling Dr. Montgomery and CombiMatrix to assign to

14        Nanogen all technology or inventions Dr. Montgomery made, conceived, reduced to

15        practice or developed (in whole or in part, either alone or jointly with others) during

16        or as a result of his employment with Nanogen, including but not limited to the

17        technology disclosed and claimed in the '302 Patent, the '221 PCT, the '688 PCT,

18        and the patent and applications themselves;

19     G.     For a preliminary injunction and permanent injunction preventing the Defendants

20        from transferring or licensing any rights to the '302 patent, the '688 PCT or the '221

21        PCT or any related patents or applications, and from filing or causing to have filed

22        any additional related patent applications;

23     H.     For an award of damages to Nanogen adequate to compensate Nanogen for damages

24        incurred as a result of Defendants' trade secret misappropriation, breach of written

25        contracts, inducing breach of contracts, breach of implied covenant of good faith

26        and fair dealing, intentional interference with prospective economic advantage,

27        unjust enrichment and conversion;

28     I.     For damages in an amount sufficient to compensate Nanogen for the damage caused

Exhibit 4 Page 30
Page 76       CASE NO.

1    by the Defendants unfair competition under common law and California Business

2    and Professions Code section 17200, including punitive damages under California

3    Civil Code section 3294 and exemplary damages provided by §17206 of the

4    California Business and Professions Code;

5    J.    For exemplary damages under California Civil Code section 3426.3(c);

6    K.    For attorneys fees under California Civil Code section 3426.4 and any other

7          applicable law or contract; and

8    L.    Any other damages or relief the Court may deem appropriate.

9    **V.   DEMAND FOR JURY TRIAL**

10         Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff Nanogen

11   respectfully demands a trial by jury on all issues that cannot be resolved as a matter of law.

12

13   DATED:  November 28, 2000              BROBECK, PHLEGER & HARRISON LLP

14

15                                         By: _____

16                                             Douglas R. Olson
                                               Jeffrey W. Guise
17                                             Peter R. Munson
                                               Attorneys for Plaintiffs
18                                             NANOGEN, INC.

19

20

21

22

23

24

25

26

27

28

Exhibit  4  Page 31
Page 77

1

## INDEX OF EXHIBITS

2 **Exhibit**    **Short Title of Exhibit**                                              **Page**

3 A      Proprietary Information and Inventions Agreement .................................... 3

4 B      U.S. Patent No. 6,093,302 ................................................................. 5

5 C      February 26, 1996 Settlement Agreement ........................................... 7

6 D      Nanogen's Employee Handbook and Montgomery
        Acknowledgement ........................................................................ 10

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Exhibit __4__ Page __22__

Page __78__

1  DOUGLAS E. OLSON, State Bar No. 38649
   JEFFREY W. GUISE, State Bar No. 164203
2  PETER R. MUNSON, State Bar No. 193216
   BROBECK, PHLEGER & HARRISON LLP
3  12390 El Camino Real
   San Diego, CA 92130-2081
4  Telephone:    (858) 720-2500
   Facsimile:    (858) 720-2555
5
   Attorneys for Plaintiff
6  NANOGEN, INC.

7

8                 UNITED STATES DISTRICT COURT

9             FOR THE SOUTHERN DISTRICT OF CALIFORNIA

10  NANOGEN, INC., a Delaware Corporation,    )    Case No.
                                              )
11                         Plaintiff,          )
                                              )
12          v.                                 )
                                              )
13  DONALD D. MONTGOMERY, an                   )
    Individual, and COMBIMATRIX CORP., a       )
14  Delaware Corporation, and a California     )
    Corporation,                               )
15                                             )
                           Defendants.         )
16                                             )
                                              )
17                                             )

18  ────────────────────────────────

19

20                          Exhibit A

21

22          Proprietary Information and Inventions Agreement

23

24

25

Exhibit 4  Page 33
Page 79

## Proprietary    Information
## and   Inventions   Agreement

Nanogen, Inc.
4510 Executive Drive, Suite 214
San Diego, CA 92121

The following confirms an agreement between me and Nanogen, Inc., a California corporation (the "Company," which term includes the Company's subsidiaries, successors and assigns), which is a material part of the consideration for my employment by the Company:

1.   "Proprietary Information" is information that was developed by, became known by, or was assigned or otherwise conveyed to the Company, and which has commercial value in the Company's business. I understand that my employment creates a relationship of confidence and trust between me and the Company with respect to Proprietary Information of the Company or its customers which may be learned by me during the period of my employment.  By way of illustration, but not limitation, Proprietary Information includes trade secrets, processes, cell-lines, gels, information, compilations, formulas, data and know-how, software programs, improvements, inventions, techniques, marketing plans, strategies, forecasts, computer programs and copyrightable material, and customer lists.

2.   In consideration of my employment by the Company and the compensation received by me from the Company from time to time, I hereby agree as follows:

(a) All Proprietary Information shall be the sole property of the Company and its assigns, and the Company and its assigns shall be the sole owner of all patents, copyrights and other rights in connection therewith. I hereby assign to the Company any rights I may have or acquire in such Proprietary Information.  At all times, both during my employment by the Company and after its termination, I will keep in confidence and trust all



Exhibit 4 Page 24
Page 80

Proprietary Information, and I will not use or disclose any Proprietary Information or anything relating to it without the written consent of the Company, except as may be necessary in the ordinary course of performing my duties to the Company.

(b) All documents, records, apparatus, equipment and other physical property, whether or not pertaining to Proprietary Information, furnished to me by the Company or produced by myself or others in connection with my employment shall be and remain the sole property of the Company and shall be returned to it immediately as and when requested by the Company. Even if the Company does not so request, I shall return and deliver all such property upon termination of my employment by me or by the Company for any reason and I will not take with me any such property or any reproduction of such property upon such termination.

(c) I will promptly disclose to the Company, or any persons designated by it, all improvements, inventions, formulas, ideas, processes, techniques, know-how and data, whether or not patentable, made or conceived or reduced to practice or learned by me, either alone or jointly with others, during the term of my employment and for one (1) year thereafter (all said improvements, inventions, formulas, ideas, processes, techniques, know-how and data shall be herinafter collectively called "Inventions").

(d) During the term of my employment and for one (1) here thereafter, I will not encourage or solicit any employee of the Company to leave the Company for any reason or to devote less than all of any such employee's efforts to the affairs of the Company, provided that the foregoing shall not affect any responsibility I may have as an employee of the Company with respect to the bonafide hiring and firing of Company personnel.

(e) I agree that all Inventions which I make, conceive, reduce to practice or develop (in whole or in part, either alone or jointly with others) during my employment shall be the sole property of the Company to the maximum extent permitted by Section 2870 of the California Labor Code, a copy of which is attached hereto. The Company shall be the sole owner of all patents, copyrights and other intellectual property or other rights in connection therewith. I hereby assign to the Company any rights I may have or acquire in such Inventions. I agree to perform, during and after my employment, all acts deemed necessary or desirable by the Company

Exhibit 4 Page 35

Page 81

to permit and assist it, at the Company's expense, in obtaining and enforcing patents, copyrights or other rights on such Inventions and improvements in any and all countries. Such acts may include, but are not limited to, execution of documents and assistance or cooperation in legal proceedings. I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents, as my agents and attorney's-in-fact to act for and in my behalf and instead of me, to execute and file any applications or related filings and to do all other lawfully permitted acts to further the prosecution and issuance of patents, copyrights or other rights thereon with the same legal force and effect as if executed by me.

(f) As a matter of record I attach hereto a complete list of all inventions or improvements relevant to the subject matter of my employment by the Company which have been made or conceived or first reduced to practice by me alone or jointly with others prior to my employment with the Company that I desire to remove from the operation of this Agreement, and I covenant that such list is complete. If no such list is attached to this Agreement, I represent that I have no such inventions and improvements at the time of signing this Agreement.

(g) I represent that my performance of all the terms of this Agreement will not breach any agreement to keep in confidence Proprietary Information acquired by me in confidence or in trust prior to my employment by the Company. I have not entered into, and I agree I will not enter into, any agreement either written or oral in conflict herewith.

(h) I represent that execution of this Agreement, my employment with the Company and my performance of my proposed duties to the Company in the development of its business will not violate any obligations I may have to any former employer.

(i) This Agreement does not require assignment of an invention which an employee cannot be obligated to assign under Section 2870 of the California Labor Code (hereinafter called "Section 2870"). However, I will disclose any Inventions as required by Section 2(c) hereof regardless of whether I believe the Invention is protected by Section 2870, in order to permit the Company to engage in a review process to determine such issues as may arise. Such disclosure shall be received in confidence by the Company.



Exhibit 4 Page 86

Page 82

3. This Agreement shall be effective as of the first day of my employment by the Company; and shall be binding upon me, my heirs, executors, assigns, and administrators and shall inure to the benefit of the Company, its successors and assigns.

Dated: ___MAY 5___, 1994

_____
Signature

___DONALD D. MONTGOMERY___
Print Name

ACCEPTED AND AGREED TO:

Nanogen, Inc.

By _____
President and Chief Operating Officer

Exhibit __4__ Page __37__
Page 83

Exhibit   A


Nanogen, Inc.
4510 Executive Drive, Suite 214
San Diego, CA 92121


1.  The following is a complete list of all inventions or improvements relevant to the subject matter of my employment by Nanogen, Inc. (the "Company") that have been made or conceived or first reduced to practice by me alone or jointly with others prior to my employment by the company that I desire to remove from the operation of the Company's Proprietary Information and Inventions Agreement:

_____        No  inventions  or  improvements.

_____        See below:   Any and all inventions regarding

___X___        Additional  sheets  attached.

2.  I propose to bring to my employment the following materials and documents of a former employer:

___X___        No  materials  or  documents.

_____        See below:

Dated: __MAY 5____, _1974_

Signature

_DONALD D. MONTGOMERY_
Print  Name

Exhibit _4_ Page _28_
Page _84_

## Exhibit B

### §2870. Application of provision providing that employee shall assign or offer to assign rights in invention to employer.

(a) Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

(1) Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or

(2) Result from any work performed by the employee for the employer.

(b) To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable.

Dated: ___MAY 5___ , 1994

_____
Signature

DONALD D. MONTGOMERY
Print Name

Exhibit 4 Page 39
Page 85

## Addendum to Exhibit A per clause number 1

- The use of holographic index gratings, also known as Bragg gratings, written into solid or hollow core optical fibers and/or optical waveguides for amplification of chemically sensitive optical signals.

- The use of whisker electrodes, including and especially scanning probe microscopy tips, for spectroscopy by their operation as nonlinear mixing devices with electromagnetic radiation.

- The use of neural networks for synthesizing artificial speckle patterns.

- The use of hollow core optical fibers for optically assisted transport of atoms and molecules.

Exhibit _4_ Page _40_

Page _86_



Blank
(4tc)



**EXHIBIT B**

Exhibit  4  Page 42

Page 88

US006093302A

# United States Patent [19]

## Montgomery

| [11] | Patent Number: | 6,093,302 |
|---|---|---|
| [45] | Date of Patent: | Jul. 25, 2000 |

[54] **ELECTROCHEMICAL SOLID PHASE SYNTHESIS**

[75] Inventor: **Donald D. Montgomery**, Millbrae, Calif.

[73] Assignee: **Combimatrix Corporation**, Burlingame, Calif.

[21] Appl. No.: **09/003,075**

[22] Filed: **Jan. 5, 1998**

[51] Int. Cl.[7] ............................................. C25D 5/02
[52] U.S. Cl. ......................................................... 205/122
[58] Field of Search ............................. 205/157, 162, 205/164, 122; 204/483, 485, 484

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| 4,764,263 | 8/1988 | Gregory et al. | 204/74 |
| 5,143,854 | 9/1992 | Pirrung et al. | 436/518 |
| 5,679,590 | 10/1997 | Marl, et al. | |
| 5,810,989 | 9/1998 | Kubak et al. | 205/91 |

### FOREIGN PATENT DOCUMENTS

| 2 703 359 | 10/1994 | France . |
| WO 93/22480 | 11/1993 | WIPO . |
| WO 95/12808 | 11/1995 | WIPO . |
| WO 96/07917 | 3/1996 | WIPO . |
| WO 97/11905 | 4/1997 | WIPO . |
| WO 98/01221 | 1/1998 | WIPO . |

### OTHER PUBLICATIONS

Gildea, Brian D. et al., "A Versatile Acid-labile Linker for modification of Synthetic BioMolecules" *Tetrahedron Letters* vol. 31:No.49:pp. 7095–7098 (1990) no month avail.

Livache, Thierry et al., "Polypyrrole DNA Chip on a Silicon Device: Example of Hepatitis C Virus Genotyping" *Analytical Biochemistry* 255: 188–194 (1998) no month avail.

Meo, Tommaso, et al., "Monoclonal antibody to the message sequence Try-Gly-Gly-Phe of opioid peptides exhibits the specificity requirements of mammalian opioid receptors", *Proc. Natl. Acad. Sci USA* 80: 4084–4088 (1983) Jul. 1983.

Merrifield, *J. Am. Chem. Soc.* 85:2149–2154 (1963) Jul. 20, 1963.

*Primary Examiner*—Kathryn Gorgos
*Assistant Examiner*—Erica Smith-Hicks
*Attorney, Agent, or Firm*—Albert P. Halluin; J. David Smith; Howrey & Simon

[57] **ABSTRACT**

A solid phase synthesis method for the preparation of diverse sequences of separate polymers or nucleic acid sequences using electrochemical placement of monomers or nucleic acids at a specific location on a substrate containing at least one electrode that is preferably in contact with a buffering or scavenging solution to prevent chemical crosstalk between electrodes due to diffusion of electrochemically generated reagents.

**48 Claims, 39 Drawing Sheets**



Exhibit 4 Page 42
Page 89

Blank
(Litc)

Exhibit 4 Page 44

Page 90

Exhibit 4 Page 45

Page 91

1  DOUGLAS E. OLSON, State Bar No. 38649
   JEFFREY W. GUISE, State Bar No. 164203
2  PETER R. MUNSON, State Bar No. 193216
   BROBECK, PHLEGER & HARRISON LLP
3  12390 El Camino Real
   San Diego, CA 92130-2081
4  Telephone:    (858) 720-2500
   Facsimile:    (858) 720-2555
5
   Attorneys for Plaintiff
6  NANOGEN, INC.

7

8              UNITED STATES DISTRICT COURT

9          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

10  NANOGEN, INC., a Delaware Corporation,   )   Case No.
                                             )
11               Plaintiff,                  )
                                             )
12        v.                                 )
                                             )
13  DONALD D. MONTGOMERY, an                 )
    Individual, and COMBIMATRIX CORP., a     )
14  Delaware Corporation, and a California   )
    Corporation,                             )
15                                           )
                 Defendants.                 )
16                                           )
                                             )
17                                           )

18  _____

19

20

21                        Exhibit C

22

23              February 26, 1996 Settlement Agreement

24

25

26

27                              Filed Under Seal

## SETTLEMENT AND GENERAL RELEASE AGREEMENT

WHEREAS, Donald Montgomery ("Dr. Montgomery") has filed a lawsuit against his former employer Nanogen, Inc. ("Nanogen") in Superior Court in San Diego County, Case No. 694201 alleging (1) violation of Labor Code §970; (2) fraudulent inducement to accept employment; and (3) constructive termination;

WHEREAS, Nanogen vigorously disputes the validity of any of these claims and contends that it has engaged in no misrepresentations of any sort and did not constructively terminate Dr. Montgomery;

WHEREAS, Nanogen is concerned that Dr. Montgomery will unfairly compete against Nanogen, misappropriate trade secrets regarding its technology or misuse confidential and proprietary information of Nanogen;

WHEREAS, Dr. Montgomery is concerned that Nanogen will interfere with his future employment prospects and/or business opportunities;

WHEREAS, the parties hereto wish to resolve the claims raised in Case No. 694201 and avoid litigation in the future;

Exhibit 4 Page 47

Page 93

**IT IS HEREBY AGREED:**

1.    Within ten (10) days of execution of this Agreement by Dr. Montgomery and Nanogen, Nanogen shall forward to Dr. Montgomery's counsel, Ott & Horowitz, a check in the amount of $25,000.00 made payable to Ott & Horowitz and Donald Montgomery. This payment is intended to compensate Dr. Montgomery for alleged pain and suffering and emotional distress.  Upon receipt of said check, Dr. Montgomery will cause to be filed a request for dismissal with prejudice.

2.    Dr. Montgomery is currently unemployed.  He wishes to work in the future as an electrochemist.  Dr. Montgomery covenants that he will not compete unfairly with Nanogen or misappropriate any trade secrets, as defined in California Civil Code §3426.1 (hereinafter referred to as "trade secrets"), of Nanogen in the future.  The parties hereto acknowledge that Dr. Montgomery is entitled to work as an electrochemist in a research capacity, in universities, for another business, or in his own venture. Notwithstanding this, Dr. Montgomery wishes by virtue of this Agreement to assure Nanogen, in writing, that he will not compete unfairly in specific areas of concern to Nanogen in the future, as specified more fully below.

3.    Dr. Montgomery was employed by Nanogen as a Senior Research Scientist.  Dr. Montgomery worked on projects that sought to use the technique of free field electrophoresis in three

2

Exhibit 4 Page 48

Page 94

dimensional geometries to transport analyte DNA in clinical samples to spatially multiplexed assay locations for medical diagnostic applications (hereinafter the "Technique").  Dr. Montgomery hereby covenants that, as of the date of execution of this Agreement, he has not engaged in work regarding the Technique other than at or for the benefit of Nanogen.  Dr. Montgomery covenants that he will not, in the future, engage in work regarding the Technique.

4.    Dr. Montgomery acknowledges that during the course of his employment, he was provided access to and is familiar with the contents of the following Nanogen patent applications filed with the U.S. Patent Office prior to August 10, 1995:

"Active Programmable Electronic Devices for Molecular Biological Analysis and Diagnostics," filed November 1, 1993, Serial No. 08/146,504;

"Self-Addressable Self-Assembling Microelectronic Systems and Devices for Molecular Biological Analysis and Diagnostics," filed July 7, 1994, Serial No. 08/271,882; and

"Automated Molecular Biological Diagnostic System," filed September 9, 1994, Serial No. 08/304,657.

Exhibit 4 Page 44
Page 45

Nothing in this Agreement shall be construed as a representation by Dr. Montgomery that the claims in said patent applications are valid.  Dr. Montgomery covenants that he will not misappropriate trade secrets contained in said patent applications.

5.    Dr. Montgomery acknowledges that he was exposed to the following trade secrets of Nanogen:  (a) solution compositions that facilitate DNA transport in the Technique (these are very low electrolyte concentrations, and Zwitterionic additives);  (b) formulation of permeation layer polymers that Dr. Montgomery developed or to which he was exposed at Nanogen;  (c) items contained in Nanogen's second continuation in part of its initial patent application, serial No. 08/146,504 filed 11/1/93, of which Dr. Montgomery was a co-inventor; (d) inventions disclosed in 13 disclosure memoranda, a listing of which is attached as Exhibit A; and (e) the use of cationic detergents for DNA transport in electric fields.  Dr. Montgomery covenants that he will not misappropriate these trade secrets.

6.    Nanogen    recognizes    that    Dr.    Montgomery    is    an electrochemist and that there are well-known devices and processes that electrochemists use as the tools of their trade.  Nanogen covenants that it will not seek to contend at any later date either informally or by virtue of a lawsuit that Dr. Montgomery cannot engage in electrochemistry other than as limited above.

Exhibit 4 Page 50
Page 96

7.    Nanogen covenants that Dr. Montgomery is entitled to work for other entities including but not limited to universities, research laboratories, biotechnology companies, pharmaceutical companies, environmental analysis companies and chemical analysis companies, even if Nanogen might consider any of these entities competitors.   Nanogen also acknowledges that Dr. Montgomery is entitled to start his own business if he so chooses.   In addition, Nanogen covenants and warrants that it will not interfere with or prevent Dr. Montgomery from being employed other than to enforce its rights under this Agreement.

8.    Dr. Montgomery further agrees that, prior to August 18, 1996, he will not encourage or solicit any employee of Nanogen to leave Nanogen for any reason or to devote less than all of any such employee's efforts to the affairs of Nanogen.

9.    Except for those obligations created by or arising out of this Agreement, Dr. Montgomery on behalf of himself, his descendants, ancestors, dependents, heirs, executors, administrators, assigns, and successors, and each of them, hereby covenants not to sue and fully releases and discharges Nanogen and its officers, directors, shareholders, employees, agents, representatives and attorneys, past and present, and each of them, hereinafter together and collectively referred to as "Nanogen Releasees," with respect to and from any and all claims, wages, demands, rights, liens, agreements, contracts, covenants, actions,

5

Exhibit   4   Page 51

Page 97

suits, causes of action, obligations, debts, costs, expenses, attorneys' fees, damages, judgments, orders and liabilities of whatever kind or nature in law, equity or otherwise, whether now known or unknown, suspected or unsuspected, and whether or not concealed or hidden, which he now owns or holds or he has at any time heretofore owned or held as against said Nanogen Releasees, arising out of or in any way connected with his employment relationship with Nanogen, including any post-employment acts up to and including the date of this Agreement, or any other transactions, occurrences, acts or omissions or any loss, damage or injury whatsoever, known or unknown, suspected or unsuspected, resulting from any act or omission by or on the part of said Nanogen Releasees, or any of them, committed or omitted prior to the date of this Agreement including, without limiting the generality of the foregoing, any claim set forth in Case No. 694201 and any claim for severance pay, bonus, sick leave, holiday pay or vacation pay.  Notwithstanding this, Dr. Montgomery does not waive any rights to continuation coverage under COBRA for health and medical insurance he currently possesses.

10.  Except for those obligations created by or arising out of this Agreement, Nanogen and its officers, directors, shareholders, employees, attorneys, agents and representatives, past and present, hereby fully release and discharge, and covenant not to sue, Dr. Montgomery and his descendants, ancestors, administrators, assigns, successors, heirs, executors, dependents, agents, representatives

Exhibit 4 Page 52

Page 98

and attorneys, past and present ("Montgomery Releasees") from and with respect to any and all claims, demands, rights, liens, agreements, contracts, covenants, actions, suits, causes of action, obligations, debts, costs, expenses, attorneys' fees, damages, judgments, orders, losses, injuries, and liabilities of whatever kind or nature in law, equity or otherwise, whether now known or unknown, suspected or unsuspected, and whether or not concealed or hidden, which it now owns or holds or it has at any time heretofore owned or held as against said Montgomery Releasees, arising out of or in any way connected with Dr. Montgomery's employment relationship with or separation from Nanogen, including any post-employment acts up to and including the date of this Agreement, or any other transactions, occurrences, acts or omissions or any loss, damage, or injury, whatsoever, known or unknown, suspected or unsuspected, resulting from any act or omission by or on the part of said Montgomery Releasees, or any of them, committed or omitted prior to the date of this Agreement.

11.  It is the intention of Dr. Montgomery and Nanogen in executing this instrument that the same shall be effective as a bar to each and every claim, demand and cause of action hereinabove specified.  In furtherance of this intention, Dr. Montgomery and Nanogen hereby expressly waive any and all rights and benefits conferred upon them by the provisions of SECTION 1542 OF THE CALIFORNIA CIVIL CODE and expressly consent that this Agreement shall be given full force and effect according to each and all of

Exhibit 4   Page 53

Page 99

its express terms and provisions, including those related to any other claims, demands and causes of action hereinabove specified. SECTION 1542 provides:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR.

The parties acknowledge that they may hereafter discover claims or facts in addition to or different from those which the parties now know or believe to exist with respect to the subject matter of this Agreement and which, if known or suspected at the time of executing this Agreement may have materially affected this settlement. Nevertheless, Dr. Montgomery and Nanogen hereby waive any right, claim or cause of action that might arise as a result of such different or additional claims or facts.  Dr. Montgomery and Nanogen acknowledge that they understand the significance and consequence of such release and such specific waiver of SECTION 1542.

12.  Dr. Montgomery and Nanogen agree that the terms of this Agreement shall remain confidential as between the parties and that they shall not disclose them to any other person, with the exception of immediate family members and financial advisors or as

8

Exhibit 4 Page 54

Page 100

compelled by law.  Neither party shall generally publicize or issue any press release relating to this Agreement, except to state that "The matter has been resolved." Notwithstanding the foregoing, the parties may disclose the terms of this Agreement to third parties for business purposes.  If litigation occurs between the parties in the future, each party is entitled to reveal all of the terms of this Agreement in connection with such litigation.

13.  Dr. Montgomery and Nanogen each warrant and represent that none of them has heretofore assigned or transferred to any person not a party to this Agreement any released matter or any part or portion thereof and that Dr. Montgomery and Nanogen each shall defend, indemnify and hold harmless the other from and against any claim (including the payment of attorneys' fees and costs actually incurred whether or not litigation is commenced) based on or in connection with or arising out of any such assignment or transfer made, purported or claimed.

14.  The lump sum payment pursuant to this Agreement is intended to be a payment as compensation for alleged personal injuries and emotional distress.  Dr. Montgomery acknowledges, however, that the characterization of this payment may be subject to a different interpretation by the Internal Revenue Service and this characterization of the payment is not a representation or warranty, or a statement of fact by Nanogen or its attorneys, which would preclude a taxing authority from concluding otherwise.

0073/Releases1.Agm/2.22.96

9



Exhibit __4__ Page 55

Page 101

Dr. Montgomery shall indemnify and defend Nanogen against any and all claims by any governmental agency or authority for taxes, interest or penalties based on payments made by Nanogen pursuant to this Agreement.   In acknowledgement of this provision, Nanogen agrees that it will not issue an IRS Form 1099.

15.  An additional $277.10 shall be paid as follows:  Nanogen shall reacquire the 2,771 shares of Nanogen common stock issued to Dr. Montgomery, for which Nanogen shall pay Dr. Montgomery the fair market value of such stock of $.10 per share, for a total of $277.10.  Nanogen covenants that it has full power and authority to reacquire these shares as set forth above.   Dr. Montgomery acknowledges and agrees that he does not hold or own any legal or beneficial interest in any stock, options, convertible securities or other equity interest of or in Nanogen other than the aforementioned 2,771 shares, and he releases any actual, existing, proposed, pending, prospective or claimed ownership interest whatsoever in Nanogen. Dr. Montgomery represents and warrants that he has not transferred, sold, pledged or assigned any interest he has or ever had in any stock, options, convertible securities or other equity interest of or in Nanogen. Dr. Montgomery agrees to return to Nanogen, at the closing of the transactions contemplated in this Agreement, Stock Certificate No. 95 duly endorsed in blank or accompanied by a duly executed Assignment Separate from Certificate attached hereto as Exhibit "B."

10

Exhibit 4  Page 56

Page 102

16. This instrument constitutes and contains the entire agreement and understanding concerning Dr. Montgomery's employment with Nanogen and the termination thereof, and other subject matters addressed herein between the parties, and supersedes and replaces all prior negotiations and all agreements, proposed or otherwise, whether written or oral, concerning the subject matters hereof. This is an integrated document.

17. This Agreement, and all the terms and provisions hereof, shall be binding upon and shall inure to the benefit of the parties and their respective heirs, legal representative, successor and assigns.

18. If any provision of this Agreement or the application thereof is held invalid, the invalidity shall not affect other provisions or application of the Agreement which can be given effect without the invalid provisions or application and to this end the provisions of this Agreement are declared to be severable.

19. This Agreement shall be deemed to have been executed and delivered within the State of California, and the rights and obligations of the parties hereunder shall be construed and enforced in accordance with, and governed by, the laws of the State of California without regard to principles of conflict of laws.

Exhibit 4 Page 57
Page 103

20.  Each party has cooperated in the drafting and preparation of this Agreement.  Hence, in any construction to be made of this Agreement the same shall not be construed against any party on the basis that the party was the drafter.

21.  This Agreement may be executed in counterparts, and each counterpart, when executed, shall have the efficacy of a signed original.  Photographic copies of such signed counterparts may be used in lieu of the originals for any purpose.

22.  In the event of litigation in connection with or concerning the enforcement of this Agreement (e.g., payment of the consideration or filing of the dismissal), the prevailing party shall be entitled to recover all costs and expenses incurred by such party in connection therewith, including reasonable attorneys' fees.

23.  No waiver of any breach of any term or provision of this Agreement shall be construed to be, nor shall be, a waiver of any other breach of this Agreement.  No waiver shall be binding unless in writing and signed by the party waiving the breach.

24.  In entering this Agreement, the parties represent that they have had the opportunity to consult with attorneys, of their own choice, that the terms of this Agreement have been completely

Exhibit 4 Page 58

Page 104

read and explained to them, and that those terms are fully understood and voluntarily accepted by them.

25.   All parties agree to cooperate fully and to execute any and all supplementary documents and to take all additional actions that may be necessary or appropriate to give full force to the basic terms and intent of this Agreement and which are not inconsistent with its terms.

Each party has read the foregoing Agreement and accepts and agrees to the provisions it contains and hereby executes it voluntarily with full understanding of its consequences.

EXECUTED this _26_ day of February, 1996, at Los Angeles County, California.

Donald Montgomery

Approved as to form and content:
OTT & HOROWITZ

By: _____
Craig A. Horowitz, Attorneys
for Donald Montgomery

Exhibit _4_ Page _59_

Page _105_

NANOGEN, INC.

By: _____
   Howard Birndorf
   Chief Executive Officer


Approved as to form and content:

PILLSBURY MADISON & SUTRO

By: _____
   David E. Kleinfeld, Attorneys
   for Nanogen, Inc.

cmp-0973/Release2.Agm/2.22.96

**14**

Exhibit 4 Page 60

Page 106

Exhibit 4 Page 61

EXHIBIT D

Page 107



Nanogen

# EMPLOYEE HANDBOOK

**1994**

Exhibit 4 Page 62

Page 108

# TABLE OF CONTENTS

A Message From Nanogen ...................................................................1
Equal Opportunity Employment .........................................................2
     Responsibility For Compliance ..................................................2
Conditions Of Employment ...............................................................3
A Word About Unions ........................................................................3
Our Relationship ...............................................................................3
Code Of Employer-Employee Relations ............................................4
Rehire Policy .....................................................................................6
Employee Status Definition ..............................................................6
     Part-Time Employee ................................................................6
     A.    Temporary Employee ...................................................6
     B.    Regular Employee .........................................................6
        1.    Regular Full-Time Employee .............................7
        2.    Regular Part-Time Employee ............................7
Hours Of Work ..................................................................................7
Time Sheets 7
Overtime ...........................................................................................7
Payday ...............................................................................................8
Performance Reviews/Wage Adjustments ........................................8
Termination Of Employment .............................................................9
Conflicts Of Interest ..........................................................................9
Paid Holidays ..................................................................................10
     Eligibility .................................................................................10
     Holiday Premium Pay ..............................................................11
     A.    Regular Non-Exempt, Full-Time Employees ...............11
     B.    Regular, Non-Exempt, Part-Time Employees ..............11
     C.    Exempt Employees .......................................................11
Vacations ........................................................................................11
     A.    Eligibility ......................................................................12
     B.    Vacation Pay .................................................................12
     C.    Restrictions ...................................................................12
Leaves Of Absence ..........................................................................13
     Medical Disability Leave ..........................................................13
     Maternity Leave ......................................................................14
     Military Leave ..........................................................................15
     Emergency/Personal Leave .......................................................15
     Bereavement Leave ..................................................................15
     Jury Duty .................................................................................15
Educational Assistance ....................................................................15
     A.    Eligibility ......................................................................16
     B.    Reimbursement ............................................................16
     C.    Courses ........................................................................16
     D.    Seminars And Workshops ............................................16

Exhibit _4_ Page _68_

Page 109

# Table of Contents (continued)

Other Benefits ................................................................................................16
Work Guidelines And Policies .......................................................................17
Safety 17
Substance Abuse ...........................................................................................17
Solicitation And Distribution ........................................................................18
Sexual Harassment18
    A.    Definition ......................................................................18
    B.    Problem-Solving Procedure ...........................................19
Employee Benefits ........................................................................................19
Workers' Compensation ................................................................................19
Other Insurance ............................................................................................19
Paid Sick Leave .............................................................................................20
    A.    Eligibility ....................................................................20
    B.    Rate Of Pay .................................................................20
    C.    Restrictions ..................................................................20
Communication .............................................................................................21
    Open Door Policy ..................................................................21
    Bulletin Board .......................................................................21
    Problem Solving ....................................................................21
Personal Telephone Use ................................................................................22
Building Security ..........................................................................................22
Visitors .........................................................................................................23
Purchasing Procedures ..................................................................................23
    A.    Purchase Requisition/Order Form .................................24
    B.    Check Request Form ....................................................24
    C.    Petty Cash Request Form ..............................................25
    D.    Purchase Order Procedure .............................................26
Computer Hardware And Software .................................................................26
Expense Reimbursement & Expense Reports .................................................26
Work Safety And Accident Reporting ............................................................28
Emergency Evacuation ..................................................................................29
For Medical Emergencies During Working Hours ..........................................30
For Medical Emergencies After Working Hours .............................................30
For Fire Emergencies During Working Hours .................................................30
For Fire Emergencies After Working Hours ...................................................30
Smoking ........................................................................................................31
Good Luck ! ..................................................................................................31

Exhibit 4 Page 4

Page 110

## A MESSAGE FROM NANOGEN

The ability to operate Nanogen in a successful manner is directly dependent on its employees, their quality and their spirit and how all employees work together. When Nanogen employed you, it hired the best candidate for the job. Nanogen is proud of its people and strives to operate so that all employees will have reason to be proud of Nanogen.

One of Nanogen's goals is to operate efficiently and profitably and, in turn, provide additional opportunities for all employees. The Company intends to provide meaningful jobs, career development opportunities and competitive wages and benefits.

A company operates successfully only to the degree its employees recognize and accept their responsibilities. Each employee must do his or her part to maintain a working climate that will lead to overall success. To do this, work must be performed conscientiously with full use of skills and abilities in a safe and efficient manner.

This handbook has been prepared for the information and guidance of everyone working at Nanogen. These guidelines are intended to cover the procedures and policies that most often apply to day-to-day activities. Some of the information may change from time to time since the policies are under constant review. You may also have specific policies which relate to your individual department. It is part of your responsibility to know and support those policies, as well as those provided in this handbook.

Nanogen hopes this booklet will answer most of your questions. If, however, you have additional questions or suggestions, please feel free to speak to your supervisor or the Human Resources Manager. They are here to assist you and encourage an open-door policy among all at Nanogen.

On behalf of Nanogen, welcome to our team!


Howard C. Birndorf
**Chairman & Chief Executive Officer**

and

Tina S. Nova, Ph.D.
**President & Chief Operating Officer**

118.

Exhibit 4 Page 65

Page 111

# EQUAL OPPORTUNITY EMPLOYMENT

The purpose of this policy is to delineate the areas encompassed by equal employment opportunity and to define the parties responsible for compliance.

It is the intent and resolve of Nanogen (the "Company") to comply with the requirements and spirit of the law in the implementation of all facets of equal opportunity. Our continued growth and success is dependent on the full use of all employee resources. Nondiscriminatory employment decisions will continue to be the policy and practice of Nanogen.

It is the policy of Nanogen to provide equal employment opportunity to all qualified people, regardless of race, color, religion, sex, national origin, age, handicap or veteran status. This policy encompasses all employment practices including, but not limited to the following:

1. Hiring, placement, supervision, promotion/upgrading, transfer or demotion.
2. Recruitment, advertising or solicitation for employment.
3. Treatment during employment.
4. Business travel.
5. Rates of pay or other forms of compensation.
6. Selection for training.
7. Layoff, recall from layoff or termination.
8. Benefits, education tuition reimbursement and social and recreational programs.

## Responsibility for Compliance

It is the responsibility of each manager to see that the Company policy of equal opportunity is communicated and understood by all employees within his or her organization. Each manager must also ensure that within his or her organization, applicants and employees are treated equally with respect to their abilities and without regard to their race, color, religion, sex, age, national origin, handicap or veteran status.

It is the responsibility of each manager to ensure that compliance with the equal employment opportunity policy is a part of the overall operating plan.

It is the responsibility of the Company management to analyze and assess personnel actions to ensure equal employment opportunity.

*Nanogen is proud to be an equal opportunity employer.*

## CONDITIONS OF EMPLOYMENT

Upon acceptance of employment with Nanogen, all new employees must agree to certain conditions of employment.  These conditions include, but are not limited to, the following:

1.    Completion of an Application for Employment;
2.    Submission of proof to legally work in the U.S.;
3.    Execution of the Blood Draw Consent Form;
4.    Completion of the Proprietary Information and Inventions Agreement; and
5.    Written acceptance of this Handbook, the Biosafety Handbook, Radiation Safety Handbook, Chemical Safety Handbook and the Injury and Illness Prevention Program Handbook.

## A WORD ABOUT UNIONS

We at Nanogen are sincerely interested in the personal development and happiness of each of our employees.  We believe that Nanogen can best promote the achievement of personal and company goals through direct and open communication.  It is our policy to deal with our employees fairly and honestly and to respect and recognize each as an individual.

We firmly believe that the best interests of our employees can be served without third-party interference.  We greatly value our ability to treat our employees as individuals without subjecting them to burdensome costs, complicated rules and costly work stoppages.  Therefore, we do not believe that unionization is necessary or desirable.  If you ever have questions on this subject, feel free to discuss them with your supervisor.

## OUR RELATIONSHIP

While we hope our relationship will be long and mutually beneficial, it should be recognized that employment with Nanogen is at the will of either the employee or employer.  This means that the employee may resign at any time and similarly, Nanogen is free to conclude an employment relationship at any time with or without notice.  There is no promise that employment will continue for a set period of time, nor is there any promise that your employment will be terminated only under particular circumstances.  No one except the Chairman of the Company and the Company President has the authority to make representations inconsistent with this policy.

Exhibit 4 Page 17

Page 113

## CODE OF EMPLOYER-EMPLOYEE RELATIONS AND
## STANDARDS OF CONDUCT

It is the policy of the Company to announce to all employees the fundamental principles and mutual rights and obligations comprising the relationship of employment between the Company and its personnel.

A.    In its continuing effort to implement fair and effective Personnel Policies and Practices, the Company pledges:

1.    To employ people on the basis of their qualifications and with assurance of equal opportunity and treatment regardless of race, religion, color, sex, age, national origin, handicapped or veteran status;

2.    To provide salaries and other employee benefits which bear a fair and reasonable relationship to the work performed;

3.    To establish reasonable hours of work;

4.    To maintain safe and healthful working conditions;

5.    To place employees in the kind of work best suited to their abilities;

6.    To provide training to those whose needs, capabilities and desires warrant such training in relation to their responsibilities at Nanogen;

7.    To welcome constructive suggestions which relate to methods, procedures, working conditions and the nature of the work performed;

8.    To establish procedures for employees to discuss freely any matter of interest or concern with their immediate supervisors or department managers; and

9.    To permit each employee as much discretion and responsibility as is consistent with a well-coordinated and effective operation.

B.    The Company expects all employees:

1.    To give a productive day's work to the best of their abilities and skills;

2.    To arrive at their assigned work location and begin work on time;

3.    To use Company equipment and supplies in a wise and proper fashion;

4.    To demonstrate a considerate, friendly and constructive attitude toward fellow employees; and

5.    To adhere to all Company Rules, Regulations and Policies.

Exhibit   4  Page 68

Page 114

C. The Company retains the right to exercise customary managerial functions, including the following rights:

1. To supervise, assign, discipline and dismiss employees;
2. To determine and change starting times, quitting times and shifts;
3. To transfer employees within departments or into other departments and other classifications;
4. To determine and change the size of and the qualifications of the work force;
5. To establish, change and abolish its Policies, Practices, Rules and Regulations;
6. To determine and change methods by which its operations are to be carried out;
7. To assign duties to employees in accordance with the Company's needs and requirements and to carry out all ordinary administrative functions; and
8. To exercise all other rights inherent in the Company's right to manage the business.

Consistent with Nanogen's policy of keeping employees informed of what is expected, the following are examples of some, but not all, violations of this doctrine. Such violations will lead to disciplinary action, based on the circumstances of the individual case, up to and including termination.

- Disregard for established safety regulations;
- Excessive tardiness and absenteeism;
- Mishandling of Company funds;
- Destruction or misuse of Company property or supplies;
- Disorderly conduct;
- Dishonesty in any form, including falsification of records or Company documents;
- Incompetence and inefficiency;
- Interference with, or intimidation of, fellow employees;
- Disclosure of confidential company information to non-employees;
- Disclosure of any information or giving a reference to any person regarding an employee or former employee;
- Unauthorized possession or use of drugs, drug paraphernalia or intoxicants such as alcohol, etc.; and
- Carrying weapons of any kind.

We appreciate your wholehearted cooperation in the observance of Nanogen's policies, which are essential to ensure good working conditions, order and safety for all employees.

122.

Exhibit 4 Page 69
Page 115

## REHIRE POLICY

Nanogen will consider applications from former employees together with other qualified applicants for available positions. Nanogen will, however, take into consideration the circumstances surrounding the employee's departure.

## EMPLOYEE STATUS DEFINITION

The purpose of this policy is to define part-time and temporary employee status and to describe benefits applicable to part-time and temporary employees. This policy is not intended to apply to student interns, co-op students, technical consultants or others whose employment is governed by programs or agreements established between Nanogen and an educational institution or by any other contractual agreement. Benefits for such individuals are specified in the particular agreement or contract through which they are employed.

Part-Time Employee
A part-time employee is any employee who is regularly scheduled to work fewer than 30 hours per week. Such employees may be either "temporary" or "regular" employees.

A.  Temporary Employee

A temporary employee is any employee paid through the Company payroll whose employment is of a specified and limited duration usually not exceeding three months. An extension of a temporary work classification for an additional three month period, or less, may be granted if found to be necessary upon management review. Such employees may be either "part-time" or "full-time." Because of the limited duration of their employment, temporary employees are not eligible for any benefits or paid leave time.

1.  This designation of "temporary" applies to all students, whether working part-time or those who work during the summer. The three-month limitation mentioned above does not apply to students.

2.  People hired through temporary agencies are employees of that agency and not of Nanogen.

B.  Regular Employee

A regular employee is any employee paid through the Company payroll whose employment duration is not specified. Such employees may be either "full-time" or "part-time."

123.

Exhibit  4  Page 70

Page 116

1. **Regular Full-Time Employee (works >30 hours per week)**
   - Eligible for group insurance benefits
   - Pay for vacation, sick time, holidays, etc., based on regular wages
   - Vacation and sick leave earned as indicated for full-time employees in the Benefits section of this handbook

2. **Regular Part-Time Employee (works <30 hours per week)**
   - Not eligible for group insurance benefits
   - Pay for vacation, sick time, holidays, etc. prorated
   - Number of hours of vacation and sick leave prorated
   - If not working daily, holidays, bereavement leave, jury duty, etc. are paid only if they fall on a scheduled work day

## HOURS OF WORK

The normal work week for full-time and hourly employees is eight hours per day, five days per week, with a minimum of a thirty-minute to a maximum of one-hour lunch period scheduled to meet the department's needs. In addition, hourly employees receive two ten-minute breaks per day. Part-time employees receive individualized schedules upon hire.

## TIME SHEETS

Your time sheet is your bill to the Company for the hours you work. It must accurately reflect non-exempt employees' hours so that pay can be correctly calculated. Any time-off should be documented by all employees in order to update vacation and sick time balances. You are on the honor system—falsification of time sheets or other Company records, may be grounds for immediate termination of employment.

## OVERTIME

Business conditions may, on occasion, require overtime and should be considered as part of the job. Although it is Nanogen's intent not to overuse the concept of overtime, if it is in the best interest of the Company, overtime work may be scheduled.

- Non-exempt employees are not permitted to work any overtime hours without prior authorization.

- Exempt employees are not eligible to receive overtime compensation.

- All overtime must be accurately documented on your time card so pay will be calculated accordingly.

124.

Exhibit _4_ Page _71_

Page _117_

- Time worked in excess of eight hours per workday or 40 hours per workweek is considered overtime. Overtime is compensated in the following manner:

| HOURS WORKED | RATE OF OVERTIME PAY |
|---|---|
| In one day, over eight hours and up to and including 12 hours | Time and one-half |
| In one day, over 12 hours | Double time |
| In one week, over 40 hours | Time and one-half |
| Seventh consecutive workday up to and including eight hours | Time and one-half |
| Sixth and seventh consecutive workday: any work over eight hours | Double time |

Sick days, holidays, vacation time, etc., do not constitute time worked for purposes of calculating overtime. Only hours actually worked are counted toward overtime calculations.

## PAYDAY

You will receive your paycheck by 5:00 p.m. on the 15th and the last day of each month. (There may be a delay with automatic deposit.) The checks will be distributed one day earlier should those dates fall on a holiday, or on Friday should they fall on a weekend.

Standard deductions will be made from your gross pay for Federal and State Income Taxes, Social Security (FICA) and State Disability, in accordance with government requirements.

If you have any questions about your paycheck or your deductions, do not hesitate to speak with the Finance Department.

## PERFORMANCE REVIEWS/WAGE ADJUSTMENTS

It is Nanogen's philosophy that every employee will have an opportunity at least once a year to have a formal, two-way discussion regarding job performance and career development. Although informal coaching/counseling sessions should take place on a frequent and routine basis, a separate in-depth evaluation of the individual's job performance, career goals and developmental needs will be conducted after every twelve months of employment with the Company. Merit adjustments to your wages may occur at this times.

Exhibit 4 Page 72

Page 118

Performance is a factor in all reviews, however, wage adjustments are not automatic. We believe in compensating employees based on merit, quantity and quality of production, professional attitude, ability and initiative. Those employees who demonstrate outstanding performance will be compensated accordingly.

## TERMINATION OF EMPLOYMENT

Should you wish to terminate your employment with Nanogen, a two week written notice is preferred. This notice should be submitted to your supervisor. If asked for a reference on a former employee, the Human Resources Representative shall verify only the date of your employment and last position held. No other information will be released.

In order for Nanogen to conduct its business efficiently and to meet its goal of providing a quality working environment, all employees are expected to meet the standards of conduct and policies set forth in this handbook. In most cases, if you have a performance problem, your supervisor will give you corrective action warnings and an opportunity to improve. These corrective action warnings may include informal verbal warnings as well as written Counseling Statements which will kept on file in your personnel record. Failure to improve performance will result in disciplinary action up to and including termination.

## CONFLICTS OF INTEREST

In order to promote a high standard of conduct in the performance of your job, it is important that you avoid conflicts of interest. A conflict of interest is a situation where your private interests or outside economic interests actually or potentially interfere or conflict with the duties and responsibilities with Nanogen. A number of factors, including your position and responsibilities, may determine whether a potential conflict exists. If you need advice as to whether a conflict of interest may exist, please consult your supervisor.

To aid in avoiding conflicts of interest, Nanogen requires that you do not accept outside employment or engage in conflicting business activities without prior approval of the Company President. Nanogen recognizes the right of its employees to spend their non-working time away from the job as they please. It does, however, require that activities away from the job follow the guidelines below:

- They must not adversely affect the employee's job performance or compromise the Company's interest;

- Proprietary Company information, including trade secrets, which could benefit other firms and individuals, must not be transmitted outside of the Company without prior written authorization from the Company President;

Exhibit 4 Page 73

Page 119

- Use of "inside" information about the Company by any employee for personal profit;

- Avoidance of a loss in trading in securities of the Company before the information has been fully released and is available to the public is forbidden; and

- Relatives or co-habitants of current employees may not be hired if such hiring would create a supervisory relationship with that relative or would put the employee in a position to influence that relative's employment, salary or other related management considerations.

For these purposes, "relative" means spouse, mother, father, children, sisters, brothers, mothers- and fathers-in-law, sons- and daughters-in-law, cousins, aunts and uncles.

## PAID HOLIDAYS

Since the dates of certain holidays vary each year, a holiday schedule will be distributed every January to each employee. If you have not received a schedule for this year, you may obtain one from the Human Resources Department.

Eligibility

1. All regular, full-time employees are normally eligible for paid holidays.

2. For regular, part-time employees, holiday pay will be prorated. If an employee is normally scheduled to work less than every day, a holiday will only be paid if it falls on a normally scheduled work day.

3. Temporary employees are not eligible for paid holidays, however, if a temporary employee is required to work on a paid holiday, he or she will receive double time for hours worked.

4. Employees must work the last scheduled day before a holiday and the first scheduled working day following the holiday in order to be eligible for holiday pay/holiday premium pay unless time-off on these days has been excused with pay (e.g., vacation, sick leave). The immediate supervisor has the option of recommending that an employee not receive holiday pay if there is a pattern of absenteeism prior to or after holidays.

127.



Exhibit 4 Page 74

Page 120

## Holiday Premium Pay

Scheduled work on holidays is discouraged since the purpose of holidays is seen by the Company as a provision for employee relaxation. If an employee is required to work on a scheduled holiday, that employee will be compensated as follows:

A. **Regular Non-Exempt, Full-Time Employees**

    1. Normal pay for the number of hours the employee is normally scheduled to work, which is defined as holiday pay.

    2. Double time for all hours actually worked on the holiday, which is defined as holiday premium pay.

B. **Regular, Non-Exempt, Part-Time Employees**

    1. If a holiday falls on a part-time employee's regularly scheduled workday and the employee is required to work, the pay will be the same as above (A1 and A2). Normal pay is defined as the usual prorated pay for a part-time employee.

    2. If the holiday falls on a day not regularly scheduled for the part-time employee and the employee is required to work, he or she will be paid double time for all hours actually worked.

C. **Exempt Employees**

    Exempt employees who are asked to work on a Company paid holiday will be given another day off with pay.

## VACATIONS

Since Nanogen recognizes the value of its employees' time away from work, each employee is strongly encouraged to take all vacation accrued each year. Vacations are based on length of service with Nanogen and accrue pro rata each pay period (commencing on the date of hire) as follows:

| Years of Service | Amount of Vacation |
|---|---|
| Less than 1 year | 10 days |
| 1 but less than 2 years | 11 days |
| 2 but less than 3 years | 12 days |
| 3 but less than 4 years | 13 days |
| 4 but less than 5 years | 14 days |
| 5 but less than 6 years | 15 days |
| 6 but less than 7 years | 16 days |

11

Exhibit 4   Page 15
Page 121

| | |
|---|---|
| 7 but less than 8 years | 17 days |
| 8 but less than 9 years | 18 days |
| 9 but less than 10 years | 19 days |
| 10 years and over | 20 days |

Employees are encouraged to take their vacation during the year that it is earned. If this is not possible, each employee may accumulate a maximum of 150% of their annual eligible amount of vacation (1.5 x Amount of Vacation, above). Anytime an employee's maximum accrual is reached, their monthly accrual will stop and does not begin again until the first day of the month following the one in which accumulated vacation time is used.

A. Eligibility

    1. All Regular, Full-Time Employees: Vacation is earned pro rata as in the above schedule.

    2. Regular, Part-Time Employees: Vacation hours earned are prorated based on the average number of hours worked per week.

B. Vacation Pay

    1. Salary during a vacation is at the same straight time rate normally earned by an employee. Salary for regular, part-time employees is prorated.

    2. If one or more pay days fall within an employee's vacation, the employee may receive those paychecks on the last work day prior to the vacation, provided a salary advance has been requested at least one week prior to the first day of vacation. (Ask the Human Resources Department for the proper form.)

    3. Terminating employees who have completed three months of continuous employment will receive pay for all unused vacation time accrued through their last day worked.

C. Restrictions

    1. New employees must complete three months of continuous employment before taking vacation. Exceptions to this may be granted under special circumstances.

    2. Approval for vacation must be secured from your supervisor at least two weeks prior to your first day of vacation (a Vacation Request Form must be used). Whenever possible, requests for

Exhibit 4 Page 76

Page 122

vacation time will be granted. However, if the vacation falls during a particularly busy time in your department, you may be asked to reschedule your vacation to a more convenient time.

3.    Vacation requests which would result in an employee being in a negative accrual status after their vacation is taken must be (a) pre-approved by the employee's supervisor and Company management, (b) not be detrimental to Company staffing requirements for productivity, and (c) under no circumstances place the employee in a negative accrual status which exceeds 40 hours. Negative accruals are not available to part-time employees.

4.    An employee has a liability to "pay back" any negative accrual through future accruals against the balance or deductions against their final paycheck if they leave the employ of the Company.

5.    Vacation time should be used in increments of full days.

6.    Vacation time does not accrue during leaves of absence or other unpaid absences from work.

## LEAVES OF ABSENCE

Nanogen offers several types of leaves of absence with conditions detailed below. It should be noted that employee benefits do not accrue during a leave of absence. All benefits would resume upon your return to work.

Employees on medical or maternity leave are eligible to apply for state disability insurance administered by the State Employment Development Department. Further information can be obtained by contacting either the Nanogen Human Resources Department or any office of the Employment Development Department. Employees are encouraged to avail themselves of this benefit.

### Medical Disability Leave

After six months of employment with the Company, regular full-time employees are eligible for unpaid disability leaves of absence, which will be granted for disabilities due to illness or injury. The leave of absence will begin after a period of eight consecutive days of absence (verified by a doctor's written statement) and shall be granted for a period equal to the actual duration of the disability up to a maximum of four months from the date the employee becomes disabled.

The Company will pay for the employee's group health insurance benefits during any disability leave. Employees will be required to use any accrued sick leave at the beginning of their leave. Vacation time cannot be used to extend a leave of absence, but may be taken in lieu of a leave of absence.

Exhibit 4 Page 77

Page 123

An employee must submit a Leave Request to his or her supervisor. The request should give maximum available notice of the anticipated beginning and ending dates of the leave. A physician's statement must also be submitted at the beginning of the leave and every 30 days thereafter stating that the employee is still disabled, and at the end of the leave stating that the employee is capable of returning to work.

The Company will seek to keep an employee's position open during a disability leave for illness or injury, but there can be no guarantee of re-employment. If the employee, as soon as he or she is capable, fails to return to his or her prior position or a comparable one, if either is available, the Company will consider the employee to have voluntarily resigned.

No employee will be entitled to take more than four months of leave during any twelve-month period.

<u>Maternity Leave</u>
Employees, including new hires, are eligible for unpaid maternity leave. The leave of absence will be granted for a period of the actual disability, up to a maximum of four months. Employees will be required to use any accrued sick leave at the beginning of their leave. Maternity leave cannot be extended beyond the above stated periods.

The Company will pay for the employee's group health insurance benefits during maternity leave if the employee is eligible for group health benefits prior to the leave of absence.

An employee must submit a Leave Request to her supervisor. The request should give maximum available notice of the anticipated beginning and ending dates of the leave. A physician's statement must also be submitted at the beginning of the leave and every 30 days thereafter stating that the employee is still disabled, and at the end of the leave stating that the employee is capable of returning to work.

Upon the employee's return from maternity leave, she will be returned to her original job, unless the job ceases to exist because of business necessity or if the Company cannot preserve the job and operate safely or efficiently. In such a case, the Company will seek to provide the employee with a substantially similar position. If the employee, as soon as she is capable, fails to return to her prior position or a comparable one, if either is available, the Company will consider the employee to have voluntarily resigned. If the employee's prior position or a comparable one is not available at the end of the leave, the employee will be given preference for the next available comparable position for which the employee is qualified.

131.

14

Exhibit 4 Page 78

Page 124

## Military Leave

If you enter military service and are required to attend yearly Reserves or National Guard duty, you may apply for an unpaid, temporary military leave of absence.

Employees are required to provide a copy of military orders to their supervisor at least two weeks prior to the time that absence from work is required.

## Emergency/Personal Leave

Requests for emergency/personal leave without pay will be considered on an individual basis. Such requests should be submitted to your supervisor.

## Bereavement Leave

All regular employees may take up to three paid days off for bereavement leave provided the deceased was related to the employee by being a spouse, child, parent, sister or brother, grandchild, grandparent, mother-, father-, sister- or brother-in law, or other relative who was a resident in the employee's household at the time of death.

## Jury Duty

If you are called to perform your civic duty by serving on a jury panel, you must present a copy of your summons to your supervisor as soon as you receive it. This will give your supervisor time to find a suitable replacement for the time you are away. If you are called as a juror during a particularly busy time in your Department, we may ask you to request the court to postpone your jury duty to a more convenient time.

An employee who has been granted a leave of absence for temporary jury duty will receive regular time compensation for time lost up to a maximum of 10 days, less the compensation received by the employee for the jury duty. Paid time off from work covers only the time you are actually required to be at the courthouse. If you are on telephone standby, you are expected to report to work and perform your job while waiting to be called to serve on a jury.

After completion of jury duty, the employee must provide the supervisor with all compensation records received.

## EDUCATIONAL ASSISTANCE

Nanogen's Educational Assistance Program is designed to encourage eligible employees to continue self-development in their current jobs, or other jobs considered to be in the Company's interest, by providing financial assistance for educational programs directed toward this objective.

132.

Exhibit 4 Page 19

Page 125

A.   **Eligibility**

Regular, full-time employees are eligible for the Educational Assistance Program. Course approval is required from the employee's supervisor, department Director and the Company President, prior to registration.

B.   **Reimbursement**

Nanogen will reimburse eligible employees the cost of tuition, books and laboratory fees up to a maximum of $500 per calendar year. The following course grades must be received for this reimbursement:

Undergraduate Courses - a minimum of a grade "C" or its equivalent.
Graduate Courses -  a minimum of a grade "B" or its equivalent

C.   **Courses**

Courses must be taken outside of regularly-scheduled working hours. Exceptions require the approval of the supervisor, department Director and Company President. Courses must be taken at a Company approved and accredited school, college or university. Reimbursement will be made upon submission of original receipts and proof of course grades. Meals, transportation and parking are not reimbursable.

D.   **Seminars and Workshops**

Attendance and reimbursement for professional seminars and workshops are at the discretion of the appropriate department manager and are not included in this program.

## OTHER BENEFITS

From time to time the Company may provide additional benefits to its employees. These may be scheduled on a one-time only or a continuing basis. Some examples could include the following:

- "TGIF" — An extra "thank you" for a job well done at the end of the week.
- Winter Holiday Get-Together — To show appreciation for your efforts throughout the year and to celebrate the holiday season.

133.

Exhibit 4 Page 80
Page 126

# WORK GUIDELINES AND POLICIES

## SAFETY

We are concerned about your safety and that of those with whom you work. For this purpose, a Biosafety Handbook, Radiation Safety Handbook, Laboratory and Chemical Safety Handbook and an Injury/Illness Prevention Handbook have been developed.

The Company will continue to provide a clean, healthy and safe place to work and will conduct safety meetings periodically. With an alert and safety attitude, you can help eliminate painful and costly accidents. You can help by consistently following the guidelines below:

- Report hazards or unsafe conditions to your supervisor immediately;

- Wear proper clothing that will not interfere with the performance of your job;

- Report all injuries, regardless if they appear minor, to your supervisor immediately. In the event of a life threatening injury to another employee, immediately contact public emergency assistance for direction or assistance;

- Never perform a job that you feel is unsafe; and

- Think about safety as you plan and perform your work.

Nanogen is committed to providing a safe environment to its employees and your adherence to our safety rules and procedures is mandatory and will be considered in your performance reviews. Continued and/or willful violation of our safety procedures will result in disciplinary action up to and including termination.

## SUBSTANCE ABUSE

The use, possession or sale of alcohol or non-prescription, illegal drugs by employees is strictly prohibited while on duty or on Company premises. Reporting to work under the influence of alcohol or non-prescription, illegal drugs is also strictly prohibited. Nanogen reserves the right to require employees to agree to inspection of their persons and/or personal property. Withholding consent to such an inspection, or any violation of this policy, will result in disciplinary action up to and including termination.

134.

Exhibit 4 Page 81
Page 127

## SOLICITATION AND DISTRIBUTION

All employee solicitations for gifts, birthdays, cosmetics, cookies, and all other purposes must be conducted during non-working time and out of the work area. Solicitation of one employee by another is prohibited while either person is on working time. Working time is all time when an employee's duties require that he or she be engaged in work tasks, but does not include an employee's own time, such as lunch period and scheduled breaks.

## SEXUAL HARASSMENT

It is the policy of Nanogen to provide employees with a work environment free from all forms of discrimination, including sexual harassment. This policy is an adjunct to the Company's Equal Employment Opportunity Policy.

A.      Definition

Sexual conduct where submission to or rejection of such conduct affects terms or conditions of employment; that substantially interferes with an employee's ability to perform the job or that creates a hostile work environment.

According to the EEOC, Title VII of the Civil Rights Act of 1964 does not limit all conduct of a sexual nature in the workplace, but rather only unwelcome sexual conduct that is a term or condition of employment. "Unwelcome sexual conduct" constitutes sexual harassment when submission to sexual conduct is made either explicitly or implicitly a term or condition of an individual's employment.

Sexual harassment includes, but is not limited to, the following:

- Making unwelcomed sexual advances or requests for sexual favors or other verbal or physical conduct of a sexual nature an implicit or explicit condition of an employee's continued employment;

- Making submission to or rejections of such conduct the basis for employment decisions affecting the employee;

- Unreasonably interfering with an individual's work performance by such conduct; and/or

- Creating an intimidating, hostile or offensive working environment by such conduct.

18

Exhibit 4 Page 82
Page 128

B.     Problem-Solving Procedure

Any employee who believes he or she has been the subject of sexual harassment should report the incident immediately. At the discretion of the employee, the report may be made to either the Human Resources Director or to the Company President. Allegations of sexual harassment will be investigated immediately and without embarrassment or negative reaction to the reporting employee.

Treating people differently on the basis of their sex is breaking the law, and if sexual harassment has occurred, adequate steps will be taken to eliminate the illegal behavior. The Company will take swift and appropriate corrective action, up to or including termination, if after the investigation an employee is found to have sexually harassed another employee.

## EMPLOYEE BENEFITS

Nanogen recognizes that its success depends upon your contributions. That is one reason why we are committed to a fair and competitive compensation program. With the high cost of health care, a very important part of your total compensation is Nanogen's comprehensive employee benefits - your "hidden paycheck."

Nanogen pays 100% of the cost of group medical, dental and life insurance for its eligible employees. If you elect coverage when you are hired, your insurance will be effective no later than the first of the month following your date of hire. The Company will also pay 70% of medical and dental insurance costs for dependents, with the employee responsible for the remaining 30% of the cost for dependents. A 125 Flex Plan is available to all employees as well. Detailed information about insurance benefits is contained in a booklet which will be given to you when coverage is elected.

## WORKERS' COMPENSATION

On-the-job injuries are covered by our Workers' Compensation Insurance, which is fully paid for by the Company. If you are injured on the job, no matter how minor it may seem, you must report the incident immediately to your supervisor or the Human Resources Representative.

## OTHER INSURANCE

The Company will pay its portion of the following:

    FICA -- Federal Insurance Contribution Act (Social Security)
    FUTA -- Federal Unemployment Insurance
    SUI -- State Unemployment Insurance

Exhibit 4 Page 83
Page 129

In accordance with state law, withholdings are also made for State Disability Insurance, a wholly employee-supported fund.

## PAID SICK LEAVE

Since the progress and success of Nanogen is dependent upon the productivity of all our employees, good attendance is encouraged and expected. However, it is in the best interest of an employee who is ill or injured not to report to work.

A.   Eligibility

Regular, Full-Time, Employees: Eligible for up to 48 hours of sick leave per calendar year. New full-time employees are eligible for a prorated number of sick days based on the number of days employed during the year.

Regular, Part-Time, Employees: Number of hours of sick leave prorated based on average number of hours worked per week, also prorated as for above new employees.

Temporary Employees: Not eligible for paid sick leave.

B.   Rate of Pay

Sick pay will be paid at the same straight time rate normally earned by the employee (regular wages). For part-time employees, pay for each sick day will be prorated by multiplying the employee's normal pay rate times the number of hours worked per day in his or her normal part-time schedule.

Absences of less than one full work day will be charged at hour intervals.

C.   Restrictions

Sick leave will not accumulate from one calendar year to the next. Unused sick leave will expire on December 31, except in instances where an employee's illness extends into the next calendar year. When this occurs, sick leave for the year in which the illness occurred will be provided, up to the length of the illness or the amount of the employee's remaining sick leave, whichever is less.

Should an employee be on sick leave or unpaid medical leave of absence on December 31, sick leave benefits will not resume until the employee has returned to work for at least 31 days.

Exhibit 4 Page 84
Page 130

The immediate supervisor has the option of recommending an employee not receive sick pay if there is a pattern of absenteeism or other abuse of leave time.

In order to be eligible for paid sick leave, an employee must personally notify his or her supervisor before the beginning of each work day.

If an employee is absent the day preceding or following a holiday or weekend, the Company reserves the right to require a written statement from the attending physician.

Sick leave is not earned by an employee during a leave of absence.

If you are sick more than six days consecutively, a note from your physician will be required before you may return to work.

You may use up to 24 hours of your sick leave annually to attend to the illness of a member of your immediate family. The term "immediate family" refers to an employee's father, mother, spouse and children. Time off in excess of the 24 hours must be taken as vacation time.

## COMMUNICATION

As the Company grows, our success will depend in large part on our ability to communicate our ideas with one another in a timely and accurate fashion. Regular, active and honest communications will help us share our thoughts and successfully develop individually and as a team.

Open Door Policy:  When you have a question about your job or employment policies, you are encouraged to speak with your supervisor.  If you wish to discuss the matter further, we encourage discussing it with the Human Resources Manager or the Company President.  When a problem exists and you need help, "let's talk about it" is the best policy.

Bulletin Board:  Information of interest and importance to you as a Company employee will be regularly posted on a Company bulletin board.

Problem Solving:  We hope that your employment with us will be problem-free. Nevertheless, we know that misunderstandings and problems occur.  When misunderstandings or problems arise, we encourage you to bring the matter to our attention as soon as possible.  Nearly all problems and questions can be resolved simply and fairly, or avoided entirely, if we learn of them promptly.

138.

Exhibit 4 Page 25
Page 131

If you have a problem or complaint, there are steps you can take to get it resolved:

1.   Discuss your problem with your immediate supervisor. Your supervisor knows your position and your job. He or she is in the best position to help because he or she works with you and is interested in seeing that you are treated properly.

     If your problem involves your supervisor or you do not wish to discuss the matter with him or her, you may contact your department manager. Also, feel free to call upon the Human Resources Representative.

2.   If you are not satisfied after speaking with your supervisor, you should talk to your department manager.

3.   If, at this point, you still wish additional input, the Company President can then be called upon.

Keep in mind that prompt discussion of a problem usually works best. With the passage of time, you, or the other persons involved, may forget the facts or confuse the issues that led to the problem. If you want to get the fairest, most accurate solution to your problem, discuss it when it happens.

Your input in the communication process will be greatly appreciated.

## PERSONAL TELEPHONE USE

Personal calls, both incoming and outgoing, are discouraged. However, the Company recognizes that there may be times when personal calls must be made or received during business hours. Such calls should be held to a minimum and must not interfere with your work. You are encouraged to make personal calls during lunchtime. When you must make a personal long distance call, the call must be billed to your home phone number.

## BUILDING SECURITY

Employees must use their card key or keys to enter the Company, before and after business hours. All interior doors between laboratory and non-laboratory areas are to remain closed when not in use.

The last employee to leave each main area of the Company each evening should check to make sure that all doors in that section are locked, the lights turned off and designated equipment turned off. Laboratory equipment not in use should be turned off by the last technician to leave the lab. Employees should lock their offices and file drawers each evening.

139.

Exhibit 4 Page 86
Page 132

The Company cannot assume liability for loss of personal property due to theft or carelessness while on Company premises. You are urged to exercise routine precautions to protect your personal property. If you do not wish the janitorial crew to enter your office, place your wastebasket outside your door, close and/or lock your office door.

## VISITORS

When all visitors come to the Company, they will be greeted by the Receptionist, sign in, and be given a Visitor's badge. Visitors shall be allowed in work areas only under the supervision of a supervisor or manager.

1. Escorted visitors must be escorted by an employee at all times. They are not authorized to be in the facility without an escort. Visiting sales representatives are always escorted visitors. (All visitors are presumed to require an escort unless there is a specific reason for an exception as defined in #2 below.)

2. Unescorted visitors will be limited to repair people here for an extended period of time or affiliates of the Company.

3. After hours' visitors includes all visitors on the premises outside the standard business hours. After-hours' visitors are the sole responsibility of the employee who invited them.

4. All visitors must sign out when leaving the Company.

5. Neither cameras nor recording devices are allowed to be used by visitors in the Company facilities without the express permission of the Company President.

## PURCHASING PROCEDURES

The following general rules apply to all purchases:

1. All purchases must be ordered by the authorized Nanogen Purchasing Agent.

2. All purchases of supplies, materials, equipment or services require a previously approved purchase order requisition, check request or petty cash request. Purchases or commitments made without proper approval will not be honored by Nanogen until the proper documentation is prepared and approved.

3. All purchase order requisitions and check requests will require "one over one" approval (i.e., the requisitioner's supervisor, at a minimum,

23                140.    Exhibit  4  Page 87
                         Page 133

must approve the requisition or request) regardless of the dollar amount.

4.      Purchases of radioactive material will need the approval of the Radiation Safety Officer before the order is placed.

5.      Purchases of biohazardous material will need the approval of the Radiation Safety Officer before the order is placed.

6.      Purchases of computer hardware or software will need the approval of the Company President before the order is placed.

7.      Purchases or rentals of office or laboratory furniture and equipment should be coordinated through the Purchasing Department.

The general use of each form is outlined below (see Appendix for samples).

A.      Purchase Requisition/Order Form

A Purchase Requisition is used for all purchases, except petty cash purchases.

The purchase order requisition describes the full purchase terms and conditions.

The dated signature of all appropriate approval levels as defined below:

| Total $ Amount | Signatures Required |
|---|---|
| Up to $250.00 | Supervisors |
| Up to $500.00 | Managers and Scientists |
| Up to $1,000.00 | Directors |
| $1,000.00 - $5,000.00 | Vice Presidents |
| Over $5,000.00 | Company President |

After the requisition has been completed, it should be forwarded to Purchasing. Once the requisition has been reviewed by Purchasing, the proper signatures will be obtained and a Purchase Order Number is assigned and the order is placed with the vendor. The pink copy of the order is returned to Receiving as notification of the item expected to arrive and the expected date of arrival.

B.      Check Request Form

Generally, a check request should be used for purchases of materials or services for which the vendor requires prepayment or payment

Exhibit 4 Page 88
Page 134

immediately upon delivery (i.e., subscriptions, seminars, postage, C.O.D. shipments, etc.) in addition to the regular purchase order requisition and procedures. The exact dollar amount, including any taxes or delivery fees, must be specified.

All items on the form must be completed by the requestor. The description section of the request should contain as much information as possible to fully describe the materials or services to be purchased. This could include quantities, catalog numbers, descriptions, delivery terms, price per item, etc.

Have the request approved by your direct supervisor and submit it to the Purchasing Department no later than five days prior to the due date. Higher level managers as dictated by the total amount of the check and the table listed under purchase requisition will be obtained by the Purchasing Department.

The check will be issued by Accounting and mailed to the payee.

The requestor is responsible for the procurement of the materials or services. After the purchase is completed, supply the Purchasing Department with receipts or other back-up.

C.     Petty Cash Request Form

The Petty Cash Request is used for the following: (a) cash expenditures under $20.00, (b) expenditures of small amounts, when the exact amount is not known prior to the purchase, and (c) all "cash required" purchases.

An approved Petty Cash Request is required prior to the issuance of cash to the requestor.

After the petty cash purchase is made, a receipt is required for all petty cash transactions.

Be as descriptive as possible with the quantities, catalog numbers, descriptions, and price estimates if the exact amount is not known.

The requestor is responsible for the procurement of the materials or services. After the purchase is made, return the change and a receipt to Accounting.

142.

Exhibit 4 Page 89
Page 125

**D.**   **Purchase Order Procedure**

**1.**   Fill out a Purchase Order Requisition with the preferred vendor, requested date of delivery, catalog number and price.

**2.**   Obtain supervisor's signature.

**3.**   Submit to Purchasing Department.

All forms mentioned above can be obtained through the Purchasing Department.

## COMPUTER HARDWARE AND SOFTWARE

Computers in the laboratories are for the shared use of employees, so it is important that basic etiquette rules are observed. Any questions regarding computer hardware and/or software can be directed to the Computer Systems Administrator.

**1.**   Computer use should be restricted to company business and access time shared on basis of priority.

**2.**   Applications should be closed and "trash" emptied at the conclusion of the individual's session on the computer.

Most of the computers at Nanogen will be interconnected through an Ethernet network. This means that many of the functions performed on a single computer can affect all of the others. For this reason and as good computer operational practice, Nanogen requires adherence to the following guidelines:

**1.**   All disks inserted into the computer should be virus-screened prior to use.

**2.**   All software loaded onto computers shall be pre-approved by the Company President, obtained by Nanogen, and licensed to the Company.

**3.**   Computer data stored on the server will be saved daily on a tape back-up system for protection against damage or loss. Individual users are responsible to save valuable company information to the server to ensure its protection.

## EXPENSE REIMBURSEMENT & EXPENSE REPORTS

It is Nanogen's policy to reimburse employees for reasonable expenses incurred on behalf of the Company, within and subject to the current guidelines set by the Internal Revenue Service. Personal automobile use for company business (but not for commuting to and from work) will be reimbursed at the legal mileage rate,

26

Exhibit 4 Page 90
Page 136

(currently .28¢ per mile).   At the onset of your travel planning, a Travel Request
form (see Appendix) should be submitted to the Accounting Department. This form
requires approval of your supervisor and should be submitted, whenever possible,
at least 30 days prior to your travel date in order to obtain the best airfare and
registration rates.   Should you be requested to travel extensively on behalf of the
Company, a travel advance can be obtained by submitting a check request to the
Accounting Department one week prior to departure.

In order for Company-related expenses to be reimbursed, you must fill out an
Expense Report form.    In order to comply with Internal Revenue Service
regulations, the Expense Report must show and substantiate the following
information:

    1.    The amount spent;
    2.    Date(s) of departure and return for each trip;
    3.    Business purpose of travel, meal and/or entertainment;
    4.    Date(s) and place(s) of travel, meal and/or entertainment;
    5.    Business relationship with the person entertained; and
    6.    Topic of discussion at business meal/entertainment.

The following are considered reasonable expenses which are reimbursable by the
Company.  Any expenses in excess of reasonable expenses or expenses greater than
$25.00, without a receipt, will not be reimbursed by the Company.

    1.    Airfare will be reimbursed at economy/coach rates and should be
          booked through the Company travel agent, Rendezvous Travel, phone
          number (619) 454-3181, whenever possible.

    2.    Employees should rent subcompact or compact automobiles, when
          necessary.  Often taxi cabs can be less expensive than a rental car during
          short trips.   Only collision/damage insurance should be purchased
          from the rental agency.  Nanogen has a $1,000,000 liability policy in
          place for hired and non-owned automobiles.

    3.    Employees should utilize moderately priced, single room hotel
          accommodations, such as Holiday Inn, Marriott, etc.  The employee
          will be reimbursed for one call home per day and business calls only.
          Rental movies will not be reimbursed.

    4.    While traveling, the employee will be reimbursed for meals up to:

                    Breakfast - $10.00
                    Lunch -    $15.00
                    Dinner -   $26.00

144.

27

Exhibit 4 Page 91
Page 137

If a candidate or business associate is taken out for a meal, reimbursement will be limited to $20.00 per person for lunch and $35.00 per person for dinner.

Meals or travel for spouses of employees/candidates/business associates will not be reimbursed without prior approval from the Company President.

Any contemplated business gift or "goodwill" business meal must be preapproved by the Company President. The Internal Revenue Service allows a maximum deduction of $26.00 per person during a year for business gifts. No deduction is allowed for "goodwill" business meals.

Hotel bills must be detailed on your Expense Report to show the breakout of room charges, meals, telephone charges, etc.

When business meals or activities are attended by two or more Company employees, the highest ranking employee should list the expense on his or her Expense Report.

Approved Expense Reports must be submitted within five working days of trip return or date of expenditure.

Receipts for all expenses must be attached (if no receipt is available, the expense must be otherwise fully documented). Cash register receipts or credit card slips are required. Tear-tab receipts from restaurants are not acceptable. Company policy requires receipts for all expenditures of $25.00 or more, except mileage. Submit the Expense Report to your department supervisor for approval.

## WORK SAFETY AND ACCIDENT REPORTING

Office personnel should follow standard work safety procedures and report any accident immediately to your supervisor. See the topic "First Aid" regarding First Aid Kits.

Laboratory personnel should follow standard laboratory safety procedures. If you have a question on any procedure, ask your supervisor prior to proceeding with the corresponding activity.

If there is an accident, injury or hazardous condition, follow these steps:

1. Take necessary steps to administer first aid to any injuries resulting from the accident/hazard. See "First Aid" regarding First Aid Kits.

2. Notify co-workers of the accident/hazard.

3. If necessary, bring the hazard under control or clean up any materials which have broken or spilled.

Exhibit 4 Page 92
Page 138

4.    Immediately notify your supervisor of the incident.

Seek medical aid, if required, at a hospital emergency room.  If there is any question as to whether a particular situation requires professional medical aid, resolve the question in favor of immediately obtaining professional medical aid.  The nearest hospital emergency room is:

**Scripps Memorial Hospital**
**9888 Genesee Avenue**
**La Jolla, CA 92037**

**Phone:  (619) 457-6150**

As soon as possible (within 24 hours) after you have been treated and are able, report the accident, injury or hazardous condition on the Nanogen "Unusual Occurrence Report."    The report forms may be obtained from the Human Resources Department or the Receptionist.

## EMERGENCY EVACUATION

Nanogen is committed to provide a safe environment for all employees and visitors.  This is primarily a management responsibility, but is also an employee responsibility to ensure that safe work practices are followed and that hazards are identified and corrected.    This includes all Company safety procedures and applicable safety and health regulations from various regulatory agencies as they relate to handling equipment, chemicals, radioisotopes and biologically hazardous materials.

Employees are expected to exercise sound judgment in performing their duties, to report immediately any accident or injury, unsafe condition or faulty equipment to their supervisor and to comply with all general and laboratory safety rules. Employees are responsible for reading and applying the procedures and precautions stated in laboratory safety training and procedure manuals located in each laboratory.  Laboratory safety handbooks will be given to each employee on their first day of employment.  If you have misplaced your handbooks or need another copy, please contact the Human Resources Department.

When an on-the-job injury or accident occurs, the employee must complete an Unusual Occurrence Report.  Refer to "Accident Reporting" in this manual for additional information.

First aid supplies, fire blankets and fire extinguishers are located in designated areas of the Company's facilities.

Exhibit  4  Page 93
Page 139

**FOR MEDICAL EMERGENCIES DURING WORKING HOURS -**

1. Dial "0" and provide the Receptionist with the following information:
   - State that this is an emergency.
   - Identify the location of the victim/emergency.
   - Identify the nature of the emergency.

2. The receptionist shall immediately notify the following:
   - The appropriate fire/paramedic emergency services.
   - The Radiation Safety Officer (when appropriate).
   - The Human Resources Manager or Representative.
   - The appropriate department Vice President.
   - The Company President.

**FOR MEDICAL EMERGENCIES AFTER WORKING HOURS:**

- Dial "911" and provide the following information:
- State that this is an emergency.
- Identify the location of the victim/emergency.
- Identify the nature of the emergency.

**FOR FIRE EMERGENCIES DURING WORKING HOURS:**

1. Dial "0" and provide the receptionist with the location and nature of the emergency. If safe to do so, attempt to put out the fire. If not, evacuate the area immediately, ensuring that all persons are out of the building.

2. The receptionist shall immediately notify the following:
   - The Fire Department
   - The Facilities Landlord
   - The Human Resources Manager or Representative
   - The Company President

3. If the building is to be evacuated, the Receptionist shall make the appropriate announcement over the public address system.

**FOR FIRE EMERGENCIES AFTER WORKING HOURS:**

1. Dial "911" and provide the location and nature of the emergency.

2. All employees shall become familiar with the location of all emergency exits, emergency showers, eye wash stations and fire extinguishers and blankets. All emergency exits will be posted in the building.

Exhibit 4 Page 94
Page 146

## SMOKING

In compliance with San Diego City Ordinance #0-17633, smoking shall not be allowed inside the building at any time.

## GOOD LUCK!

Thank you for becoming a part of the Nanogen team. We are happy to have you with us. With your support, our Company will grow and prosper and continue to provide meaningful and challenging employment for you and other members of our community.

148.

Exhibit 4 Page 95
Page 141

# Nanogen INCORPORATED

## ACKNOWLEDGMENT OF RECEIPT AND UNDERSTANDING

### of the

### EMPLOYEE HANDBOOK

I acknowledge receipt of Nanogen Incorporated's Employee Handbook. I have read this Handbook in its entirety and I acknowledge my responsibility to follow all company practices and procedures.

Employee: _____      JULY 1, 1994
         Signature                                         **Date**

         DONALD D. MONTGOMERY
         **Please print**

Received by: _____      7/1/94
         **Human Resources**                               **Date**

Exhibit 4 Page 96
Page 142

EXHIBIT 5

**SUN ◯ IANCE**

... Office
...
...rand Blvd          Phone
PO Box 29035        818 241-5212
Glendale CA 91209-9035   Fax
                    818 543-6390

January 16, 2001

**CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**
**# 7099 3400 0006 2566 1532**

Mr. Patrick D. de Maynadier
Executive Vice President and
General Counsel
CombiMatrix Corporation
34935 SE Douglas Street
Snoqualmie, WA 98065

| RE: | | |
|---|---|---|
| Parent Company | : | Acacia Research Corporation |
| Claimant | : | Nanogen, Inc. |
| Applicable Coverage Part | : | Excess Directors and Officers Liability |
| Policy Number | : | P SF 001831 |
| Claim Number | : | 3510000133 |
| Company | : | Royal Insurance Company of America |

Dear Mr. De Maynadier:

On behalf of Royal Insurance Company of America ("Royal"), we acknowledge receipt of the Complaint filed by Nanogen, Inc. against CombiMatrix Corp. and Donald Montgomery in the United States District Court for the Southern District of California. In the Complaint, Nanogen asserts claims for Correction of Inventorship of U.S. Patent No. 6,093,302, Declaratory Ruling of Applicants, Assignee and Inventors, Misappropriation of Trade Secrets, Breach of Contract, Inducing Breach of Contract, Breach of the Implied Covenant of Good Faith and Fair Dealing, Intentional Interference with Prospective Economic Advantage, Unfair Competition, Unjust Enrichment, Constructive Trust, Injunctive Relief, and Conversion.

Royal issued an Excess Liability Policy, No. P SF 001831 ("Excess Policy") which is effective for the Policy Period of March 1, 2000 to January 22, 2001. The Excess Policy has a Limit of Liability of $5,000,000, which is excess the $10,000,000 Limit of Liability for the Policy issued by National Union Fire Insurance Co. PA, No. 857-85-90 ("Primary Policy").

Our Excess Policy is a follow-form policy to the Primary Policy. After you receive the Primary Carrier's coverage position with respect to the November 28, 2000 Complaint, we will be able to advise you of our coverage position. If you would kindly provide us with a copy of the Primary Carrier's coverage letter when it has been issued to you, as

• Alliance Assurance Company of America    • Marine Indemnity Insurance Company of America    • Royal Lloyd's of Texas
• American and Foreign Insurance Company    • Phoenix Assurance Company of New York    • Royal Special Risks Insurance Company
• Financial Structures Insurance Company    • Royal & SunAlliance Personal Insurance Company    • Royal Surplus Lines Insurance Company
• Globe Indemnity Company                    • Royal Indemnity Company                    • Safeguard Insurance Company
• The London Assurance of America Inc.        • Royal Insurance Company of America        • The Sea Insurance Company of America

Exhibit 5  page 1

Page  148                                    Exhibit "5"

Mr. Patrick O. del May
January 9, 2001
Page 2

well as a copy of the Primary Policy, we would appreciate it. After we receive this information, we will review the Primary Carrier's coverage letter and Policy, together with the litigation submitted, and our Excess Policy, analyze coverage, and then forward to you our coverage position with respect to this matter.

In the interim, Royal expressly reserves its rights under the Excess Policy, the Primary Policy, and pursuant to applicable law, to rely upon and enforce any and all terms of the Excess Policy, and the Primary Policy if facts become known to Royal which result in the application of any such terms, conditions, exclusions, endorsements, or other provisions of the Excess Policy, and the Primary Policy in the referenced claim.

Under the Unfair Claims Practices Acts Regulations, you have the right to have the Department of Insurance review any questions you may have. Their address and telephone number are:

> California Department of Insurance
> Claims Service Bureau, 11th Floor
> 300 South Spring Street
> Los Angeles, CA 90013
> 800-927-4375
> 213-897-5691.

We would like you to know that we value and appreciate you as a customer. I look forward to working together with you as we move forward in this matter. Please do not hesitate to contact me at any time to discuss any developments or questions you may have. My direct dial telephone number is (818) 543-6327. Thank you in advance for your assistance and cooperation.

Sncerely,

Ricki J. Shoss. Esq. (ced)

Ricki J. Shoss, Esq.
Professional & Financial Risks Specialist

RJS:cad

cc:

Mr. Jed N. Shea
Lockton Companies
444 W. 47th Street, Suite 900
Kansas City, MO 64112-1906

Exhibit 5 page 2
Page 144

**EXHIBIT 6**



**CHUBB GROUP OF INSURANCE COMPANIES**

**801 South Figueroa St.**                    **20th Floor, Suite 2000**
**Los Angeles, California 90017**

**Telephone No: (213) 833-5222**            **Fax No: (503) 452-3584**

December 11, 2000

Mr. Patrick D. de Maynadier
CombiMatrix Corporation
34935 SE Douglas Street
Snoqualimie, WA 98065

RE:        Insured:    Acacia Research Corporation
          Policy:    8158 94 96
        Loss Date:    11/28/00 (Reference Only)
   Case Reference:   <u>Nanogen Inc. vs Donald Montgomery. CombiMatrix Corp.</u>
               Northern Dist. Court, California.
       Company:    Federal Insurance Company ("Federal")

Dear Mr. de Maynadier:

In response to your December 4, 2000 letter to Lockton Companies referencing the captioned litigation; Mr. Jed N. Shea from Lockton has forwarded a copy of the material to Federal for review. This claim has been assigned for my handling and any future inquiries relating to Federal's coverage in this matter should be directed to my attention.

Federal provides excess Director and Officer Liability insurance coverage to Acacia Research Coporation under the referenced policy for the period March 1, 2000 to January 22, 2001. The policy limits of liability are stated as $5,000,000 excess of $10,000,000 limits provided under National Union (Primary Policy) No. 857-85-90 for the same period.

The insuring clause of Federal's policy provides:

> "The Company shall provide the Insureds with insurance during the Policy Period excess of the Underlying Limit. Coverage hereunder shall attach only after the insurers of the Underlying Insurance shall have paid in legal currency the full amount of the Underlying Limit for such Policy Period. Coverage hereunder shall then apply in conformance with the terms and conditions of the Primary Policy as amended by any more restrictive terms and conditions of any other policy designated in Item 4(B) of the Declarations, except as otherwise provided herein."

As related in my voicemail to you today, I would appreciate the opportunity to discuss this litigation with you at your earliest convenience. The material we received from Lockton did not contain a copy of the complaint as indicated in your December 4, 2000 letter; only copies of pleadings seeking to seal certain exhibits to the complaint. Accordingly, I would appreciate receiving a copy of the complaint in order to evaluate any potential for coverage under the Federal policy.

Mr. Patrick D. de Mayr.                CombiMatrix Corporation
RE:              Insured:      ⬤    ia Research Corporation
                 Policy:     8158 94 96
        Case Reference:     Nanogen Inc. vs Donald Montgomery, CombiMatrix Corp.
                            Northern Dist. Court, California

December 11, 2000
Page 2

Additionally, I would appreciate your clarification of the relationship between the named insured on Federal's policy, Acacia Research Corporation, and the defendant CombiMatrix Corp.

Finally, pursuant to the cited Insuring Clause, Federal's Excess Policy essentially follows-form to the terms and conditions of the Primary Policy issued by National Union. At such time as you receive the coverage position from National Union in this matter, please forward a copy for my review. Following receipt and review of the coverage position from National Union, we will be in a better position to take a coverage position on behalf of Federal.

Federal's position with respect to coverage for this matter is based upon information provided to date and is subject to further evaluation as additional information becomes available. Federal reserves all rights and defenses under the Excess Policy; the Primary Policy; and available at law to deny coverage on alternative bases as other terms, conditions, exclusions, endorsements and provisions of the Excess Policy and the Primary Policy are found to be applicable.

Very truly yours,

David Brennan AIC CPCU
Western Specialty Claims
acacia1211.db1

cc:

Mr. Jed N. Shea
Lockton Companies
444 W. 47th St. Suite 900
Kansas City, MO 64112-1906

Tom Sicard
Chubb Executive Risk
P.O. BOX 13167
KANSAS CITY, MISSOURI 64199-3167

Exhibit  6  page  2

Page  146

**EXHIBIT 7**



**AIG**                     AIG ████cal Services, Inc.
                            175 Wa████reet
                            New York, NY  10038
                            212.770.7000

**Robert E. Plunkett**
Director of Complex Claims
Direct Dial: (212) 458-1519
Facsimile: (212) 458-1476
E-Mail: Robert.Plunkett@AIG.com

November 3, 2003

VIA FACSIMILE AND REGULAR MAIL
Scott Burell, Vice President, Finance
CombiMatrix Corp.
6500 Harbour Heights Parkway
Mukilleo, WA  68275

**Re:   Insured: Acacia Research Corporation**
**Matter: Nanogen**
**Policy No.: 8578590**
**Claim No: 297-011357**

Dear Mr. Burell:

I write as a follow up to our several conversations concerning CombiMatrix Corporation's position that the defense fees and costs incurred by CombiMatrix and its officer, Dr. Donald Montgomery, in the Nanogen suit are covered under the above-referenced Policy. Those fees and costs total approximately $1.8 million, and were incurred on behalf of both Dr. Montgomery and CombiMatrix. For the reasons stated below, AIG Technical Services ("AIGTS"), on behalf of National Union Fire Insurance Company of Pittsburgh, PA, believes there is no coverage for such fees and costs, and thus we must reject CombiMatrix's position.

As an initial matter, CombiMatrix failed to meet its obligation to cooperate under the Policy by failing to keep AIGTS informed of developments in the Nanogen action. It appears that CombiMatrix completely failed to contact AIGTS after May 14, 2001, the date of its letter to Christopher Butler enclosing a status report stating that defendants' motion to dismiss had only been granted in part, and that an Answer had been filed. According to our file, the next communication between AIGTS and CombiMatrix was a letter from John Favilla at AIG to Patrick de Maynadier at CombiMatrix dated August 29, 2002, stating that AIGTS had received no correspondence from CombiMatrix since the May 14th letter, and requesting an update. John then noted in the file on November 27, 2002, that he was advised by CombiMatrix's general counsel that the Nanogen suit had settled, and that CombiMatrix was seeking $1.8 million in defense fees and costs from National Union.

**Exhibit "7"**

Exhibit _7_ page _1_
Page _147_

A Member of
American International Group, Inc.

51055 (6/00)

CombiMatrix's failure to keep National Union apprised for what appears to be over a year-and-a-half while they litigated the case from the filing of the Answer through the filing of a summary judgment motion is a clear breach of the duty to cooperate clause. Clause 8 of the Policy provides:

> The insureds shall not admit or assume any liability, enter into any settlement agreement, stipulate to any judgment, or incur any Defense Costs without the prior written consent of the Insurer. Only those settlements, stipulated judgments and Defense Costs which have been consented to by the Insurer shall be recoverable as Loss under the terms of this policy. The Insurer's consent shall not be unreasonably withheld, provided that the Insurer shall be entitled to effectively associate in the defense, the prosecution and the negotiation of any settlement of any Claim that involves or appears reasonably likely to involve the Insurer.

Based on the documents in our file, it appears that CombiMatrix sent one letter to AIGTS requesting payment of bills, a letter dated April 12, 2001, enclosing bills amounting to $59,624 (which is below the $150,000 policy retention applicable to Defense Costs). There is no indication in the file that any other request was ever made by CombiMatrix seeking AIGTS' consent to pay defense costs. Furthermore, CombiMatrix never sought AIGTS' consent to the settlement, and completely failed to include National Union in the events and progress of the litigation for a year-and-a-half, including settlement negotiations. Indeed, it appears that summary judgment motions were pending and trial was scheduled sometime towards the end of 2002 at the time the Nanogen case settled. Thus, this case was almost fully litigated, through discovery and dispositive motions, without a single communication from CombiMatrix to AIGTS. The file indicates that it was only after John Favilla wrote a letter to CombiMatrix that CombiMatrix informed him that the suit had been settled. National Union has no obligation under the express terms of Clause 8 to pay any of the defense fees and costs under these circumstances.[1]

Assuming that there was not a breach of the duty to cooperate, we note that coverage for the fees and costs would appear to be precluded under Endorsements 5 to the Policy. Endorsements 5 and 6 contain "Pending and Prior Litigation" exclusions, which exclude coverage for "Loss in connection with a Claim made against an Insured" as follows:

Endorsement 5:

alleging, arising out of, based upon or attributable to any pending or prior litigation as of January 22, 1997, or alleging or derived from the same or essentially the same facts as alleged in such pending or prior litigation.

---

[1] This same reasoning would apply in the event CombiMatrix were to seek reimbursement of the settlement amount, or any part thereof.

Exhibit 7 page 2

Page 148

Endorsement 6:

[W]ith respect to the $4,000,000 excess of $1,000,000 Limits of Liability, this policy does not apply to any claim arising out of any litigation pending and/or prior to April 09, 1998 or any fact, circumstance or situation alleged in such litigation, and furthermore, this policy does not apply to any future claim arising out of any of the foregoing.

Under the above endorsements, a Claim that relates to litigation filed as of January 22, 1997 is totally excluded from coverage, and a Claim relating to litigation filed as of April 9, 1998, but after January 22, 1997, is excluded with respect to $4 million of the $5 million in policy limits.

Endorsement 5 is implicated by Dr. Montgomery's suit against Nanogen, as it was filed on November 3, 1995 (hereinafter, the "Montgomery Suit"). Dr. Montgomery asserted various causes of action in the Montgomery Suit involving his employment with Nanogen. He alleged in that suit that Nanogen made misrepresentations in order to induce him to accept employment, including misrepresentations concerning the viability of its technology, and that his refusal while a Nanogen employee to make presentations concerning that technology resulted in his constructive discharge. As part of the settlement in that suit, the parties signed a Settlement and General Release Agreement ("Settlement Agreement") that contained the following provisions:

(1) A "Whereas" clause stating that Nanogen is "concerned that Dr. Montgomery will unfairly compete against Nanogen, misappropriate trade secrets regarding its technology or misuse confidential and proprietary information of Nanogen";

(2) A "Whereas" clause stating that "Dr. Montgomery is concerned that Nanogen will interfere with his future employment prospects and/or business opportunities";

(3) A provision wherein Dr. Montgomery covenanted "that he will not compete unfairly with Nanogen or misappropriate any trade secrets . . . of Nanogen in the future";

(4) A provision wherein Dr. Montgomery covenanted that he had not engaged in work regarding a particular technique involving free field electrophoresis other than for the benefit of Nanogen, and that he would not engage in such work in the future.

(5) An acknowledgement by Dr. Montgomery that he was provided access to certain listed patent applications and exposed to certain listed trade secrets, and that he would not misappropriate such information.

(6) A provision wherein Dr. Montgomery covenanted that it would not interfere with Dr. Montgomery's future employment of business other than to enforce its rights under the Agreement; and

Exhibit 7 page 8

Page 149

(7) Covenants by Dr. Montgomery and Nanogen not to sue each other, except
regarding the obligations arising out of the Settlement Agreement.

It would appear that the Montgomery Suit, including the Settlement Agreement in
that suit, constitutes a "prior litigation" under the terms of both Endorsements 5 and 6.
Both the Montgomery Suit and the Nanogen action involved Dr. Montgomery and
Nanogen as parties, and both involved claims concerning Dr. Montgomery's employment
at Nanogen, including the technology he was privy to while working there. The
Settlement Agreement in the Montgomery Suit is clearly part of the litigation in that suit,
and the above provisions in the Settlement Agreement involve the same subject matter
involved in the Nanogen suit - Dr. Montgomery's alleged misappropriation of
Nanogen's trade secrets. In fact, both Nanogen and Dr. Montgomery asserted claims in
the Nanogen action alleging that the other party breached covenants in the Settlement
Agreement, including the covenant-not-to-sue provision (Nanogen's breach) and the
covenants not to compete and not to disclose trade secrets (Dr. Montgomery's breach).
This is further evidence that the Nanogen action arose out of, was based upon, or
attributable to the Montgomery Suit. Because the Montgomery Suit was filed prior to
January 22, 1995, the prior acts date contained in Endorsement 5, it appears coverage for
the Nanogen action is excluded under that endorsement.

Even putting the above provisions aside that appear to exclude coverage, coverage
for the defense fees and costs would be seriously limited under other provisions of the
Policy. The Policy provides no direct coverage for CombiMatrix[2], as the Nanogen action
does not involve a "Securities Claim" or a "Year 2000 Third Party Claim." (See Clause
1, Coverage B, of the Policy). The Policy provides coverage for Dr. Montgomery only
for Wrongful Acts done in his capacity as a director or officer of CombiMatrix. (Clause
1, Coverage A). Of the 14 total causes of action asserted in the Nanogen complaint, two
are against CombiMatrix alone, five are against both Dr. Montgomery and CombiMatrix,
and five are against Dr. Montgomery alone. Furthermore, all causes of action arise out of
Dr. Montgomery's assignment of rights to CombiMatrix in the information and
technology underlying the patent applications. Nanogen alleged that such assignment
was in violation of Dr. Montgomery's contractual obligation under the Proprietary
Information and Inventions Agreement ("Proprietary Agreement") with Nanogen to
assign to Nanogen ownership of all inventions resulting from work performed at
Nanogen. Nanogen further alleged that it was the owner of the trade secrets underlying
the patent applications, and that Dr. Montgomery misappropriated those trade secrets by
assigning the technology rights to CombiMatrix.

---

[2] From my several conversations with you, I understand that CombiMatrix is a covered "Subsidiary" of the
named insured, Acacia Research Corp., because Acacia owned more that 50% of the outstanding voting
stock, directly or indirectly, of CombiMatrix on or before the Policy inception date (January 22, 1999).
Please note CombiMatrix would not be a covered Insured, and Dr. Montgomery would not be a covered
officer of an Insured, in the event that CombiMatrix did not meet this definition, or any of the other
definitions of a "Subsidiary" in Clause 2 (p) of the Policy. Please advise us immediately if we are mistaken
in our understanding.

Exhibit 7 page 4

Page 160

Dr. Montgomery assigned those rights prior to becoming an officer or director of CombiMatrix. As set out in the Assignment And Subscription Agreement between CombiMatrix and Dr. Montgomery, dated April 19, 1996, part of the consideration provided by Dr. Montgomery for becoming a shareholder of CombiMatrix was the assignment of such rights. Furthermore, it was only after execution of the Assignment and Subscription Agreement that the Board appointed Dr. Montgomery as a director and approved his employment as Vice President of CombiMatrix Corporation. (See Minutes of Meeting of the Board of Directors of CombiMatrix Corporation, dated April 19, 1996.) Accordingly, it is clear that he assigned his rights prior to becoming a director or officer.

Even were this not the case, we note that Dr. Montgomery did not assign his ownership rights in technology to CombiMatrix in his capacity as a director or officer, but rather in his capacity as purported inventor of the technology and originator of the information forming the basis of the assignment. In other words, the act of assignment was not performed as part of his duties as a director or officer, nor in his capacity as such, and thus did not constitute a covered "Wrongful Act." In this regard, "Wrongful Acts" is defined in the Policy as meaning any "actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or act by the Directors or Officers in their respective capacities a such, or any matter claimed against them solely by reason of their status as Directors or Officers of the Company[.]"

You have taken the position that the wrongful activities alleged in the Nanogen complaint, and the causes of action asserted therein, all arise out of the filing of the patent applications (which occurred after Dr. Montgomery became a director and officer), as opposed to the assignment of the rights in those patents, and that Dr. Montgomery was responsible for filing the patents as an officer of CombiMatrix. Putting aside the issue of whether the filing constituted an act done by Dr. Montgomery in his capacity as a director or officer, we note that the complaint alleged that Dr. Montgomery's assignment of rights to CombiMatrix, in and of itself, was a misappropriation of trade secrets in violation of his Proprietary Agreement with Nanogen, in which, it is alleged, he agreed to assign the rights to CombiMatrix. The complaint further alleges that CombiMatrix's act of receiving those rights (pursuant to the assignment) was a misappropriation of trade secrets. These allegations are expressly or necessarily the basis of most of the causes of action asserted in the complaint.[3] Furthermore, we note that the alleged wrongful activity alleged in the complaint of Dr. Montgomery having "used" Nanogen's alleged proprietary information would necessarily include assigning ownership rights in that information. Such alleged wrongful "use" is asserted throughout the complaint and in all the causes of action in the complaint in one form or another. Moreover, the assignment was the pivotal wrongful activity from which all others, including the filing of the patents, arose. Without the assignment, there could be no subsequent filing. Accordingly,

___

[3] For example, see First Cause of Action (paras. 30-31), Second Cause of Action (para. 37), Third (paras. 41-42, 45, 50, 58, 59), Fourth (paras. 64, 68, 70, 72), Fifth (paras. 79-80), Ninth (paras. 103-107, 110), Eleventh (para. 124), Twelfth (para.130), Thirteenth (para. 138), and Fourteenth (para. 144).

Exhibit 7  page 5

Page 151

at the very least, Dr. Montgomery committed a significant portion of the alleged
wrongful activities in an uninsured capacity.

We note as well that several of the causes of action seek injunctive and
declaratory relief that would not, if granted, have resulted in covered Loss under the
Policy. The definition of "Loss" includes "damages," which term would not include pure
injunctive and declaratory relief. Additionally, "Loss" expressly excludes "any amount
for which the Insureds are not financially liable." Causes of Action One through Four,
Twelve, Thirteen and Fourteen seek injunctive or declaratory relief exclusively. We note
also that the Tenth Cause of Action, asserting that Dr. Montgomery fraudulently induced
Nanogen to sign the Settlement Agreement, is based upon allegations that Dr.
Montgomery met with Acacia officers before his employment with Acacia to discuss
forming a company founded on Nanogen's trade secrets. These alleged activities were
committed prior to Dr. Montgomery's becoming a director and officer, and thus were not
done in an insured capacity.

Finally, Clause 8 of the Policy provides as follows:

With respect to (i) Defense Costs jointly incurred by, (ii) any joint settlement
entered into by and/or (iii) any judgment of joint and several liability against: the
Company and any Natural Person Insured in connection with any Claim other
than a Securities Claim and a Year 2000 Claim (other than the claims described in
clause 5(d)), the Company and the Natural Person Insureds and the Insurer agree
to use their best efforts to determine a fair and proper allocation of the amounts as
between the Company and the Natural Person Insureds and the Insurer taking into
account the relative legal and financial exposures, and the relative benefits
obtained by, the Natural Person Insureds and the Company.

In terms of the relative benefits obtained from the defense, the Nanogen
complaint alleges that CombiMatrix was assigned rights by Dr. Montgomery in the
subject patent applications, and so clearly it is CombiMatrix that benefited from the
assignment. Similarly, the "legal and financial exposures" in the action were directed at
CombiMatrix – the holder of the patents that allegedly violated Nanogen's rights. In fact,
Nanogen apparently did not assert that Dr. Montgomery breached any duty owed to them
in his officer or director capacity, and it would appear any such claim would not be viable
and thus would not expose Dr. Montgomery to any liability. Rather, Nanogen based its
claims against Dr. Montgomery personally on his alleged breach of contractual
obligations owed to Nanogen arising under the Settlement Agreement and Proprietary
Agreement. Such claims, again, would not have resulted in exposure to Dr. Montgomery
in his director or officer capacity. Accordingly, both the benefits and legal and financial
exposures weighed heavily on Acacia, and not on Dr. Montgomery in an insured
capacity.

Exhibit __7__ page __6__

Page ___152___

Please contact me in the event you have any questions concerning the above, or would like to discuss AIGTS' position in more detail. In the meantime, AIGTS continues to reserve all rights under the Policy and applicable law.

Very truly yours,

ROBERT E. PLUNKETT

Exhibit 7 page 7
Page 153

## DECLARATION OF SERVICE

STATE OF CALIFORNIA, COUNTY OF ORANGE

I, the undersigned, declare under penalty of perjury that I am a citizen of the United States, over the age of 18 years, employed in the County of Orange in the office of a member of the Bar of this Court, at whose direction such service was made. I am not a party to the within action. My business address is 18200 Von Karman Avenue, Suite 900, Irvine, California 92612-1023.

On July 18, 2005, I served the foregoing document(s) described as **FIRST AMENDED COMPLAINT FOR: 1) BREACH OF CONTRACT; 2) BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING; and 3) VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE §12700** on the interested parties in this action by placing true copies thereof enclosed in a sealed envelope addressed as follows:

| | | Method of Service |
|---|---|---|
| Michelle R. Bernard, Esquire<br>Steven B. Bitter, Esquire<br>Matthew G. Kleiner, Esquire<br>GORDON & REES, LLP<br>101 West Broadway, Suite 1600<br>San Diego, CA 92101 | Attorneys for Defendant<br>National Union Fire<br>Insurance Company of<br>Pittsburgh, PA | First-Class Mail |

**√**   **BY MAIL**

___   I caused such envelopes with postage thereon fully prepaid to be placed in the United States mail at Irvine, California.

**√**   I am "readily familiar" with this firm's practice of collection and processing correspondence for mailing. It is deposited with the United States Postal Service on that same day in the ordinary course of business. I am aware that on motion of parties served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

___   **BY FACSIMILE:**

___   A copy was transmitted via facsimile, {√ } followed with copy by FedEx.

___   **BY FEDEX:**

___   As follows: I delivered such FedEx envelope, fully prepaid, to the FedEx facility located at 18651 Von Karman Ave., Irvine, California.

Executed on July 18, 2005, at Irvine, California.

*Patricia F. Wood*
_____
Patricia F. Wood