```
                                    FILED
                           CLERK, U.S. DISTRICT COURT

                              FEB - 8 2008

                           CENTRAL DISTRICT OF CALIFORNIA
                           BY                      DEPUTY
```

Priority  
Send  
Enter  
Closed  
JS-5/JS-6 _____  
JS-2/JS-3 _____  
Scan Only_____

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

|  |  |
|---|---|
| Acacia Research Corp., et al. | CASE NO. CV 05-501 PSG (MLGx) |
| Plaintiffs, | FINDINGS OF FACT AND CONCLUSIONS OF LAW FOLLOWING COURT TRIAL |
| vs. | |
| National Union Fire Ins. Co. of Pittsburgh, PA | |
| Defendant. | |

## I.   PROCEDURAL BACKGROUND

Acacia Research Corp. ("Acacia") and Combimatrix Corp. ("Combimatrix" and jointly with Acacia, "Plaintiffs") have sued National Union Fire Insurance Co. of Pittsburgh, Pennsylvania ("Defendant") over an insurance coverage dispute, seeking reimbursement of litigation and settlement costs for a lawsuit under Plaintiffs' Directors & Officers Insurance Policy ("Policy") provided by Defendant.

On June 28, 2007, the Court ruled on the parties' cross-motions for summary judgment. The Court found, as a matter of law, that (1) the prior litigation exclusions provided in Endorsements 5, 6, and 11 to the Policy do not apply to Plaintiffs' claim

for coverage and (2) Defendant's defense that Combimatrix's officer, Montgomery, acted outside the scope of his duties as a director or officer in assigning Combimatrix his invention rights fails. The Court also found that there were triable issues of fact regarding the other issues and claims raised by the parties.

Then, on November 13, 2007, a court trial on Plaintiffs' claims commenced, and the trial concluded on December 7, 2007. The Court now issues its Findings of Fact and Conclusions of Law in this Order.

II.   LEGAL STANDARD

A.   Findings of Fact and Conclusions of Law in a Court Trial

Federal Rule of Civil Procedure 52(a)(1) states that "[i]n an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court. Judgment must be entered under Rule 58." Fed. R. Civ. P. 52(a)(1).

III.   FINDINGS OF FACT

A.   Plaintiffs' Insurance

Plaintiffs are insured under National Union Fire Insurance Company of Pittsburgh, PA, Directors, Officers and Corporate Liability Insurance Policy, D & O Gold No. 857-85-90 ("Policy"). (Trial Exhibit ("TE"), 17.) By the terms of the Policy, Plaintiffs, their directors and officers, and any past, present or future subsidiary of Plaintiffs, are covered under the policy. The policy at issue in this litigation ran from January 22, 1999 to January 22, 2002. The policy is a claims made policy and applies to claims that are first made against Plaintiffs during the policy period and reported in writing to Defendant. The limits under the policy are $10 million. (TE, 17.1 and 17.59.) The policy also has a self insured retention of $150,000. (TE, 17.2.)

B.   Combimatrix and Dr. David Montgomery

In April of 1996, Combimatrix hired Dr. David Montgomery ("Montgomery") as

1  an officer, Vice President-Research and Development. (TE, 21.3.) Combimatrix and

2  Montgomery also executed a Proprietary Information and Inventions Agreement. (TE,

3  21.11.) The agreement provided that Montgomery would assign all inventions that he

4  made while working at Combimatrix to Combimatrix. At the same time, Montgomery

5  was appointed to serve on Combimatrix's board as a Director. (TE, 21.1.) Later,

6  Montgomery became the Chief Technology Officer at Combimatrix. Montgomery was

7  always an officer and director of Combimatrix.

8        While serving as an officer and director, Montgomery developed technology that

9  was assigned to Combimatrix. The technology led to two patents. On January 5,

10  1998, an application for Patent No. 6,093,302 (the "'302 Patent") was filed. The '302

11  Patent was issued on July 25, 2000 and identified Montgomery as the inventor and

12  Combimatrix as the assignee. (TE, 19.4.) The application for Patent No. 6,280,595

13  (the "'595 Patent") was filed on September 10, 1999. The '595 Patent was issued on

14  August 28, 2001 and identified Montgomery as the inventor and Combimatrix as the

15  assignee. (TE, 19.3.)

16        C.    The Underlying Litigation

17        On November 28, 2000, Nanogen, Inc. brought a lawsuit against Montgomery

18  and Combimatrix alleging 14 causes of action. (TE, 49.2.) Paragraph 26 of the

19  Complaint alleges "Montgomery was a founding stockholder and the Vice President of

20  Research and Development of Combimatrix at the time the alleged rights in the '302

21  Patent, the '221 PCT and '688 PCT were granted to Combimatrix by Dr.

22  Montgomery." The next paragraph asserts that Nanogen is the rightful owner of the

23  technology. (TE 49.10.) Each of the 14 causes of action alleges that Montgomery was

24  the Vice President of Reserch and Development when he wrongfully provided

25  Combimatrix with the disputed technology. In late August of 2001, the original

26  complaint was amended to add the '595 Patent to the claim. (TE, 29.)

27        At the outset of the litigation, Montgomery and Combimatrix entered into an

28  Indemnity Agreement and Joint Defense Agreement. (TE, 58 and 59.) The agreements

3

1   memorialize the parties' conclusions "that they have certain interests in common and

2   are able to assert certain common defenses." (TE, 59.1)  The uncontroverted

3   testimony at trial confirmed that Montgomery's and Combimatrix's common defense to

4   the lawsuit was that Montgomery did not steal technology from Nanogen because the

5   disputed technology was developed by him while he was acting as the Vice President

6   of Research and Development and as Chief Technology Officer at Combimatrix.

7        First, Dr. Amit Kumar, President and Chief Executive of Combimatrix, testified

8   that the technology was developed by Montgomery while at Combimatrix:

9        Q.  Now, you said that Combimatrix uses electricity to get the DNA on the

10       chip; is that correct?

11       A.  That's correct.

12       Q.  How many other companies presently use this method for putting the DNA

13       on the chip?

14       A.  None that I'm aware of today.

15       …

16       Q.  Where was the technology developed that was at the – in dispute in the

17       Nanogen lawsuit?

18       A.  At Combimatrix.

19       Q.  And it was developed by Dr. Montgomery there?

20       A.  Yes.

21       …

22       Q.  How does the Nanogen's product differ from Combimatrix's product?

23       A.  It's a very different product.  It uses a gold chip, and – although they

24       attempt to also analyze DNA.

25       Q.  What do you mean by a gold chip?

26       A.  It's not a semiconductor.  It doesn't use electricity to put DNA on the chip.

27       It's a thin film of glass with gold on it.

28  (Trial testimony, Volume I, p. 140, lns. 20-25; p. 150, ln. 8 – p. 151, ln. 1.)

1    Next, Patrick D. de Maynadier, General Counsel for Combimatrix, discussed

2    the Indemnity and Joint Defense agreements between Montgomery and Combimatrix:

3        15.  We also proposed to enter into a new Indemnity Agreement with Dr.

4        Montgomery, specific to the Nanogen Lawsuit, which is Exhibit 58.

5        Combimatrix was already required to defend Dr. Montgomery, because he was

6        acting as an Officer and Director of Combimatrix, which was liable for his

7        actions. …

8        16.  Because of the common, singular defense based upon proving Dr.

9        Montgomery's innocence, Combimatrix and Dr. Montgomery entered into a

10       Joint Defense Agreeement, Exhibit 59, by which the parties could freely share

11       information and counsel.

12       …

13       18.  …  This common defense was in response to the claim that the technology

14       belonged to Nanogen, and had been taken by Dr. Montgomery from Nanogen to

15       Combimatrix.  Dr. Montgomery was the lead inventor at Combimatrix; he was

16       its Chief Technology Officer.  Unless Nanogen could prove that Dr.

17       Montgomery had, in fact, stolen the technology which Combimatrix was using,

18       and for which Dr. Montgomery had sought a patent on behalf of Combimatrix,

19       Dr. Montgomery could not be found liable, and that would be the only basis by

20       which Combimatrix could be found liable.  Dr. Montgomery was the only

21       alleged actor involved.

22   (Narrative Statement of Direct Testimony of Patrick D. de Maynadier, at paragraphs

23   15, 16, and 18.)

24       Finally, Mauricio Flores, litigation counsel for Combimatix, also confirmed the

25   defense strategy shared by Montgomery and Combimatrix:

26       Q.  What was the defense to the lawsuit?

27       A.  Don didn't do it.  Don didn't take the technology that belonged to Nanogen.

28       Q.  Was there any other defense for Combimatrix?

1    A.  No.

2    Q.  Assuming that Don did it, was there any defense for Combimatrix?

3    A.  No.

4    Q.  Were there any distinct claims against Combimatrix that were not alleged to

5    be the result of Dr. Montgomery's actions?

6    A.  No.

7  (Trial Testimony, Volume II, p. 18, lns. 3-14.)

8       After nineteen months of litigation and legal expenses that were quickly

9  approaching $2 million, Combimatrix considered settling the lawsuit with Nanogen.

10  Combimatrix came to realize that continuing to litigate against Nanogen would have

11  ultimately destroyed the company.  Richard Harris, President of Acacia, reasoned:

12  "We felt it was like winning the battle and losing the war. … We saw no upside and

13  no ability to continue to fund the lawsuit.  Even if we won, we were in the same

14  position that we always thought we were; that we owned the technology. … We didn't

15  have the cash to do that (fund the entire lawsuit to the conclusion)."  (Trial Testimony,

16  Volume I, p. 118, lns. 15-25.)   Dr. Kumar agreed with Harris' assessment.  (Trial

17  Testimony, Volume I, p 151, lns. 16-24.)

18       Initially, Nanogen demanded a large cash settlement to resolve the lawsuit.

19  However, Combimatrix was not in position to settle the lawsuit on those terms.  Dr

20  Kumar explained: "Not only did we not have that tremendous amount of cash, even if

21  we had it, we would have needed it for our own efforts.  Giving them the cash was

22  tantamount to going bankrupt; so we couldn't do that."  (Trial Testimony, Volume I,

23  p.152, ln. 25 – p. 153, ln 3.)  Accordingly, the parties discussed delayed payments and

24  cash equivalents, including stock and royalties.

25       A settlement was ultimately reached on August 8, 2002.  (TE, 78.)  The

26  settlement terms were memorialized in an agreement signed by Combimatrix,

27  Montgomery and Nanogen on September 30, 2002.  Combimatrix and Montgomery

28

agreed to pay Nanogen $ 1 million in two installments.[1]  Combimatrix also agreed to issue stock to Nanogen and to pay royalties on the '302 Patent and the '595 Patent to Nanogen. Finally, Combimatrix agreed to pay royalties on a patent unrelated to the lawsuit, Patent No. 6,444, 111.  (TE, 93.)  As of November 5, 2007, Combimatrix has paid the following to Nanogen:

|  |  |
|---|---|
| Common Stock Issued to Nanogen: | $ 17,965,686.04 |
| Cash Paid to Nanogen: | $  1,855,640.12. |

(TE, 71.)

In the settlement agreement, Nanogen did not assign any rights nor grant any licenses to Combimatrix.  To the contrary, Nanogen acknowledged that Combimatrix owned all rights, title and interest in the patents and disputed technology.  (TE, 93.10.)

Finally, in the Nanogen lawsuit, Combimatrix actually paid $1,793,158.04 in legal fees.  These costs and expenses were reasonable and were used to provide a common defense to Montgomery and Combimatrix.  Mr Flores, lead counsel for Combimatrix testified:

> Q. In defending Combimatrix in that lawsuit, what was your involvement with respect to the defense of Dr. Donald Montgomery?
>
> A. Well, I was generally responsible for the patent law and trade secret law aspects of the case, and also the development of the facts relating to the technology.  That was both for my client and for Dr. Montgomery.

(Trial Testimony, Volume 2, p.17, lns 6-12.)

Mr. de Maynadier's testimony was that counsel was divided by issues, not by parties.  At trial, he confirmed that position by stating: "And the lead counsel selected for this case was defending both Combimatrix and Don.  There's no way to discern between the defense of the two at this point."  (Trial Testimony, Volume 3, p. 117, lns 19-21.)

---

[1] Combimatrix agreed to indemnify Montgomery.

1    D.    Plaintiffs' Attempts to Obtain Coverage and Defendant's Claims
2          Handling

3          Shortly after the commencement of the Nanogen lawsuit, Combimatrix provided
4    written notice of the claim to Defendant.  About two weeks later, on December 15,
5    2000, Defendant wrote a letter that acknowledged receipt of the claim and promised to
6    forward a "preliminary coverage evaluation to you in the near future." [2] (TE, 32.)
7    However, the author of the letter, Raymond F.Tiburzi, had already written in a
8    December 13, 2000 email that the claim "does not appeared to be covered – 'theft of
9    trade secrets' lawsuit – by officer of Combimatrix."  (TE, 31.)

10         Defendant assigned the claim file to Christine Cirillo on December 21, 2000.
11   By January 5, 2001, Cirillo ceased responsibility for the claim.  During her handling of
12   the claim, she called the insurance agent to acknowledge receipt of the claim and on
13   January 4, 2001, she ordered a copy of the policy to evaluate coverage.  (TE, 6 and
14   Trial Testimony, Volume 1, p.192, ln 13 – p, 193, ln. 8.)

15         Two months later, the claim file was reassigned to Christopher Butler.
16   (Defendant's Response to Special Interrogatory No. 1.)  The only activity performed
17   by Butler occurred on March 9, 2001, when he wrote to the insured:  "the purpose of
18   this letter is to request additional information.  In addition, this letter will advise you of
19   certain provisions that may impact coverage in light of the information provided."
20   (TE, 5.) This letter was the first communication by the Defendant to Combimatrix,
21   coming some 3 months after acknowledging notice of the claim.

22         Mr. de Maynadier received the Butler correspondence and responded to the
23   Defendant on the same day.  In a letter dated March 20, 2001, Combimatrix provided a
24   complete and detailed response to Defendant's request for additional information.  The
25   March 20th letter closed by stating, "If there are any questions or issues from your
26   perspective or that of our insurers, please let me know."  (TE, 35.)  Defendant never

27   ───────────────
     [2] Typically, a preliminary coverage evaluation is provided to the insured within
28   14 to 30 days.  (Trial testimony, Volume 1, p. 197- ln. 25- p. 198, ln. 2.)

responded.

Next, Mr. de Maynadier sent another letter to Mr. Butler on April 12, 2001. The letter requested payment from Defendant for legal bills in the amount of $59,624. The letter added: "In order to better serve your needs and avoid flooding you with documentation, please let me know the type of information you would like to receive as the case progresses." (TE, 9.) Defendant never responded.

Again, on May 14, 2001, de Maynadier wrote to the Defendant and provided an update on the Nanogen lawsuit. He also wrote: "If there are any questions or issues from your perspective or if you require any additional documents or information, please let me know." (TE, 1.) Defendant did not respond.[3]

In May of 2001, Mr. Butler was removed from the claims department and no longer handled any files including Plaintiffs' claim file. In fact, from May of 2001 to August of 2002, Defendant did not assign anyone to handle Plaintiffs' claim. (Defendant's Response to Special Interrogatory No 1.) For 15 months, Defendant did nothing on Plaintiffs' claim file.

At last, on August 29, 2002, John Favilla assumed handling of the claim. Mr. Favilla reviewed the entire claim file and noted that no activity occurred on the file since May of 2001. He wrote to Mr. de Maynadier on August 29, 2002, requesting a litigation update and status report on the claim. (TE, 2 and Trial Testimony, Volume 3, p.38 ln. 19 – p. 39, ln.3.)[4] Combimatrix did not respond to Mr. Favilla's letter.

About 90 days later, on November 27, 2002, Favilla called Combimatrix to

---

[3] On September 30, 2001, Mr. de Maynadier asserts that he sent another letter to Defendant. The letter enclosed documents reflecting payments by Combimatrix for legal bills in the amount of $101,690.62. The letter requests reimbursement from the Defendant noting "Our company is very much in need of this payment and your prompt attention to this matter would be appreciated." (TE, 3.) Defendant never responded to this letter, claiming that it never received the letter.

[4] Mr. de Maynadier left Combimatrix in October of 2001.

1    speak with Mr. de Maynadier.  Favilla was told that Mr. de Maynadier was no longer

2    with the company.  Someone from Combimatrix told Favilla that the lawsuit had been

3    settled for $20-30 million and that the legal bills totaled $1.8 million.  (Trial

4    Testimony, Volume 3, p. 43 lns. 10-17 and TE, 6.)   Combimatrix faxed a copy of a

5    press release that outlined the terms of the settlement to Favilla.  (TE, 7.)

6         On January 17, 2003, Favilla spoke to someone at Combimatrix and discussed

7    coverage issues.  Mr. Favilla told Combimatrix that the settlement was not covered

8    because the Policy did not cover patent or breach of contract cases:

9         Q. Do you see where you state, 'I have advised the insured that there is no

10        coverage for the settlement as a policy does not cover patent cases or breach of

11        contract'?

12        A. I see that.

13        Q. You told that to the insured, did you not, sir?

14        A. That's correct.

15        Q. You wanted the insured to believe that; isn't that correct?

16        A. Yes.

17   (Trial Testimony, Volume 3,p.90, lns 5-10; TE, 6.2 and 10.9.)

18        Favilla went on to concede that the Policy did not contain any exclusions related

19   to breach of contract and patent:

20        Q. Now, am I correct that there is no exclusion contained in the policy that says

21        it does not cover patent cases?

22        A. That's correct.

23        Q. Is there any exclusion contained in the policy that says it doesn't cover

24        breach of contract cases?

25        A. No.  There's no exclusion.

26   (Trial Testimony, Volume 3, p. 91 lns. 19-24.)

27        Favilla admitted that he gave the coverage opinions to the insured even though

28   he lacked sufficient information to determine whether any exclusions applied:

1    Q.  Did you have sufficient information from Combimatrix between January
2    2003 and May 2003 to determine whether there were any applicable exclusions
3    that might bar coverage for this claim?
4    A.  No.  As I testified earlier, the threshold issue that I never resolved was the
5    capacity issue of Dr. Montgomery.
6  (Trial Testimony, Volume 3, p.101, lns. 2-11.)

7    Finally, on May 5, 2003, the claim file was transferred to Robert Plunkett for
8  handling.  Plunkett and Combimatrix engaged in numerous conversations.  Plunkett
9  requested documents and Combimatrix timely complied with his requests.  By Mid-
10  August of 2003, Plunkett had sufficient information to render a coverage opinion.
11  (Trial Testimony, Volume 4, p. 38, lns .4-11.)   Plunkett reviewed all of the documents
12  and wrote a denial of coverage letter.  (Trial Testimony, Volume 4, p. 38, lns. 12-18.)

13    On November 3, 2003, almost 3 years after receiving notice of the claim,
14  Plunkett wrote **a first** and final coverage letter to Combimatrix.  (TE, 11.)  In brief,
15  Defendant's coverage letter denies coverage based on the insured's failure to
16  cooperate.  The letter also relies on the prior litigation exclusions, endorsements 5 and
17  6, and the assertion that Montgomery assigned his rights prior to becoming an officer.[5]
18  Lastly, Plunkett writes that there is no direct coverage for Combimatrix and that the
19  policy does not provide coverage for injunctive relief.

20    At trial, Plunkett testified that he reviewed all of the documents and the policy
21  prior to writing the coverage opinion.  However, Plunkett approached the review in a
22  manner that revealed a steadfast determination to deny coverage.  He admitted as
23  much:

24    Q.   You were looking at allegations that would form a basis to deny coverage;
25    correct?
26    A.  I ultimately would, yes.

27
28  [5] These coverage defenses were rejected by the Court on June 28, 2007.

11

1   (Trial Testimony, Volume 4, p. 81, lns. 23-25.)

2          Furthermore, Plunkett ignored facts and documents that were favorable to

3   Combimatrix's coverage position.  Plunkett assumed that the disputed technology was

4   developed prior to Montgomery's arrival at Combimatrix; and therefore, he concluded

5   that the technology was assigned prior to Montgomery becoming an officer or director.

6   (Trial Testimony, Volume 4, p. 78, lns. 4-22.)  Instead, the evidence at trial

7   demonstrated that the disputed technology was developed by Montgomery while he

8   was the Vice President of Research and Development at Combimatrix.  Furthermore,

9   by virtue of a second assignment entitled the Proprietary Information and Inventions

10  Agreement, Montgomery assigned all inventions, including the disputed technology,

11  developed during his employment as an officer to Combimatrix.  (TE, 21.12.)

12  Plunkett's coverage analysis ignored these facts in order to support a denial of

13  coverage:

14          Q.  And am I correct, the reason you presumed that the assignment of the

15          technology was under that first assignment agreement was because that's all you

16          were given?

17          A.  Yes.

18          Q.  Well, why don't you take a look at Page 21.12, and tell me if that page is

19          one of the documents that you were given.

20          A.  Yes.

21          Q.  And were aware that under this provision Dr. Montgomery agreed to assign

22          anything that he invented while working as a vice president of Combimatrix to

23          Combimatrix?

24          A.  Yes.  He agreed to do the same thing for Nanogen.  He allegedly violated

25          that agreement.

26          Q.  And you knew that fact, did you not, sir?

27          A.  I did.

28  (Trial Testimony, Volume 4, p. 78, ln. 23 – p. 79, ln. 11.)

E.     Plaintiffs' damages

As of November 5, 2007, Plaintiffs' damages from the Nanogen lawsuit are as follows:

| | |
|---|---|
| Legal Fees: | $  1,793,158.04 |
| Common Stock Issued to Nanogen: | $17,965,686.04 |
| Cash Paid to Nanogen: | $  1,855,640.12 |
| Total: | $21,614,484.20. |

(TE, 71.1.)

In addition, Plaintiffs seek prejudgment interest at a rate of 10%.  The interest claimed as of the November 5th date equals $9,606,497.42.  Accordingly, minus the $150,000 policy retention, Plaintiffs pray judgment in the amount $31,070,981.62 plus $310,492.99 (present value of future royalty payments).  (TE, 72.1 and 74.1.)

IV.     CONCLUSIONS OF LAW

A.     Principles of Insurance Policy Coverage

Insurance policies are written in at least two essential parts: the insuring agreement, which states the risk or risks covered by the policy, and the exclusion clauses, which remove coverage for risks that would otherwise fall within the insuring clause. *See Waller v. Truck Insurance Exchange, Inc.*, 11 Cal. 4th 1, 16, 44 Cal. Rptr. 2d 370 (1995) (citing *Collin v. American Empire Ins. Co.*, 21 Cal. App. 4th 787, 802, 26 Cal. Rptr. 2d 391 (1994)).  An insured bears the burden of proving that its claim falls within the scope of coverage, while the insurer bears the burden of proving that a claim fails because of a narrowly construed exclusion. *Waller*, 11 Cal. 4th at 16.

B.     Principles of Insurance Policy Interpretation

Under the principle that interpretation of an insurance policy is a question of law, courts interpret insurance policies. *Waller*, 11 Cal. 4th at 18 (citing *AIU Ins. Co. v. Superior Court*, 51 Cal. 3d 807, 818, 274 Cal. Rptr. 820 (1990)).  To fulfill this duty, courts rely on established rules to guide their interpretations.

13

"The rules governing policy interpretation require us to look first to the language of the contract in order to ascertain its plain meaning or the meaning a layperson would ordinarily attach to it." *Waller*, 11 Cal. 4th at 18 (citing Cal. Civ. Code § 1638; *Reserve Insurance Co. v. Pisciotta*, 30 Cal. 3d 800, 807, 180 Cal. Rptr. 628 (1982)). "The fundamental rules of contract interpretation are based on the premise that the interpretation of a contract must give effect to the 'mutual intention' of the parties. 'Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation. [Citation]  Such intent is to be inferred, if possible, solely from the written provisions of the contract. [Citation]  The 'clear and explicit' meaning of those provisions, interpreted in their 'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning is given to them by usage' [Citation], controls judicial interpretation." *Waller*, 11 Cal. 4th at 18 (citing Cal. Civ. Code §§ 1636, 1638, 1639, 1644; *AIU*, 51 Cal.3d at 821-22; *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1264-65, 10 Cal. Rptr. 2d 538 (1992)).

"A policy provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable." *Waller*, 11 Cal. 4th at 18 (citing *Bay Cities Paving Grading, Inc. v. Lawyers' Mutual Ins. Co.*, 5 Cal. 4th 854, 867, 21 Cal. Rptr. 2d 691 (1993)). "But language in a contract must be interpreted as a whole, and in the circumstances of the case, and cannot be found to be ambiguous in the abstract." *Waller*, 11 Cal. 4th at 18 (citing *Bank of the West*, 2 Cal. 4th at 1265). "Courts will not strain to create an ambiguity when none exists." *Waller*, 11 Cal. 4th at 18-19 (citing *Reserve Insurance*, 30 Cal. 3d at 807).

"Furthermore, policy exclusions are strictly construed [Citation], while exceptions to exclusions are broadly construed in favor of the insured. [Citation]  'An insurer cannot escape its basic duty to insure by means of an exclusionary clause that is unclear.  As we have declared time and again any exception to the performance of the basic underlying obligation must be so stated as clearly to apprise the insured of its

14

1  effect. [Citation]  Thus, the burden rests upon the insurer to phrase exceptions and

2  exclusions in clear and unmistakable language." *E.M.M.I. Inc. v. Zurich American*

3  *Ins. Co.*, 32 Cal. 4th 465, 471, 9 Cal. Rptr. 3d 701 (2004) (internal citations omitted).

4      C.     Coverage Under the Policy

5      Defendant's initial argument is that there is no coverage under the policy for

6  Plaintiffs.  Specifically, Defendant claims that there is no entity coverage for

7  Combimatrix separately from coverage for its officers and directors.  To weigh

8  Defendant's argument, the Court examines the language of the Policy regarding

9  coverage for Combimatrix and its officers and directors.

10      Regarding coverage for individual officers of Combimatrix, the insurance

11  contract states that:

12      This policy shall pay the Loss of each and every Natural Person Insured(s)

13      arising from a Claim ... first made against the Natural Person Insured(s) during

14      the Policy Period ... and reported to the Insurer pursuant to the terms of this

15      policy for any actual or alleged Wrongful Act in their respective capacities as

16      Natural Person Insured(s), except when and to the extent that the Company has

17      indemnified the Natural Person Insureds.

18  (TE, 4.4.)  Regarding coverage for Combimatrix itself, the insurance contract further

19  states:

20      This policy shall pay the Loss of the Company arising from a: ... (iii) Claim ...

21      first made against a Natural Person Insured(s), during the Policy Period ... and

22      reported to the Insurer pursuant to the terms of this policy for any actual or

23      alleged Wrongful Act, but, ... in the case of (iii) above, only to the extent that

24      the Company has indemnified the Natural Person Insureds for such Loss

25      pursuant to law, common or statutory, or contract, or the Charter or By-laws of

26      the Company duly effective under such law which determines and defines such

27      rights of indemnity.

28

(TE, 4.4.)  The insurance contract also sets forth requirements for claims reporting by stating that the "Company or the Insureds shall, as a condition precedent to the obligations of the Insurer under this policy, give written notice to the Insurer of a Claim made against an Insured as soon as practicable after the Named Corporation's risk manager or general counsel first becomes aware of the Claim ..." (TE, 4.16.)  With the reporting of a covered claim, "the Insurer shall advance excess of the applicable retention amount, at the written request of the Insured, covered Defense Costs every ninety (90) days.  Such advance payments by the Insurer shall be repaid to the Insurer by the Insureds or the Company, severally according to their respective interests, in the event and to the extent that the Insureds or the Company shall not be entitled under the terms and conditions of this policy to payment of such Loss." (TE, 4.17.)

Thus, by the terms of the Policy, Combimatrix received coverage for claims made against any of Combimatrix's officers or directors if Combimatrix indemnified its officers or directors for the claims.  However, Combimatrix was required to give written notice to Defendant of the claim.  Upon Combimatrix's notice of a claim, Defendant was then obligated to advance covered defense costs every ninety days for amounts in excess of the insurance contract's retention amount.

### 1.    Entity Coverage for Combimatrix

Defendant argues that there is no entity coverage for Combimatrix under the Policy, and therefore, Combimatrix should not be able to recover any defense costs.  Here, the Court finds that Combimatrix is entitled to coverage under the Policy for its indemnification of Montgomery.  Combimatrix indemnified Montgomery for the lawsuit Nanogen brought against Montgomery and Combimatrix.  Also, the claims Nanogen brought against Montgomery were covered claims under the policy, as discussed more fully below.

### 2.    Allocation of Defense Costs Between Combimatrix and Montgomery

1    However, Defendant also argues that the Court should allocate defense costs

2    incurred by Combimatrix on its own behalf and costs incurred defending Montgomery.

3    Defendant points out that the Policy provides no coverage for claims brought against

4    Combimatrix based on Combimatrix's own alleged misconduct.  Defendant further

5    notes that the Policy states:

6        the Company is covered, subject to the policy's terms and conditions, only with

7        respect to its indemnification of its Natural Person Insureds under Coverage

8        B(iii) as respects a Claim against such Natural Person Insureds, ... Accordingly,

9        the Insurer has no obligation under this Policy for covered Defense Costs

10       incurred by, judgments against or settlements by the Company arising out of a

11       Claim made against the Company ... or any obligation to pay Loss arising out of

12       any legal liability that the Company has to a claimant ...

13       With respect to (i) Defense Costs jointly incurred by, (ii) any joint settlement

14       entered into by and/or (iii) any judgment of joint and several liability against:

15       the Company and any Natural Person Insured in connection with any Claim ... ,

16       the Company and the Natural Person Insureds and the Insurer agree to use their

17       best efforts to determine a fair and proper allocation of the amounts as between

18       the Company and the Natural Person Insureds and the Insurer taking into

19       account the relative and financial exposures, and the relative benefits obtained

20       by, the Natural Person Insureds and the Company.

21       In the event that a determination as to the amount of Defense Costs to be

22       advanced under the policy cannot be agreed to, then the Insurer shall advance

23       such Defense Costs which the Insurer states to be fair and proper until a

24       different amount shall be agreed upon or determined pursuant to the provisions

25       of this policy and applicable law.

26   (TE, 4.17.)

27    Based on these provisions of the Policy, Defendant claims that if the Court

28   determines that Defendant was liable under the Policy to Plaintiffs for claims made

17

1   against Plaintiffs, then the Court should now allocate the defense costs incurred

2   between Combimatrix and Montgomery.  While the Policy does provide for an

3   allocation between Montgomery and Combimatrix, the Policy also provides that such

4   an allocation should occur after negotiations between Combimatrix and Defendant

5   about allocation terms.  Here, Defendant did not negotiate with Plaintiffs regarding any

6   allocation and refused to recognize any valid claim by Plaintiffs at all.  It is not clear

7   that an allocation under the Policy would be proper at this time, and the Court finds

8   that it is also unnecessary.

9        The Court finds that *all* defense costs incurred by Combimatrix arose out of its

10   indemnification of Montgomery for alleged wrongful acts committed by Montgomery.

11   Specifically, the underlying Nanogen action centered on Nanogen's accusations that

12   Montgomery stole Nanogen's technology and brought it to Combimatrix.  Accordingly,

13   Combimatrix and Montgomery presented a single and joint defense to the Nanogen

14   suit.  Because the wrongful acts alleged in the underlying action all involved the

15   alleged wrongful acts of Montgomery, no allocation of defense costs between

16   Combimatrix and Montgomery is needed.[6]

17        In summary, the Court finds that there is coverage for Combimatrix under the

18   Policy for its indemnification of Montgomery, including all costs incurred from the

19   Nanogen lawsuit.

20        3.    Coverage Under the Policy for Montgomery

21        Under the Policy, Montgomery is covered for the claims brought against him by

22   Nanogen.  However, Defendant argues that there are Policy exclusions that relieved its

23   duty to advance defense costs to Combimatrix for the claims brought against

24   Montgomery.  The Court now addresses Defendant's exclusions arguments.

25        D.    Does Exclusion H of the Policy Bar Coverage?

26

27   _____

28        [6] Though briefed by the parties, the Court finds that there is also no need to address
     the separate legal doctrine of the "Larger Settlement Rule."

1    Defendant argues that Exclusion (h) in the Policy is an independent bar to

2  coverage to Plaintiffs' claims.  The Policy's "Exclusions" section states:

3         The Insurer shall not be liable to make any payment for Loss in connection with

4         a Claim made against an Insured:

5         ...

6         (h) alleging, arising out of, based upon or attributable to any actual or alleged

7             act or omission of the Natural Person Insureds serving in their capacities as

8             directors, officers, trustees, employees or governors of any other entity other

9             than the Company or an Outside Entity, or by reason of their status as directors,

10            officers, trustees, employees or governors of such other entity ...

11  (TE, 4.12-13.)  Defendant argues that "any claim attributable to, arising out of, or

12  based upon acts by Dr. Montgomery related to his role or status as an employee of

13  Nanogen are barred from coverage."  (D's Closing Trial Brief, p. 21, lines 13-16.)

14  Defendant further argues that Montgomery's status as a Nanogen employee gave rise

15  to Nanogen's later claim that Montgomery misappropriated trade secrets from Nanogen

16  and took them to Combimatrix.

17    However, Plaintiffs present the more convincing argument that Nanogen's

18  claims against Montgomery arose from Montgomery's actions as an officer of

19  Combimatrix.  The Court believes that it is more accurate to characterize any alleged

20  misappropriation of Nanogen's confidential information to have occurred during

21  Montgomery's employment with Combimatrix.  While Montgomery was employed with

22  Nanogen, he might have learned Nanogen's confidential information, but he did not

23  misappropriate that information because he was authorized to have it.  It was only

24  when Montgomery was an employee at Combimatrix that he could have committed the

25  alleged wrongful acts of revealing Nanogen confidential information or using

26  Nanogen's confidential information inappropriately.

27

28

1    Thus, the Court finds that Exclusion (h) of the Policy is inapplicable to

2    Nanogen's claims against Montgomery, and the exclusion does not bar a finding of

3    coverage under the Policy for Plaintiffs' claims.

4    E.    Did Plaintiffs Submit a Valid Claim to Defendant Pursuant to the Policy?

5    Defendant also argues that, even if Plaintiffs' claims might have been covered

6    under the Policy, Plaintiffs failed to meet the requirements to make a valid claim under

7    the Policy.  Specifically, Defendant argues that Plaintiffs failed to submit a proper

8    claim that triggered coverage because Plaintiffs never notified Defendant that the

9    $150,000 retention was exhausted.  To determine the merits of Defendant's argument,

10   it is necessary to discuss the scope of Defendant's duties to Plaintiff under the Policy.

11                  1.    Scope of Duty to Advance Defense Costs

12   Contrary to Defendant's position, the Court finds that, in this case, the duty to

13   advance defense costs is broad as the duty to defend.  *See Hurley v. Columbia Cas.*

14   *Co.*, 976 F. Supp. 268, 275 (D. Del. 1997) (Under Michigan law, "the duty to defend

15   is broader than the duty to indemnify only in that it requires the insurer to provide a

16   defense even for claims which are ultimately held meritless.  The agreement to

17   advance defense costs must be similarly interpreted; as noted by the Michigan

18   Supreme Court, it would be an anomaly to require [an insurer] to advance defense

19   costs only for meritorious claims."); *Shapiro v. Am. Home Assurance Co.*, 616 F.

20   Supp. 906, 913 (D. Mass. 1985) (finding that an insurance contract's "statement of the

21   duty to reimburse costs of defense ... is at least as broad as the duty to defend under

22   traditional insurance provisions.")

23   Given the broad scope of Defendant's duty to advance defense costs, Defendant

24   was required to advance defense costs for potentially covered claims.  *See Horace*

25   *Mann Ins. Co. V. Barbara B.*, 4 Cal. 4th 1076, 1081, 17 Cal. Rptr. 2d 210 (1993) ("It

26   is now a familiar principle that a liability insurer owes a broad duty to defend its

27   insured against claims that create a potential for indemnity.")

28

20

1    Along with the broad duty to advance defense costs, Defendant had other duties

2    to Plaintiffs.  The California Supreme Court has reiterated that "[t]he law implies in

3    every contract, including insurance policies, a covenant of good faith and fair dealing.

4    'The implied promise requires each contracting party to refrain from doing anything to

5    injure the right of the other to receive the agreement's benefits.  To fulfill its implied

6    obligation, an insurer must give at least as much consideration to the interests of the

7    insured as it gives to its own interests.  When the insurer unreasonably and in bad faith

8    withholds payment of the claim of its insured, it is subject to liability in tort.'" *Wilson*

9    *v. 21st Century Ins. Co.*, 42 Cal. 4th 713, 720, 171 P.3d 1082 (2007) (internal

10   citations omitted).  Furthermore, "[t]o protect its insured's contractual interest in

11   security and peace of mind, 'it is essential that an insurer fully inquire into possible

12   bases that might support the insured's claim' before denying it."  *Id.* at 721 (internal

13   citations omitted).  Also, "[d]elay [in communication by an insurer] through silence is

14   particularly inappropriate in the insurance context, given the overarching principle that

15   an insurer owes its insured a fiduciary duty to disclose relevant matters arising from

16   their relationship."  *Flintkote Co. v. General Acc. Assur. Co. of Canada*, 480 F. Supp.

17   1167, 1180 (N.D. Cal. 2007) (citation omitted).

18       Defendant's duty of good faith and fair dealing existed throughout the parties'

19   relationship.  *Gruenberg v. Aetna Ins. Co.*, 9 Cal. 3d 566, 578, 108 Cal. Rptr. 480

20   (1973).  ("[T]he insurer's duty [of good faith and fair dealing] is unconditional and

21   independent of the performance of plaintiff's contractual obligations.")  Also, as with a

22   duty to defend, Defendant's duty to advance defense costs arose on tender of a

23   potentially covered claim.  *Flintkote Co.*, 480 F. Supp. at 1177 ("The duty to defend

24   arises when a claim that may potentially be covered is tendered to the insurer.")

25   (citation omitted).

26       2.    Validity of Plaintiff's Claim Submission to Defendant

27       Given the nature of Defendant's duties to Plaintiffs, the Court finds that

28   Combimatrix did submit a valid claim to Defendant.  Combimatrix provided written

21

1   notice of the claim to Defendant shortly after commencement of the Nanogen lawsuit.

2   About two weeks later, on December 15, 2000, Defendant's employee Raymond

3   Tiburzi, wrote a letter to Combimatrix to acknowledge receipt of the claim and

4   promised to forward "a preliminary coverage evaluation" in the "near future."  When

5   the claim file was reassigned to Defendant's employee, Chris Butler, he wrote a letter

6   to the insured, on March 9, 2001, requesting additional information and advising

7   Combimatrix that certain Policy provisions could impact coverage of their claim.  This

8   was the first communication to Plaintiffs following the initial acknowledgement of the

9   claim some three months prior.

10          Plaintiffs immediately responded to Defendant providing detailed information

11   regarding the claim.  Plaintiff's letter dated March 20, 2001 added: "If there are any

12   questions or issues from your perspective or that of our insurers, please let [Plaintiffs

13   know]."  Then, on April 12, 2001, Plaintiffs sent another letter to Defendant requesting

14   payment for legal bills in the amount of $59,624.  Plaintiffs' April 12, 2001 letter

15   stated: "In order to better serve your needs and avoid flooding you with

16   documentation, please let me know the type of information you would like to receive

17   as the case progresses."  Defendant never responded to this letter.

18          The Court finds that based on these facts, Plaintiffs submitted a valid claim to

19   Defendant, and Defendant had duties to communicate with Plaintiff and investigate

20   Plaintiffs' claim, rather than doing nothing and waiting for a communication that

21   Plaintiff had exhausted its $150,000 retention.  Under Defendant's duty of good faith

22   and fair dealing and Defendant's duty to investigate and put its insureds' interests on

23   the same level as its own interests, Defendant was obligated to respond to Plaintiffs'

24   April 12, 2001 letter.  Defendant cannot convincingly argue that Plaintiffs did not

25   submit a valid claim under the Policy terms when Defendant failed its duties to

26   Plaintiffs to act on Plaintiffs' claim.

27          Furthermore, the explicit language of the Policy itself required Combimatrix to

28   do no more than it did to notify Defendant of its claim.  The Policy required that the

22

1   "Company or the Insureds shall, as a condition precedent to the obligations of the
2   Insurer under this policy, give written notice to the Insurer of a Claim made against an
3   Insured as soon as practicable after the Named Corporation's risk manager or general
4   counsel first becomes aware of the claim ..." (TE, 4.16.) Here, Combimatrix's then-
5   general counsel did notify Defendant promptly of Nanogen's lawsuit against
6   Montgomery and Combimatrix. The Policy itself did not require Combimatrix to
7   provide Defendant with a second notice of exhaustion of the $150,000 retention.

8          F.     Breach of the No-Voluntary Settlement Clause
9          Finally, Defendant argues that Plaintiffs violated the No-Voluntary Settlement
10  Clause of the Policy, and therefore, Plaintiffs forfeited coverage under the Policy. The
11  Policy states:

12          The Insureds shall not admit or assume any liability, enter into any settlement
13          agreement, stipulate to any judgment, or incur any Defense Costs without the
14          prior written consent of the Insurer. Only those settlements, stipulated
15          judgments and Defense Costs which have been consented to by the Insurer shall
16          be recoverable as Loss under the terms of this policy.

17  (TE, 4.17.) Defendant claims that Plaintiffs' settlement of the Nanogen lawsuit
18  without notice to Defendant violates this provision of the Policy.

19          The Court, however, finds that the provision was unenforceable due to
20  "economic necessity, insurer breach, or other extraordinary circumstances."
21  *Jamestown Builders, Inc. v. General Star Indemnity Co.*, 77 Cal. App. 4th 341, 346,
22  91 Cal. Rptr. 514 (1999) (citations omitted). Here, the Court finds that Plaintiffs have
23  sufficiently established that the settlement was involuntary and in response to
24  Defendant's breach of its duties. After Plaintiffs unsuccessfully attempted to obtain
25  coverage for the Nanogen suit from Defendant, Plaintiffs faced economic ruin and were
26  forced to settle with Nanogen involuntarily.

27          Also, the settlement came only after Defendant's breach of its duties to
28  Combimatrix. Combimatrix initially notified Defendant of the suit in December 2000.

23

Then, Combimatrix received no reply to its request for reimbursement of legal costs in April 2001.  Between May 2001 and August 2002, no one was assigned by Defendant to work on Combimatrix's claim file, and Defendant did not attempt to communicate with Combimatrix.  These extraordinary circumstances show that Defendant was in breach of its duties to Combimatrix.

Therefore, the Court finds that the no-voluntary settlement clause is unenforceable against Plaintiffs in this case.

G.    Was the Settlement a Covered Loss?

Defendant additionally argues that the terms of the settlement cannot meet the definition of a covered "loss" under the Policy.  The Policy states:

"Loss" means damages, judgments (including any award of pre-judgment and post-judgment interest), settlements, Defense Costs ...; however, Loss shall not include civil or criminal fines or penalties imposed by law ...

(TE, 4.7.)  The exclusions section of the Policy further states:

The Insurer shall not be liable to make any payment for Loss in connection with a Claim made against an Insured:

(a) arising out of, based upon or attributable to the gaining in fact of any profit or advantage to which the Insured was not legally entitled ...

(TE, 4.12.)

"It is well established that one may not insure against the risk of being ordered to return money or property that has been wrongfully acquired." *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1266, 10 Cal. Rptr. 2d 538 (1992); *Level 3 Communications, Inc. v. Federal Ins. Co.*, 272 F.3d 908, 910 (7th Cir. 2001).

However, in this case, the Court determines that the settlement terms did provide for a "loss" to Plaintiffs.  Here, the settlement provided for a transfer of stocks and patent royalties.  Furthermore, the settlement did not arise as restitution for any wrong committed by Plaintiffs.  In the settlement agreement, Nanogen did not assign any rights nor grant any licenses to Combimatrix.  To the contrary, Nanogen

24

1  acknowledged that Combimatrix owned all rights, title and interest in the patents and

2  disputed technology.  (TE, 93.10.)

3  　　　　All the evidence presented in this case shows that Plaintiffs did not

4  misappropriate any confidential information from Defendant.  Instead, Plaintiffs claim

5  that they agreed to the settlement with Nanogen because they could not afford to

6  litigate the case despite their innocence.  Defendant has presented no evidence to show

7  that Plaintiffs actually did steal Nanogen's technology.

8  　　　　Plaintiffs' innocence in the underlying litigation distinguishes the present case

9  from Defendant's cited cases.  In *Level 3 Communications*, the Seventh Circuit agreed

10  "that a 'loss' within the meaning of an insurance contract does not include the

11  restoration of an ill-gotten gain - is clearly right."  *Level 3 Communications*, 272 F.3d

12  at 910.  However, in that case, the plaintiff "made no attempt to show that the fraud

13  suit was groundless and the settlement [entered into by it] merely an effort to avoid the

14  expense of defending a nuisance suit."  *Id.* at 911-12.  Similarly, in *Intex Plastics*

15  *Sales Co. v. United Nat. Ins. Co.*, 1992 WL 437984 (C.D. Cal. 1992), the district

16  court found that payment of patent royalties was not an insurable loss, but the district

17  court based this ruling on its other finding that, in an underlying action, a district court

18  ordered the plaintiff to pay a reasonable royalty based on a jury finding that the

19  infringer gained from the unauthorized use of a patent.  *Id.* at *1.

20  　　　　Thus, contrary to Defendant's argument, the Court finds that the settlement

21  terms did provide for a covered loss under the Policy.

22  　　　　H.　　Bad Faith Denial of Coverage

23  　　　　When an insurer engages in unreasonable conduct in connection with an

24  insured's claim, such as refusing to properly investigate a plaintiff's claim, the insurer

25  is said to have tortiously breached the implied covenant of good faith and fair dealing.

26  *Egan v. Mutual of Omaha Ins. Co.*, 24 Cal. 3d 809, 819, 169 Cal. Rptr. 691 (1979);

27  *Gruenberg v. Aetna Ins. Co.*, 9 Cal. 3d 566, 575, 108 Cal. Rptr. 480 (1973) ("[W]hen

28  an insurer unreasonably and in bad faith withholds payment of the claim of its insured,

1    it is subject to liability in tort.") To establish a bad faith claim, the insured must show

2    that (1) benefits due under the policy were withheld; and (2) the reason for withholding

3    the benefits was unreasonable or without proper cause." *Neal v. Farmers Ins.*

4    *Exchange*, 21 Cal. 3d 910, 920, 148 Cal. Rptr. 389 (1978).

5         In this case, Plaintiffs have shown that Defendant withheld benefits in bad faith.

6    As discussed above, Plaintiffs have shown that coverage benefits were due to them

7    under the Policy.  Furthermore, Plaintiffs have established that the withholding of the

8    benefits was unreasonable and done without proper cause.  The facts establishing the

9    unreasonableness of Defendant's actions bear repeating here.

10        Shortly after the commencement of the Nanogen lawsuit, Combimatrix provided

11   written notice of the claim to Defendant.  About two weeks later, on December 15,

12   2000, Defendant wrote a letter that acknowledged receipt of the claim and promised to

13   forward a "preliminary coverage evaluation to you in the near future."  However, the

14   author of the letter, Raymond F.Tiburzi, had already written in a December 13, 2000

15   email that the claim "does not appeared to be covered – 'theft of trade secrets' lawsuit

16   – by officer of Combimatrix."

17        Defendant assigned the claim file to Christine Cirillo on December 21, 2000.

18   Two months later, the claim file was reassigned to Christopher Butler.  The only

19   activity performed by Butler occurred on March 9, 2001, when he wrote to the insured:

20   "the purpose of this letter is to request additional information.  In addition, this letter

21   will advise you of certain provisions that may impact coverage in light of the

22   information provided."  This letter was the first communication by the Defendant to

23   Combimatrix, coming some 3 months after acknowledging notice of the claim.

24        Mr. de Maynadier received the Butler correspondence and responded to the

25   Defendant on the same day.  In a letter dated March 20, 2001, Combimatrix provided a

26   complete and detailed response to Defendant's request for additional information.  The

27   March 20th letter closed by stating, "If there are any questions or issues from your

28   perspective or that of our insurers, please let me know."  Defendant never responded.

1      Next, Mr. de Maynadier sent another letter to Mr. Butler on April 12, 2001.

2   The letter requested payment from Defendant for legal bills in the amount of $59,624.

3   The letter added: "In order to better serve your needs and avoid flooding you with

4   documentation, please let me know the type of information you would like to receive

5   as the case progresses." Defendant never responded.

6      Again, on May 14, 2001, de Maynadier wrote to the Defendant and provided an

7   update on the Nanogen lawsuit. He also wrote: "If there are any questions or issues

8   from your perspective or if you require any additional documents or information,

9   please let me know." Defendant did not respond.

10      In May of 2001, Mr. Butler was removed from the claims department and no

11   longer handled any files including Plaintiffs' claim file. In fact, from May of 2001 to

12   August of 2002, Defendant did not assign anyone to handle Plaintiffs' claim. For 15

13   months, Defendant did nothing on Plaintiff's claim file.

14      At last, on August 29, 2002, John Favilla assumed handling of the claim. Mr.

15   Favilla reviewed the entire claim file and noted that no activity occurred on the file

16   since May of 2001.

17      On January 17, 2003, Favilla spoke to someone at Combimatrix and discussed

18   coverage issues. Mr. Favilla told Combimatrix that the settlement was not covered

19   because the Policy did not cover patent or breach of contract cases. At trial, Favilla

20   conceded that the Policy did not contain any exclusions related to breach of contract

21   and patents. Favilla admitted that he gave the coverage opinions to the insured even

22   though he lacked sufficient information to determine whether any exclusions applied.

23      Finally, on May 5, 2003, the claim file was transferred to Robert Plunkett for

24   handling. Plunkett and Combimatrix engaged in numerous conversations. Plunkett

25   requested documents and Combimatrix timely complied with his requests. By Mid-

26   August of 2003, Plunkett had sufficient information to render a coverage opinion.

27   Plunkett reviewed all of the documents and wrote a denial of coverage letter.

28

1    On November 3, 2003, almost 3 years after receiving notice of the claim,

2    Plunkett wrote **a first** and final coverage letter to Combimatrix.  Plunkett approached

3    the review in a manner that revealed a steadfast determination to deny coverage.

4         Based on these facts, the Court determines that Defendant improperly and

5    unreasonably withheld benefits due to Plaintiff under the Policy.  Where a tort theory

6    of recovery is established, the insured is no longer limited to the limits of the Policy,

7    and instead, the insured's damages will be "the amount which will compensate for all

8    detriment proximately caused thereby, whether it could have been anticipated or not."

9    Cal. Civ. Code § 3333; *Crisci v. Security Ins. Co. of New Haven, Conn.*, 66 Cal. 2d

10   425, 433, 58 Cal. Rptr. 13 (1967).  Thus, Plaintiffs are entitled to recover the amount

11   of the settlement and defense costs, plus interest.  *See Oil Base, Inc. v. Transportation*

12   *Indem. Co.*, 148 Cal. App. 2d 490, 492 (1957) (finding that the insurer's "obligation to

13   reimburse [the insured] attached the moment [the insured] made the payment which

14   [the insurer] was obligated under its policy to make, and, the amount being certain,

15   interest commenced to run from that date"); *California Shoppers, Inc. v. Royal Global*

16   *Ins. Co.*, 175 Cal. App. 3d 1, 33 (1985) (affirming award of damages for breach of

17   duty to indemnify plus prejudgment interest).

18             1.    Calculation of Prejudgment Interest

19        Cal. Civ. Code § 3287(a) provides in part: "Ever person who is entitled to

20   recover damages certain, or capable of being made certain by calculation, and the right

21   to recover which is vested in him on a particular day, is entitled to recover interest

22   thereon from that day ..."  Cal. Civ. Code § 3287(a).  Here, the amount of damages is

23   certain because the amount of the Nanogen settlement and Plaintiffs' defense costs can

24   be certainly ascertained.  Therefore, the Court finds it appropriate to grant Plaintiffs'

25   request for an award of 10% prejudgment interest on its damages.  Cal. Civ. Proc.

26   Code §685.010(a); Cal. Const., art. XV, §1.

27        Thus, the Court finds that Plaintiffs are entitled to recover for all their

28   settlement and defense costs, plus prejudgement interest calculated from the date of

28

1  settlement payment.  The Court awards Plaintiffs $31,070, 981.62 plus $310,492.99

2  (present value of future royalty payments).

3        I.      Punitive Damages

4        The California Supreme Court has further stated that punitive damages may be

5  awarded upon a finding of a tortious breach of the implied covenant of good faith and

6  fair dealing, if the Court finds that the insurer acted with oppression, fraud or malice.

7  *Silberg v. California Life Ins. Co.*, 11 Cal. 3d 452, 462, 113 Cal. Rptr. 711 (1974).

8  Here, the Court finds no evidence of oppression, fraud, or malice, and thus, the Court

9  finds that punitive damages are unwarranted.

10  V.    CONCLUSION

11        For the foregoing reasons, the Court finds in favor of Plaintiffs.  The Court

12  awards Plaintiffs $31,070, 981.62 plus $310,492.99 (present value of future royalty

13  payments) to include the costs of the Nanogen settlement, Plaintiffs' defense costs, and

14  prejudgment interest.  Plaintiffs are ordered to prepare and file a Proposed

15  Judgment within 15 days from the entry of this Order.

16

17

18

19

20  DATE:  2/8/08

21                                            PHILIP S. GUTIERREZ
                                              United States District Judge

22

23

24

25

26

27

28